RECORD NOS. 17-4102(L), 17-4186, 17-4191, 17-4207

In The

# United States Court of Appeals

For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

v.

## VICTOR OYEWUMI OLOYEDE, BABATUNDE EMMANUEL POPOOLA, a/k/a Emmanuel Popoola, a/k/a Tunde Popoola, MOJISOLA TINUOLA POPOOLA, a/k/a Mojisola Oluwakemi Tin Popoola, a/k/a Moji T. Popoola, GBENGA BENSON OGUNDELE, a/k/a Benson Ogundele,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

———————————

## BRIEF OF APPELLANTS

———————————

Gerald C. Ruter
LAW OFFICES OF GERALD C. RUTER, P.C.
9411 Philadelphia Road, Suite O
Baltimore, Maryland  21237
(410) 238-8000

*Counsel for Appellant*

Richard A. Seligman
LAW OFFICE OF RICHARD SELIGMAN
1350 Connecticut Avenue, NW, Suite 202
Washington, DC  20036
(202) 745-7800

*Counsel for Appellant*

John O. Iweanoge, II
THE IWEANOGES' FIRM, PC
Iweanoge Law Center
1026 Monroe Street, NE
Washington, DC  20017
(202) 347-7026

*Counsel for Appellant*

Justin Eisele
SEDDIQ LAW FIRM
14452 Old Mill Road, Suite 201
Upper Marlboro, Maryland  20772
(301) 513-7832

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. viii

JOINT STATEMENT OF JURISDICTION ............................................1

STATEMENT OF ISSUES – BABATUNDE POPOOLA'S ...................2

STATEMENT OF ISSUES- GBENGA OGUNDELE ............................3

STATEMENT OF ISSUES – MOJISOLA POPOOLA ...........................4

STATEMENT OF ISSUES - VICTOR OLOYEDE'S ...........................4

STATEMENT OF THE CASE – COMBINED ......................................5

SUMMARY OF THE ARGUMENT - BABATUNDE POPOOLA.....................22

SUMMARY OF ARGUMENT – GBENGA OGUNDELE ...................24

SUMMARY OF ARGUMENT – MOJISOLA POPOOLA...................26

SUMMARY OF THE ARGUMENT – VICTOR OLOYEDE ...............29

LAW AND ARGUMENT – BABATONDE POPOOLA....................29

I.      The Evidence was Insufficient to Support Mr. Popoola's
        Conviction for Aggravated Identity Theft Under 18 U.S.C.
        § 1028A (Count Six). ..........................................................29

        A.      Standard of Review.................................................29

        B.      Argument ...............................................................30

II.   The Evidence Was Insufficient to Support Mr. Popoola's
      Conviction for Wire Fraud ..................................................... 35

      A.   Standard of Review .................................................... 35

      B.   Law and Argument ..................................................... 35

III.  The Evidence Was Insufficient to Support Mr. Popoola's
      Conviction for Money Laundering ........................................ 38

      A.   Standard of Review .................................................... 38

      B.   Law and Argument ..................................................... 38

IV.   The District Court Erred in Prohibiting Mr. Popoola from
      Presenting Evidence and Cross-Examining Government
      Witnesses on the Facts and Evidence Relating to his Defense
      theory ............................................................................... 44

      A.   Standard of Review .................................................... 44

      B.   Law and Argument ..................................................... 44

           1.   Appellant's Statement to the FBI at the Time of
                Arrest. ........................................................... 45

           2.   Investigation of Marcus ..................................... 47

           3.   Other Fraud Investigations Targeting Attorneys ........... 50

           4.   Misleading Evidence by the Government ................... 51

V.    The District Court Erred in Denying Appellant's Motion to
      Sever, Resulting in the Denial of Appellant's Fifth Amendment
      Right to Due Process Under the United States Constitution .............. 53

      A.   Standard of Review .................................................... 53

      B.   Law and Argument ..................................................... 54

VI.   The Sentenced Imposed on Mr. Popoola was Based on the Trial
      Court Incorrect Application of the Sentencing Guideline .................57

      Standard of Review ....................................................................57

      (a)   The District Court Erred in Calculating the Loss Amount
            Attributable to the Mr. Popoola for Sentencing Purposes. .......57

      (b)   District Court Erred in Sentencing Appellant as a
            Manager or Supervisor Pursuant to U.S.S.G. § 3B1.1(b),
            as the Appellant did not exercise the necessary control
            over any other individual involved in the Alleged
            Conspiracy. .............................................................59

      (c)   The District Court Erred in Enhancing the Appellant's
            Offense Level at Sentencing for Sophisticated Means. ............62

VII.  The District Court Erred in Denying Appellant's Motion for
      New Trial Rule 33, When the Evidence Was Insufficient to a
      Finding of Guilt Beyond A Reasonable Doubt. ................................65

      A.   Standard of Review ..................................................65

      B.   Law and Argument ..................................................65

VIII. The District Court Erred in Giving the Aiding and Abetting
      Instruction on the Aggravated Identity Theft Charged in Count
      6 of the Indictment. ...............................................................66

IX    The District Court Erred in Giving the Willful Blindness
      Instruction That Prejudiced Mr. Popoola. .........................................66

X.    The District Court Erred When it Prevented Appellants' From
      Introducing Exculpatory Statement That Were Part of the
      Inculpatory Statements introduced Into Evidence the
      Government in violation of the Rule of Completeness. .....................66

ARGUMENT – GBENGA OGUNDELE ........................................................ 67

I.     The District Court Erred in Admitting Charts under Rule 1006
       in Violation of the Rule and Appellants' Sixth Amendment
       Rights ................................................................................. 67

       Standard of Review ............................................................ 67

       Argument ........................................................................... 67

II.    The District Court Erred When It Instructed the Jury on the
       Elements of Aggravated Identity Theft and also Erred in Failing
       to Instruct the Jury that Prior Knowledge of the Use of Actual
       Person's Identity's was Required for Purposes of Culpability
       under an Aiding and Abetting Theory as to Aggravated Identity
       Theft. ................................................................................. 76

III.   The District Court Erred in Allowing the Government to
       Present Gbenga Ogundele's Statement in a Misleading Manner
       by Allowing the Government to Introduce the Inculpatory
       Portions While Denying Appellants the Ability to Introduce the
       Exculpatory Portions Through the Same Agent. ............................. 83

       Standard of Review ............................................................ 83

       Argument ........................................................................... 83

IV.    The District Court Procedurally Erred in its Calculation of Mr.
       Ogundele's Sentence by Applying a 16-level Enhancement to
       Mr. Ogundele's Sentence Based on the Amount of Loss ................... 90

       Standard of Review. ........................................................... 90

       Argument ........................................................................... 90

ARGUMENT – MOJISOLA POPOOLA.................................................92

I.    The District Court Committed Error When It Failed to Suppress
      Evidence Obtained by the FBI When Mojisola Popoola Was
      Asked to Enter Her Passcode onto Her iPhone Without Miranda
      Warnings and In Violation of the Fifth and Sixth Amendment
      Rights of Mojisola Popoola.................................................92

      Standard of Review .........................................................92

      Argument.......................................................................92

II.   The District Court Erred When it Instructed the Jury That They
      Could Consider Conscious Avoidance to Determine Mojisola
      Popoola's Knowledge of the Wire Fraud Conspiracy .......................99

      Standard of Review .........................................................99

      Argument.......................................................................99

III.  Defendant Mojisola Popoola Was Denied Her Sixth
      Amendment Right to Present Exculpatory Evidence by the Trial
      Court's Denial of Her Motion to Sever and Alternatively to
      Cross Examine Agent Custer on Co-Defendant Gbenga
      Ogundele's Custodial Statement Inculpating Himself and
      Exculpating Mojisola Popoola ...........................................105

      Standard of Review .......................................................105

      Argument.....................................................................105

      A.   The District Court Erred When it Denied Mojisola
           Popoola's Motion to Sever.......................................107

      B.   The District Court Erred When It Denied Mojisola
           Popoola the  Opportunity to Present Exculpatory
           Evidence Pursuant to FRE 804(b)(3) and FRE 807...............111

IV.   The District Court Erred When It Allowed the Government to Present FRE 404(b) Evidence to The Jury, Resulting in Prejudice to Mojisola Popoola. .........................................................115

     Standard of Review ........................................................................115

     Argument ........................................................................................115

ARGUMENT – VICTOR OLOYEDE ................................................................119

   I.   The District Court Erred When It Instructed the Jury That They Could Consider Conscious Avoidance To Determine Mr. Oloyede's Knowledge of the Wire Fraud and Money Laundering Conspiracies ................................................................119

     Standard of Review ........................................................................119

     Argument ........................................................................................119

   II.   The District Court Erred in Admitting Charts Under Rule 1006 in Violation of the Rule and Appellants' Sixth Amendment Rights .............................................................................................122

   III.  The District Court Erred Procedurally and Substantively in its Calculations of the Sentencing Guidelines and in its Sentencing of the Appellant .................................................................................122

     Standard of Review ........................................................................122

     Argument ........................................................................................122

     A.   District Courts Must Conduct an Individualized Assessment at Sentencing and Demonstrate On the Record That They Have Considered All Non-Frivolous Arguments in Favor of a Lower Sentence .............................124

     B.   The District Court Failed to Explain Why a Lower Term Would Not Satisfy the Sentencing Goals Under 18 U.S.C. § 3553(a) ....................................................................127

CONCLUSION ....................................................................................... 129

JOINT ORAL ARGUMENT REQUEST ........................................... 129

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arthur Anderson LLP V. United States*,
    544 U.S 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) .........................33

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153, 109 S. Ct. 439 (1988) ...........................................................87

*Board v. United States*,
    134 S. Ct. (2017)............................................................................................34

*Brady v. Maryland*,
    373 U.S. 83 (1963)...................................................................................48, 49

*Bruton v. U.S.*,
    391 U.S. 123 (1968).................................................................................54, 55

*Cuellar v. United States,*
    553 U.S. 550, 128 S. Ct. 1994, 170 L. Ed. 2d 942 (2008) .........................42

*Curcio v United States*,
    354 U.S. 118 (1957).....................................................................................97

*Delaware v. Van Ardsall*,
    475 U.S. 673 (1986).....................................................................................45

*Doe v United States*, ("Doe II"),
    487 U.S. 201 (1988).....................................................................................97

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009).....................................................................................78

*Gall v. United States*,
    552 U.S. 38 (2007).............................................................57, 122, 124, 125

*Giglio v. United States*,
    405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) ................................49

*Glasser v. United States*,
    315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942) ..................................35, 38

*Global-Tech Appliances  Inc. v SEB S.A*,
    —— U.S. ——, 131 S. Ct. 2060, 2070, 179 L. Ed.2 d 1167 (2011) ..........102

*Green v. Georgia*,
    442 U.S. 95 (1979)........................................................................................74

*Hamric v. Bailey*,
    386 F.2d 390 (4th Cir. 1967) ..................................................................49, 52

*Johnson v. United States*,
    135 S. Ct. 5221, 192 L. Ed. 2D 569 (2015)............................................33, 34

*Krulewitch v. United States*,
    336 U.S. 440 (1949)....................................................................................110

*McDonnell v. United States,*
    136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016)..................................................34

*Miranda v. Arizona*,
    384 U.S. 436 (1966)................................................................................94, 130

*Moran v. Burbine*,
    475 U.S. 412 (1986)......................................................................................94

*Napue v. Illinois*,
    360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2D 1217 (1959) ..............................49

*Old Chief v. United States*,
    519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997) .............................44

*Ornelas v. United States*,
    517 U.S. 690 (1996).......................................................................................92

*Rhode Island v. Innis*,
    446 U.S. 291 (1980)....................................................................95

*Rita v. United States*,
    551 U.S. 338 (2007)..................................................................124

*Rosemond v. United States,*
    134 S. Ct. 1240 (2014)...............................................25, 79, 80, 82

*Rosemond v. United States*,
    2013 U.S. LEXIS 4108 (U.S. 2013)................................. 129-130

*Skilling v. United States*,
    561 U.S. 358, 130 S. Ct 2896, 177 L. Ed. 2d 619 (2010). ..........................33

*Texas v. Washington*,
    388 U.S. 14 (1967)...............................................................73, 74

*United States Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1998) ...................................................86

*United States v. Adefehinti*,
    510 F.3d 319 (D.C. Cir. 2007).................................40, 41, 43, 44

*United States v. Adepoju*,
    756 F.3d 250 (4th Cir. 2014) ....................................................30

*United States v. Aguilar*,
    515 U.S. 593, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995) ..........................32

*United States v. Allen*,
    491 F.3d 178 (4th Cir. 2007) ............................................55, 107

*United States v. Aslan*,
    644 F.3d 526 (7th Cir. 2011) ..................................................123

*United States v. Bailey*,
    No. PWG-16-0246, 2017,
    U.S. Dist. LEXIS 80093 (D. Md. May 24, 2017) ................*passim*

*United States v. Black*,
 389 Fed. Appx. 256 (4th Cir. 2010) ...........................................125

*United States v. Blatney*,
 No. MC 2016-16,
 2017 WL 2422807 (A.F. Ct. Crim. App. May 22, 2017)............................98

*United States v. Bollin*,
 264 F.3d 391 (4th Cir. 2001). ....................................................35

*United States v. Booker*,
 543 U.S. 220 (2005)..............................................................90

*United States v. Brockingham*,
 849 F.2d 872 (4th Cir.1988) ....................................................118

*United States v. Bros. Const. Co. of Ohio*,
 219 F.3d 300 (4th Cir. 2000) ..................................................105

*United States v. Broughton*,
 689 F.3d 1260 (11th Cir. 2012) .................................................39

*United States v. Bucci*,
 525 F.3d 116 (1st Cir. 2008)....................................................86

*United States v. Burns*,
 162 F.3d 840 (5th Cir. 1998) ...................................................42

*United States v. Campbell*,
 977 F.2d 854 (4th Cir. 1992) ...................................................38

*United States v. Carter*,
 564 F.3d 325 (4th Cir. 2009) ..................................................126

*United States v. Catone*,
 769 F.3d 866 (4th Cir. N.C. 2014)...............................................91

*United States v. Chong Lam*,
 677 F.3d 190 (4th Cir. 2012) ...................................................65

*United States v. Chorman*,
    910 F.2d 102 (4th Cir. 1990). ........................................................39

*United States v. Cole*,
    525 F.3d 656 (2008) .............................................................19, 84

*United States v. Dargan*,
    738 F.3d 643 (4th Cir. 2013) .....................................................112

*United States v. Donaway*,
    447 F.2d 940 (9th Cir. 1971) ......................................................54

*United States v. Dornhofer*,
    859 F.2d 1195 (4th Cir. 1988) ...................................................101

*United States v. Edelmann*,
    458 F.3d 791 (8th Cir. 2006) ......................................................64

*United States v. Engle*,
    676 F.3d 405 (4th Cir. 2012). ......................................................30

*United States v. Gay*,
    466 Fed. Appx. 183 (4th Cir. 2012) ...........................................125

*United States v. Ghertler*,
    605 F.3d 1256 (11th Cir. 2010) ...................................................64

*United States v. Gitarts*,
    2009 WL 2705507 (4th Cir. 2009) ..............................................67

*United States v. Gonzalez-Villatoro*,
    417 Fed. Appx. 297 (4th Cir. 2011) ...........................................125

*United States v. Green*,
    599 F.3d 360 (4th Cir.2010), *cert. denied,*
    ⸺ U.S. ⸺, 131 S. Ct. 271, 178 L.Ed.2d 179 (2010) ..............................92

*United States v. Greene*,
    681 F. App'x 194 (4th Cir. 2017) .............................................. 29-30, 31, 34

*United States v. Grubbs*,
    585 F.3d 793 (4th Cir. 2009) .......................................................57

*United States v. Guevara*,
    277 F.3d 111 (2d Cir. 2001) ........................................................86

*United States v. Hardee*,
    396 Fed. Appx. 17 (4th Cir. 2010) ...........................................126

*United States v. Hargrove*,
    625 F.3d 170 (4th Cir. 2010) .......................................................90

*United States v. Harvey*,
    653 F.3d 388 (6th Cir. 2011) .......................................................86

*United States v. Hassan El*,
    5 F.3d 726 (4th Cir. 1993), *cert. denied*,
    128 L. Ed. 2d 50, 114 S. Ct. 1374 (1994)...................................83

*United States v. Hassan*,
    742 F.3d (4th Cir. 2014) ..............................................................86

*United States v. Heath*,
    559 F.3d 263 (4th Cir. 2009) .....................................................124

*United States v. Hubbell*,
    530 U.S. 27 (2000)................................................................96, 97

*United States v. Janati*,
    374 F.3d 263 (2004) ...............................................................70, 71

*United States v. Jinwright*,
    683 F.3d 471 (4th Cir. 2012) .............................................102, 103

*United States v. Johnson*,
    54 F.3d 1150 (4th Cir. 1995) .......................................................70

*United States v. Johnson*,
    587 F.3d 625 (4th Cir. 2009) .....................................................125

*United States v. Kelly*,
    35 F.3d 929 (4th Cir. 1994) ........................................................49

*United States v. Kirschner*,
    823 F. Supp. 665 (E.D. Mich. 2010) ..........................................97

*United States v. Kivanc*,
    714 F.3d 782 (4th Cir. 2013). ...................................................112

*United States v. Kontny*,
    238 F.3d 815 (7th Cir. 2001) ......................................................63

*United States v. LaFrance*,
    No. 91-5767, No. 91-5768,
    1992 U.S. App. LEXIS 13615 (4th Cir. June 9, 1992) ...............53

*United States v. Lancaster*,
    78 F.3d 888 (4th Cir. 1996) ........................................................45

*United States v. Leech*,
    409 Fed. Appx. 633 (4th Cir. 2011) .........................................125

*United States v. Lighty*,
    616 F.3d 321 (4th Cir. 2010). ....................................99, 102, 105

*United States v. Locklear*,
    24 F.3d 641 (4th Cir. 1994) ........................................................55

*United States v. Lynn*,
    592 F.3d 572 (4th Cir. 2010) ...............................122, 124, 125, 126

*United States v. MacDonald*,
    688 F.2d 224 (4th Cir.1982), *cert. denied*,
    459 U.S. 1103 (1983)................................................................105

*United States v. Macias*,
    786 F3d 1060 (7th Cir. 2015) ...................................................102

*United States v. Majors*,
    196 F.3d 1206 (11th Cir. 1999) ..................................................43

*United States v. Makalou,*
    517 F. App'x 155 (4th Cir. 2013). ..................................................65

*United States v. Mancuso,*
    42 F.3d 836 (4th Cir. 1994) .......................................................100

*United States v. Manigan,*
    592 F.3d 621 (4th Cir. 2010) .......................................................90

*United States v. McBride,*
    676 F.3d 385 (4th Cir. 2012) .....................................................115

*United States v. McLean,*
    715 F.3d 129 (4th Cir. 2013) .......................................................30

*United States v. Mehta,*
    594 F.3d 277 (4th Cir. 2010)..................................................35, 38

*United States v. Mendoza-Mendoza,*
    597 F.3d 212 (4th Cir. 2010). ...................................................122

*United States v. Mitchell,*
    1 F.3d 235 (4th Cir. 1993) .........................................................118

*United States v. Mitchell,*
    502 F.3d 931 (9th Cir. 2007) .......................................................86

*United States v. Mitchell,*
    76 M.J. 413 (C.A.A.F. 2017).......................................................95

*United States v. Moore,*
    709 F.3d 287, 2013 WL 765746 (4th Cir. 2013).........................65

*United States v. Nesbitt,*
    464 Fed. Appx. 89 (4th Cir. 2012) ...........................................125

*United States v. Olaniyi-Oke,*
    199 F.3d 767 (5th Cir. 1999) .......................................................41

*United States v. Paguio, Jr.,*
   114 F3d 928 (9th Cir. 1997) ..............................................................113, 114

*United States v. Parodi,*
   703 F.2d 768 (4th Cir. 1983). .....................................................76, 107, 108

*United States v. Pierce*,
   409 F.3d 228 (4th Cir. 2005). ........................................................................91

*United States v. Poulsen*,
   655 F.3d 492 (6th Cir. 2011) ......................................................................123

*United States v. Powell*,
   650 F.3d 388 (4th Cir. 2011) .............................................................124, 129

*United States v. Queen,*
   132 F.3d 99 (4th Cir. 1997) ........................................................................116

*United States v. Robinson*,
   389 F.3d 582 (6th Cir. 2004) ........................................................................67

*United States v. Ruhe*,
   191 F3d 376 (4th Cir. 1999) ......................................................................102

*United States v. Sampol*,
   636 F.2d 621 (1980) ....................................................................................110

*United States v. Sanchez-Robles*,
   927 F.2d 1070 (9th Cir. 1991) ....................................................................100

*United States v. Santoni*,
   585 F.2d 667 (4th Cir. 1978) ........................................................................53

*United States v. Schnabel*,
   939 F.2d 197 (4th Cir. 1991) ......................................................................101

*United States v. Shuford*,
   454 F.2d 772 (4th Cir. 1971) ......................................................................107

*United States v. Sigalow*,
    C.B. 995 (1943) ...................................................................80

*United States v. Slaughter*,
    891 F2d 691 (9th Cir. 1989) ...............................................114

*United States v. Smith*,
    526 F. App'x 256 (4th Cir. 2013). ........................................39

*United States v. Steed*,
    674 F.2d 284 (4th Cir. 1982) .........................................35, 38

*United States v. Sutton*,
    801 F.2d 1346, 255 U.S. App. D.C. 307 (D.C. Cir. 1986) ...........86

*United States v. Thayer*,
    204 F.3d 1352 (11th Cir. 2000) ...........................................43

*United States v. Thornton*,
    554 F.3d 443 (4th Cir. 2009) ..............................................90

*United States v. Torres-Aguirre*,
    481 Fed. Appx. 803 (4th Cir. 2012) ....................................125

*United States v. Weaver*,
    282 F.3d 302 (4th Cir. 2002) ..............................................44

*United States v. Weiss*,
    630 F.3d 1263 (10th Cir. 2010) ...........................................64

*United States v. Whittington*,
    858 F.3d 254 (4th Cir. 2017) ......................................116, 117

*United States v. Willey,*
    57 F.3d 1374 (5th Cir. 1995) .........................................42, 43

*United States v. Young*,
    561 F. App'x 85 (2d Cir. 2014) ...........................................82

*Yates v. United States*,
    135 S. Ct. 1074, 1088, 191 L. Ed. 2d 64 (2015) ...........................................33

*Zafiro v. United States,*
    506 U.S. 534 (1993).....................................................................55, 107, 110

**STATUTES**

18 U.S.C. § 28A(c)...........................................................................................31

18 U.S.C. § 924(c) ...........................................................................................79

18 U.S.C. § 924(e) ...........................................................................................34

18 U.S.C. § 1028 ...............................................................................................2

18 U.S.C. § 1028A ....................................................................................*passim*

18 U.S.C. § 1028A(a)(1) ............................................................................20, 78

18 U.S.C. § 1349 .....................................................................................1, 2, 5, 31

18 U.S.C. § 1503...............................................................................................33

18 U.S.C. § 1512...............................................................................................33

18 U.S.C. § 1519...............................................................................................33

18 U.S.C. § 1956...............................................................................................39

18 U.S.C. § 1956(a)(1)(B)(i).............................................................................40

18 U.S.C. § 1956(h) ...............................................................................1, 2, 5, 39

18 U.S.C. § 1957.......................................................................................39, 40

18 U.S.C. § 3231 ...............................................................................................1

18 U.S.C. § 3553...........................................................................................124

18 U.S.C. § 3553(a) ..................................................................*passim*

18 U.S.C. § 3742 .................................................................................2

18 U.S.C.S. § 2.....................................................................79, 80, 83

18 U.S.C.S. § 924(c) ........................................................................79

28 U.S.C. § 1291 ...............................................................................2

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. V ......................................................*passim*

U.S. CONST. amend. VI......................................................*passim*

U.S. CONST. amend. XIV ...............................................................74

## RULES

Fed. R. App. P. 4 ...............................................................................2

Fed. R. Crim. P. 14(a) ...................................................................54

Fed. R. Crim. P. 33.........................................................................65

Fed. R. Crim. P. 33(a) ...................................................................65

Fed. R. Evid. 404(b)........................................................4, 115, 116, 118

Fed. R. Evid. 611(a) .......................................................................70

Fed. R. Evid. 701 ............................................................................75

Fed. R. Evid. 804(a)(1) ...............................................................111

Fed. R. Evid. 804(b)(3) ............................................................*passim*

Fed. R. Evid. 807 ........................................................................106, 107, 111, 112

Fed. R. Evid. 1006 ...........................................................................................*passim*

## GUIDELINES

U.S.S.G. § 2B1.1 cmt. n.8(B) ...........................................................................63

U.S.S.G. § 2B1.1(a) ...........................................................................................25

U.S.S.G. § 2B1.1(b) ...........................................................................................91

U.S.S.G. § 2B1.1(b)(9)(C) (2010) ...................................................................63

U.S.S.G. § 2B1.1(b)(10) .....................................................................................63

U.S.S.G. § 3B1.1 ..........................................................................................*passim*

U.S.S.G. § 3B1.1(a) ...........................................................................................59

U.S.S.G. § 3B1.1(b) ...........................................................................................59

## OTHER AUTHORITIES

1 F. Wharton, Criminal Law § 251 (11th ed. 1912) .............................................80

Charles Alan Wright & Kenneth W. Graham, Jr.,
*Federal Practice and Procedure: Evidence* § 5077.2 (2d ed. 2005).......................88

Charles Alan Wright & Victor James Gold,
*Federal Practice and Procedure* § 8043 (1st ed. 2000) .........................................70

*John Henry Wigmore*, Code of Evidence 371 (3d ed. 1941)..................................85

*Weinstein's Federal Evidence* § 611.02[2][a][vii]
(Joseph M. McLaughlin ed., 2d ed. 2003). ...........................................................70

## JOINT STATEMENT OF JURISDICTION

The basis for subject matter jurisdiction in the District Court is 18 U.S.C. § 3231, which states in pertinent part that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." On May 15, 2015, Appellants were indicted, along with others, in a Ten Count Indictment with the following: Conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; Conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); aggravated identity theft, in violation of 18 U.S.C. § 1028A. The offenses took place between January 2011 and May 18, 2015. Appellant Mojisola Popoola was not charged with Aggravated Identity Theft.

These charges constituted offenses against the United States, and, therefore, the United States District Court for the District of Maryland had jurisdiction pursuant to 18 U.S.C. § 3231.

A jury found all Appellants guilty on all counts in which they were named on November 18, 2016.

On February 16, 2017, the district court sentenced Victor Oloyede. He filed a timely Notice of Appeal on February 17, 2017.

On March 22, 2017, the district court sentenced Gbenga Ogundele and Mojisola Popoola. Ogundele filed his timely Notice of Appeal on April 3, 2017. Mojisola filed her timely Notice of Appeal on April 2, 2017.

On March 20, 2017, the district court sentenced Babatunde Popoola. He filed a timely Notice of Appeal on March 23, 2017.

This is an appeal taken from the trial and sentencing. Jurisdiction is conferred upon the United States Court of Appeals for the Fourth Circuit by 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

Federal Rule of Appellate Procedure 4 characterizes a criminal appeal as an "[a]ppeal as of [r]ight" and states that a defendant shall file notice of appeal within 14 days after the entry of (i) the judgment or order appealed from or (ii) a notice of appeal by the government.

### STATEMENT OF ISSUES – BABATUNDE POPOOLA'S

I.    Whether the evidence was sufficient to find Mr. Popoola guilty of aggravated identity theft in violation of 18 U.S.C. § 1028 acgarged in count 6 of the indictment, where his sister consented to the use of her bank of America account.

II.   Whether the evidence was sufficient to find babtunde popoola guilty of wire fraud in violation of 18 U.S.C. § 1349.

III.  Whether the evidence was sufficient to find Babtunde Bopoola guilty of money laundering in violation of 18 U.S.C. § 1956(h).

IV.    Whether the court erred in prohibiting Mr. Popoola from introducing evidence and cross-examining government witnesses on various issues relating to the defendant's theory of the case, which was extremely prejudicial.

V.    Whether the district court erred in denying appellant's motion to sever, resulting in the denial of appellant's fifth amendment right to due process under the united states constitution.

VI.    Whether the court erred in predicating mr. Popoola's sentence on erroneous loss amount and inappropriate enhancements that resulted in the sentence of 120 months incarceration

VII.    whether the trial court erred in denying mr. Popoola's motion for new trial.

VIII.    whether the trial court erred in giving the aiding and abeting instruction on the aggravated identity theft charged in count 6 of the indictment.

IX.    whether the trial court erred in giving the willful blindness instruction that prejudiced mr. Popoola.

X.    whether the court erred when it prevented appellants' from introducing exculpatory statement that were part of the inculpatory statement introduced by the government in violation of the rule of completeness.

## STATEMENT OF ISSUES- GBENGA OGUNDELE

I.    The District Court Erred in Admitting Charts under Rule 1006 in Violation of the Rule and Appellants' Sixth Amendment Rights.

II.    The District Court Erred When It Instructed the Jury on the Elements of Aggravated Identity Theft and also Erred in Failing to Instruct the Jury that Prior Knowledge of the Use of Actual Person's Identity's was Required for Purposes of Culpability under an Aiding and Abetting Theory as to Aggravated Identity Theft.

III.    The District Court Erred in Allowing the Government to Present Gbenga Ogundele's Statement in a Misleading Manner by Allowing the Government to Introduce the Inculpatory Portions While Denying Appellants the Ability to Introduce the Exculpatory Portions Through the Same Agent.

IV.   The District Court Procedurally Erred in its Calculation of Mr. Ogundele's Sentence by Applying a 16-level Enhancement to Mr. Ogundele's Sentence Based on the Amount of Loss.

## STATEMENT OF ISSUES – MOJISOLA POPOOLA

I.   Whether Ms. Popoola made a custodial statement in violation of her Fifth and Sixth Amendment Rights when she complied with an FBI agent's request without Maranda warnings to identify her iPhone and enter her passcode, thereby requiring suppression of its contents?

II.   Whether there was a sufficient evidentiary predicate for the Willful Blindness/Conscious Avoidance Instruction and did the instruction undermine the burden of proof regarding the essential elements of knowledge and intent?

III.   Whether the court abused its discretion when it denied Ms. Popoola's ability to present her co-defendant's exculpatory statement through severance or alternatively through its admission as a statement against penal interest FRE 804(b)(3).

IV.   Whether the prejudice outweighed probative value of admitting FRE 404(b) evidence of alleged instances of fraud in reporting her income when there was no evidence offered that the income was Ms. Popoola's verses her husband who filed separately for himself and his automobile business?

## STATEMENT OF ISSUES - VICTOR OLOYEDE'S

I.   Whether there was a sufficient evidentiary predicate for the Willful Blindness Instruction and did the instruction undermine the burden of proof regarding the essential elements of knowledge and intent?

II.   Whether the District Court erred in admitting Chart Evidence under Rule 1006 in violation of the Rule and Appellants' Sixth Amendment rights?

III.   Whether the District Court erred procedurally or substantively in its calculations of the sentencing guidelines and in its sentencing of the Appellants?

4

A.    District Courts Must Conduct an Individualized Assessment at Sentencing and Demonstrate On the Record That They Have Considered All Non-Frivolous Arguments in Favor of a Lower Sentence.

B.    The District Court Failed to Explain Why a Lower Term Would Not Satisfy the Sentencing Goals Under 18 U.S.C. § 3553(a).

## STATEMENT OF THE CASE – COMBINED

**Basis of the Conspiracy**

On May 18, 2015, the Appellants were indicted, along with others, and charged with Conspiracy to Commit Wire Fraud 18 U.S.C. § 1349 and Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h). (Indictment, J.A. 114-139). Ogundele, Babatunde Popoola, and Oloyede also faced charges of Aggravated Identity Theft in violation of 18 U.S.C. § 1028A. *Id.*

The indictment alleged, inter alia, that the defendants and co-conspirators conspired to commit fraud by initiating romantic relationships with elderly female and male victims though online dating websites for the purpose of obtaining money from them by making up false stories about financial need to convince unidentified victims (A –Q) to deposit money though wire transfers into bank accounts referred to as "drop accounts". There are 21 overt acts in furtherance of the conspiracy to commit fraud alleged. See¶ 40 a-u. The conspirators allegedly used the money to purchase used automobiles to export to Nigeria.

5

The government put forward testimony of multiple victims who testified that they gave money to persons over the internet after developing relationships with them. J.A.. The victims met these scammers through various dating websites. (J.A. 824).

Generally, the theory of defense for Mojisola Popoola is that she believed she was assisting Mr. Ogundele with his car business and that she had no knowledge of the identity of customers or source of funds for purchasing the cars in the automobile export business by her husband, her brother Mukhtar Haruna, or any of the other co-defendants.

Mr. Popoola and Mr. Oloyede placed the blame toward Mr. Ogundele and Mr. Haruna arguing that they were the ones who had knowledge of the conspiracy while all along they believed they were part of a legitimate business.

Mr. Ogundele argued that he too was innocent, and that he was convinced by his brother-in-law, Haruna, to get involved in this scam while he had believed he was in a legitimate car business.

**Relevant Facts for Individual Appellants.**

*M. Popoola.*

With respect to Count One, the wire fraud conspiracy, only one overt act was alleged naming Ms. Popoola: "On or about July 8, 2014, a co-conspirator who identified himself as 'Jeremiah Reeds' caused Victim A to Deposit $5,000 at a

Bank of America branch into BOA x5641 controlled by M. Popoola." See Overt

Act ¶40 a. Count Two, the Money Laundering Conspiracy, alleges 13 overt acts of

which only one is Mojisola Popoola is alleged to have committed. "On or about

February 19, 2014, after receiving a cash deposit of $9,500 from Victim M, M

Popoola wrote a check for $9,500 payable to 'G.O. Benson LLC' drawn on

account BOA x5641, which was deposited to account WF x4126, controlled by

Ogundele." See ¶ 7 f.  (Indictment, J.A. 114-140). The defendants allegedly used

the money to purchase used automobiles to export to Nigeria.

The government's case against Ms. Popoola consisted of the presentation of

evidence with respect to two identified victims of the romance fraud, Debra Bitner,

(Victim M) in the amount $9500 and Ruth Martin (Victim A), in the amount of

$5,000.00. Ms. Bitner did not testify at trial but email correspondence between Ms.

Bitner and an unidentified and unindicted co-conspirator was introduced in which

Ms. Bitner was directed to deposit $9,500 in to Mojisola Popoola's BOA bank

account and then send a copy of the deposit slip to him by email. The scammer

then sent an email with the attached deposit slip to Ms. Popoola's half-brother

identified as indicted co-conspirator Mukhtar Haruna, who in turn sent the email

with attachment to Ms. Popoola's husband, co-conspirator Gbenga Ogundele. The

government also introduced a text message from Ms. Popoola's husband obtained

from Ms. Popoola's iPhone telling her to expect a deposit of $9,500 and to write

him a check to his automobile business. Also introduced were supporting copies of

Ms. Popoola's BOA bank records. (J.A. 1689-1670; Govt. Exhibit BOA7n, J.A.

4192-4199). The defense in cross examination, introduced email correspondence

between Ms. Bitner and the scammer, suggesting that the source of the $9,500 was

not from her own funds arising from the alleged romance fraud but from a federal

tax fraud scam that he conned her into assisting him with despite her suspicion that

it was illegal. (J.A. 2368-2378; Defense Exhibits 2&3, J.A. 4108-4109).

Ruth Martin testified that she was a victim of a romance fraud and had

deposited $5,000.00 at the direction of a scammer (AKA Jerimiah Reed) into Ms.

Popoola's BOA account.  She identified chain of emails and an attached deposit

slip between the scammer and co-defendants Haruna and Ogundele. (J.A. 1170-

1199). On Cross examination Ms. Martin acknowledged that she never had contact

with Ms. Popoola. That she had made 5 or 6 deposits at Mr. Reed's direction to

other accounts and did so even after she was told by a bank teller she was a victim

of a scam. Like Ms. Bitner she confronted Mr. Reed, but she was nevertheless

manipulated by him to continue giving him money. She agreed he was a master

manipulator and he could easily lie to the person who was receiving the money that

it came from a legitimate source. (J.A. 1199-1210). Ms. Popoola's BOA account

records reflecting the $5,000.00 deposit were also introduced into evidence along

with a check to her husband's business for the same amount.  (J.A. 1191-1192;

8

Gov't Exhibit BOA7x, J.A. 4200-4201). The government introduced a chart of Ms. Popoola's BOA Account # 5641 bank records reflecting numerous cash deposits between 2011 and 2014, which included two deposits from these two identified alleged victims in 2014. (Govt. Exhibit Chart 8, J.A. 4209).

The government's evidence included text messages about Ms. Popoola using her account for her husband's business deposits and when she asked him why his account was shut down, he told her not to worry about it. (Govt. Exhibit Phone 3e, J.A. 4223).

Ms. Popoola presented evidence from two witnesses showing innocent explanations for cash deposits reflected in her bank account. Mr. Olayinka Agbayewa testified he asked Ms. Popoola if her husband, who was known to travel frequently to Nigeria, could transfer $5000 to his sick mother in Nigeria. (J.A. 3254-3259). Another Nigerian friend and church member, Mojisola Ayo, testified she was part of a small group of people who contribute $200 cash to a joint savings account held by Ms. Popoola called a "Susu" and rotate every few weeks in making a withdrawal of the group's combined deposit. (J.A. 3491-3500). This was offered to rebut adverse inferences the jury might draw from a Government Exhibit Phone 3e (J.A. 4228) of a text message of from Ms. Popoola advising members of the "Susu" to not deposit money into her BOA bank account after it was shut down.

9

*Babatunde Popoola.*

On May 18, 2015, Mr. Popoola, along with nine codefendants, was charged in a ten-count indictment in the United States District, District of Maryland, Case No. 8:15-cr-00277-PWG-5. The indictment alleged that the offense spanned the period between J.A.nuary 2011 and May 18, 2015, in the District of Maryland and elsewhere. J.A. 114.

Mr. Popoola testified that his half-brother, Mukhtar D. Haruna, contacted him about a legitimate business opportunity involving currency exchanges between Nigeria and the United States, since Mr. Haruna already had a storefront in Nigeria operating the business. J.A. 3263-3290; J.A. 3449. Mr. Popoola was led to believe that individuals would deposit currency in the account associated with Appellant for purpose of currency exchange and for individuals indebted to Mr. Haruna for his other businesses. Mr. Popoola believed that the monies deposited into his accounts were at the direction of Mr. Haruna and Mr. Popoola was simply providing an account in the United States. Based on testimony, upon deposit of the funds Mr. Popoola would exchange the currency into Naira and transfer the proceeds to an account controlled by Mr. Haruna and Mr. Popoola would receive a commission on the transaction. At trial, Mr. Popoola provided a detailed response to the monies deposited into his bank account. Appellant noted specific transactions were related to automobile sales, some transactions involved wages

10

from his employment, and other transactions involved transfers of U.S. currency to Naira that was ultimately transferred to Mr. Haruna.

At no point during trial was there any evidence presented that Mr. Popoola communicated with the other defendants involved with the individuals identified as victims. J.A. 3263-3290; J.A. 3449-3553.

The Government's evidence against Mr. Popoola is limited to the following: (1) in 2012 Mr. Popoola received $10,000.00 from defendant, Victor Oloyede, who had just received a $20,000.00 payment from an alleged victim; and (2) Mr. Haruna directed, Victor Oloyede, to send $10,000.00 to Mr. Popoola for transfer to Nigeria in the Nigerian currency ("Naira"). Mr. Popoola testified that Mr. Oloyede wanted to transfer the $10,000.00 only to a Bank of America account, but since Mr. Popoola did not have a Bank of America account, Mr. Popoola obtained the consent of his sister to use her bank account for the transaction. Mr. Oloyede transferred the $10,000.00 to the Bank of America account and Mr. Haruna was given the Naira equivalent of the money in Nigeria.

In 2014, two deposits were made by an alleged victim, in the amounts of $19,000.00 and $15,000.00, into an account in the name of Adeyinka Awolaja. Based on the Government's evidence, Mr. Popoola received funds from Mr. Awolaja for the purchase of automobile at the direction of Adeniyi Marcus. The other specific evidence against Mr. Popoola was that in 2014, Mr. Popoola

11

received a check from Olusola Olla in the amount of $27,855.00 which Mr. Olla allegedly received from a victim. However, the testimonies and evidence showed that the check was paid to Mr. Popoola for the purchase of vehicles as is evident from the 'reason' identified in the check's notation was 'cars.'

Other than these specific transactions, there was no evidence presented against Appellant for the charges against him. There was no evidence of communication or interactions between Mr. Popoola and the alleged leader of the conspiracy, Gbenga Benson Ogundele.

*V. Oloyede*

Mr. Oloyede was born and raised in Nigeria. At the time of trial he was 42 years of age and had been in the United States since 1970 via the United States lottery system. J.A. 3081. He settled in Maryland. He worked at various jobs. In 2006 he worked for a car business called ADE Motors as a salesman, his duties included attending auctions where cars can be bought for personal use or resale. J.A. 3084. In 2007, he joined Discount Motors essentially in the same capacity. He testified that he would buy, fix up and then resell vehicles in that capacity. Some of these vehicles he sent to Nigeria. J.A. 3088. In 2009, Mr. Oloyede opened EAV Group and it remained in business until 2012. He closed that business and opened Crown Global immediately after he closed EAV Group. Documents consistent with a demonstration that it was a legitimate business were introduced,

12

including licensure for being able to be an automobile wholesaler.  J.A. 3092.  Mr.

Oloyede also testified he knew the Appellant Ogundele and had purchased a car

directly from him in years prior and he was invited by Mr. Ogundele to learn the

car business from him.  J.A. 3095.  He began actually shipping cars to Nigeria in

2008 through Desire Limited after he would purchase a car for a customer who

wanted the car shipped.  He explained that the customers would place money into

his bank account for payment of the car and his fees.  Mr. Ogundele was one of

those customers.  J.A. 3104.  A composition book was introduced through Mr.

Oloyede that showed his purchase of vehicles for customers and their export out of

the country. J.A. 3100-3101.  Starting in 2012, Mr. Oloyede testified the amount of

money coming into his bank accounts greatly increased.  He stated this money was

coming from a "Mr. Mukhtray" from Nigeria. J.A. 3108.  Mukktray is Mr.

Ogundele's brother-in-law.  (Mukktray is Mukhtar Danjuma Haruna, a co-

defendant in this case but was not prosecuted with the Appellants in this case).  Mr.

Oloyede had first met him in 2010 when he married in 2010 in Nigeria and

Mukhtar was present.  J.A. 3109.  The Appellant explained in 2012, he spoke with

Mukhtar and Ogundele about selling cars for Mukhtar in Nigeria and in so doing it

would assist in the transfer of Nigerian Naira into U.S. dollars when the money

was wired from a Nigerian bank into an American bank.  J.A. 3108, 3111.  Mr.

Oloyede had been purchasing cars for export to Mr. Ogundele and he had some of

13

his own clients as well. When Mukhtar got involved he was seeing much more money coming into his accounts and he believed this was for car customers Mukhtar had for whom Mr. Oloyede was to purchase cars. The money transferred from Mukhtar represented the cost of the car plus Mr. Oloyede's fees and costs. J.A. 3111. When Mukhtar became involved with depositing money into his account, Mr. Oloyede knew most of the money being deposited was not car sales related. He did not know what it was associated with but he did not like it and told (Mukhtar) "to stop sending me money." J.A. 3113, 3165-3166. He also told Mr. Ogundele to assist him in having the unexplained deposits stopped. J.A. 3114. He testified he had no idea of the "scam" that was presented by the government witnesses who were victims of the underlying wire fraud outlined in the indictment. J.A. 3114. The Appellant testified as to his car business transactions and introduced further documentation proving the legitimacy of this activity. J.A. 3120-3127. Mr. Oloyede testified that his "relationship" with Mukhtar ended in October of 2012, after he had closed his Bank of America account and after having spoken with two representatives of the bank who advised him "what was going on in my account." J.A. 3171. After having spoken with the bank personnel, the Appellant Oloyede spoke again with Mukhtar as well as Mr. Ogundele and verbally sparred with both of them about how and why his account had been closed by the bank. Mukhtar continued to claim any money he had placed in Mr.

14

Oloyede's bank account was "good money".  J.A. 3172.  He said he neither spoke

or dealt with Mukhtar again but did have further contact and conducted further

business with Mr. Ogundele into 2013. J.A. 3173.  Mr. Poopola also sold cars that

were shipped by Mr. Oloyede.  He saw Mr. Popoola at auctions and knew his

involvement in the car business was only one of several jobs in which he was

engaged.  J.A. 3181-3182.  Concerning a $20,000 deposit into Mr. Oloyede's bank

account in March of 2012 that come from Mukhar, Mr. Oloyede testified that

Mukhtar asked him to deposit $10,000 to Mr. Poopola's sister's account (not the

co-defendant sister, Mojisola Popoola) for what he believed was a transaction

concerning the sale of a car.  J.A. 3183-3185.  Further cross examination of Mr.

Oloyede made it clear he also purchased a large number of cars for a company

known as Reliable Motors and FAV Nigeria, Limited as well as the others already

set forth above.  J.A 3189.  Notwithstanding the large number of car sales over a

period of several years, Mr. Oloyede testified that only a dozen or so were

purchased for any of the co-defendants in this indictment.  J.A. 3203-3204.

A Pre-Sentence report was prepared, objections were noted and sentencing

occurred on February 14, 2017.  The objections noted by Appellant's counsel were

argued at the sentencing hearing and some of the objections were granted, some

denied.  Some of those denied will be addressed in this Appeal.  The Court

sentenced the Appellant to a period of incarceration of 168 months as to Count

15

One and 42 months consecutive as to Count Two; 24 months consecutive to

Counts One and Two as to Count Four; and 24 months concurrent to all other

counts as to Count Six for a total sentence of 234 months.  Restitution was ordered

in the total amount of $1,641,959.74.

A timely appeal was noted on February 17, 2017.

**Motions.**

*Mojisola Popoola.*

The government executed an arrest warrant and a search warrant of Ms.

Popoola's home on September 30, 2015.  Ms. Popoola was not provided her

Miranda rights at any time during the search or upon being questioned by the

federal agents. (Motions Hearing, J.A. 259).  An FBI agent asked Ms. Popoola

where her cell phone was; she told the agent where it was.  (Mot. Hr., J.A. 256,

265-266). The same FBI agent asked her to enter her password into her cell phone,

which she did, thereby giving them access to her text messages and other data used

against her at trial. (Mot. Hr., J.A. 248-249, 259).

During the same search, FBI agents interviewed Ms. Popoola's husband, Mr.

Ogundele and he made a statement to the FBI agent which was exculpatory of Ms.

Popoola.  He told the FBI agent that after his bank account was shut down Ms.

Popoola accepted deposits into her account at his direction, but that she did not

know anything about his business and that no one contacts her to deal with the

business.  (Govt. Motion, J.A. 141-149). Ms. Popoola filed a pre-trial Motion to Sever her case from that of her husband in order to call him as a witness (J.A. 160-173) and a Motion to Suppress Statements (her passcode to her IPhone) and the physical evidence that was a fruit of the illegally obtained statement (J.A. 174-183).   The Motion to Sever was denied (Mot. Hr., J.A. 369, 386-387) and the Motion to Suppress Statements and Physical Evidence was denied at a pre-trial motions hearing. (Mot. Hr., J.A. 294-295).

The government filed a Motion in Limine seeking to prevent the defendant from cross examining the FBI agents regarding the exculpatory statements made by Gbenga Ogundele to law enforcement officers. (J.A. 465-468).  Ms. Popoola filed her opposition to this motion. (J.A. 487-491).  The government's motion was granted. (J.A. 561-562).

Ms. Popoola filed a motion in opposition to the government's Motion in Limine to seek a ruling on the admission of Bankruptcy documents in light of Rule 404(b) (J.A. 492-493). (Govt. Exhibit Mojisola 1, J.A. 4213-4216).  At a pre-trial hearing the court also ruled on the admissibility of an application for welfare assistance (Govt. Exhibit B4, J.A. 4178-4189) and an application for a time share (Govt. Exhibit Mojisola 2, J.A. 4217-4220). The court admitted the documents over objection. (J.A. 585-589).

17

*Babatunde Popoola.*

Prior to trial, Mr. Popoola's trial counsel filed motions to sever the trial and subsequently supplemented the motion. J.A. 184-187; 221-222. A hearing was held on September 22, 2016 and the motion was denied. J.A. 387-406. Additionally, a motion to admit co-defendants statement filed by Appellant was held on October 21, 2016 and was denied. J.A. 479-486, 542-547, 556-563.

*Gbenga Ogundele*

Prior to, and during the trial Ogundele and his codefendants objected to the introduction of various charts to be submitted pursuant to Fed. R. Evid. 1006. J.A. 1739. Defendants objected on the grounds of 1006 and the Sixth Amendment and that the admission of the charts was unfairly prejudicial. *Id*. The government proffered as to how the evidence was gathered. Id. Testimony was then taken on November 3, 2016 regarding the creation of the charts. J.A. 1997.

The agent testified that, "I didn't include all of the wires. I only included wires that had names that were included on a victim list that was provided by the case agent." Id. at 192. Defense objected, and the trial court sustained the objection and granted the motion to strike. After testimony, defense counsel filed a renewed motion to strike arguing prejudice again and that the agent's testimony controverted the government's original proffer as to the 1006 summaries. J.A. Doc

329. The following morning the trial court took up this motion and denied it. J.A.

11/14/16 pg 18-21.

**Rule of Completeness.**

Prior to trial, the government moved to exclude mention of any exculpatory

portions of Gbenga Ogundele's statement to the agents. (J.A. 465-468). Parts of

Ogundele's statements were exculpatory to both Babatunde and Mojisola Popoola.

Mr. Ogundele also made statements about his own innocent involvement in the car

business that the government sought to exclude. Defense counsel, argued various

reasons as to why the statement should be presented in total. Mojisola Popoola

filed a written opposition. (J.A. 487-491). Citing the factors in *United States v.*

*Cole*, the court granted the governments motion. (10/21/16 Tr. 41-42) 525 F.3d

656 (2008).

**Jury Instructions.**

Ogundele, along with the other defendants, submitted objections to the

government's proposed jury instructions. (J.A. 503-514).

Ms. Popoola objected to the government's proposed Willful Blindness

instruction (aka "Conscious Avoidance, Deliberately Closing Eyes") be given to

the jury. *Id.* Over defense objection, the trial court gave a modified instruction to the jury. See (J.A. 3679-3680) (Court Exhibit 2, SJ.A. 2-6) [1]

Mr. Ogundele, also as part of J.A. 503 jointly with others facing the 1028A charge, objected to the submitted elements instruction for Aggravated Identity Theft. They also objected and argued that an instruction should not have been given for Aiding and Abetting on the Aggravated Identity Theft. (J.A. 503). The court overruled these two objections and embedded the objections, and rulings, into the final jury instructions. (ECF Court Exhibit 360-2, 53-57).

Mr. Popoola prior to trial on October 18, 2016, filed timely objections to the Governments proposed jury instructions, joining other defendants including but not limited to Instruction No.: 37 on aiding and abetting in relation to the charged violation of 18 U.S.C. § 1028A(a)(1). J.A. 515-520, 503-514. The Court overruled Mr. Popoola's objections to jury instructions.

**Verdict and Motion for New Trial.**

On November 18, 2016, the jury returned a verdict finding the Appellants guilty on all charges. (J.A. 4253-4256).

Following a motion for new trial filed on December 1, 2016 and a hearing held on February 22, 2017, the Court denied the motion for new trial and the relevant exhibits were filed under seal. J.A. 4388-4463.

---

[1] Final Jury Instructions with commentary, Court Exhibit 2, SJA 2-6, was mistakenly omitted from the Joint Appendix.

**Sentencing.**

On February 16, 2017, Victor Oloyede was sentenced to a term of 168 months as to Count One, 42 months on Count Two to run consecutively to Count One, 24 months as to Count 4 to run consecutive to Counts One and Two, 24 months as to Count 6 to run concurrently to Count Four. This resulted in a total sentence of 234 months. The court ordered $1,641,959.74 in restitution. He timely filed a Notice of Appeal on February 17, 2017.

On March 22, 2017, both Ms. Popoola and Mr. Ogundele were sentenced. Mr. Ogundele was sentenced to a term of 210 months incarceration under Counts One and Two and 24 months incarceration under Count Three to be served consecutively for a total term of 236 months incarceration. On August 25, 2017, restitution was ordered in the amount of $2,141, 123.95. On March 30, 2017, the District Court entered final judgment in Appellant's case. Appellant filed a Notice of Appeal on April 3, 2017.

Ms. Popoola was sentenced to a term of imprisonment of 18 months on Count One and a term of imprisonment of 18 months on Count Two, to run concurrently with Count One. The Court imposed a term of supervised release of 3 years on Count One to run concurrently with Count Two, with home detention for a period of 3 years and restitution in the amount of $34,100.00. Special assessment

of $200.00. (Judgment, J.A. 4751-4756). Ms. Popoola timely filed her Notice of Appeal on April 2, 2017. (J.A. 4760).

On March 20, 2017, Mr. Popoola was sentenced to a term of 120 months incarceration under Counts One and Two and 24 months incarceration under Count Six to be served consecutively for a total term of 144 months incarceration. J.A. 4549. At sentencing, Mr. Popoola's loss amount was determined based on Chart 13 to be more than $250,000.00 but less than $550,000.00. J.A. 4665-4667, 4689-4690. In addition, the court added four points because of the number of victims; two points because substantial part of the fraud occurred outside of the United States; two points because there was a money laundering conspiracy conviction; two points for sophisticated means; three points for supervisory role under § 3B1.1 for a total level 32 and guideline range of 121 months to 151 months. J.A. 4690.

### SUMMARY OF THE ARGUMENT - BABATUNDE POPOOLA

The Appellant contends that the evidence was insufficient to convict appellant of Aggravated Identity Theft, as 18 U.S.C. § 1028A because the evidence was uncontroverted that Mr. Popoola obtained the consent of his sister to use her Bank of America account which negates an essential element of the offense. The District Court Erred in Prohibiting Mr. Popoola from cross examining Government Witnesses on facts and statements by Mr. Popoola that form the basis of his defense in addition to the exclusion or prohibition during cross examination

on exculpatory statements by Defendant to law enforcement agents while allowing

incriminating statements by Defendants, which was highly prejudicial.

The evidence against Mr. Popoola was insufficient as a matter of law to convict

him of conspiracy to commit wire fraud and money laundering.  A rational trier of

fact could not have found the essential elements of the crimes beyond a reasonable

doubt of the charges against him.

Additionally, Appellant contends that his right to due process and a fair trial

was denied when the court overruled his motion to sever his case from that of

several co-defendants.

The District Court overruled the Appellant's objection to the loss amount

suggested in the PSR and held the Appellant responsible for more than 250,000.00

but less than $550,000.00 of actual loss to the victims relying upon the prejudicial

Chart 13.  This actual loss figure was not justified or established by a

preponderance of the evidence, and the Appellant submits that the District Court

erred in sentencing him based upon a loss amount of over $250,000.00.

Also at sentencing, the Appellant was assessed a three-level managerial role

enhancement.  Appellant argued that such an enhancement was unwarranted

because the government had not provided any reliable evidence to prove that the

Appellant managed and/or supervised other participants in the alleged offense.

The District Court overruled the Appellant's objection to the managerial and/or

23

supervision enhancement. Without the requisite showing of control, the § 3B1.1 enhancement should not have been imposed by the District Court. Also, there was nothing to support the enhancement for sophisticated means and vulnerable victims.

The erroneous jury instructions on willful blindness and aiding and abetting prejudiced Mr. Popoola and resulted in his conviction for the charged offenses.

## SUMMARY OF ARGUMENT – GBENGA OGUNDELE

The United States Constitution guarantees defendants a right to a fair trial. If a rule of evidences causes an unfair trial, then it should be disallowed under that rule as the Constitution reigns supreme. The district court erred in allowing introduction of editorialized business records under Rule 1006. These charts were not a substitute for voluminous records, they were lists of transactions that the government believed involved victim losses. The agent who created the chart did so at the behest of the prosecutors and the lead case agent. The contents were improperly admitted expert opinions as well as being improperly admitted under Rule 1006 and in violation of the 6th Amendment right of appellants.

Three of the four appellants were convicted of aggravated identity theft under erroneous jury instructions. The defendants proffered the correct elements for this crime. Specifically, that the element of knowing that the victim's identity was real was included in the proffered instruction. The court erroneously denied

the proffered instruction. Further, the court instructed erroneously as to the aiding and abetting theory. The aiding and abetting instructions did not clearly state that the defendants were required to have prior knowledge of the aggravated nature of the identity theft. This error is similar to that made in *Rosemond v. United States* wherein the Supreme Court reversed on the grounds that the trial court failed to instruct that the defendant had prior knowledge that a gun would be used for the § 924(c) offense. 134 S. Ct. 1240 (2014).

The trial court erred in granting the government's motion to exclude exculpatory portions of appellant Ogundele's statement to the agents. Excluding the exculpatory portions were so fundamentally unfair that they should have been included under the common-law rule of completeness even if otherwise inadmissible. Ogundele's statement, as presented, was misleading and inaccurate. Ogundele gave innocent explanations for his business while also noting the lack of involvement of his wife, Mojisola. Further, the excluded portions included exculpatory evidence as to Babatunde Popoola. This same trial court reversed field and acknowledged that the common-law rule of completeness was still alive in a subsequent opinion in another case. *United States v. Bailey*, No. PWG-16-0246, 2017, U.S. Dist. LEXIS 80093, 4 (D. Md. May 24, 2017).

At sentencing, the trial court, as to appellant Ogundele, committed procedural error in applying the amount of loss enhancement under § 2B1.1(a) of

the United States Sentencing Guidelines. Amounts not proven at trial must be proven up at sentencing. The government did not prove this amount of loss by a preponderance of evidence.

## SUMMARY OF ARGUMENT – MOJISOLA POPOOLA

Ms. Popoola was denied a fair trial because the court failed to suppress evidence seized from her iPhone in violation of her 5th and 6th Amendment rights. During the execution of a search warrant and an arrest warrant, an FBI agent questioned her about the location and identity of her iPhone and then asked her to unlock the iPhone by entering her passcode. The agent conceded that she did not advise Ms. Popoola of her Maranda rights and right to refuse to answer her questions or enter the passcode to unlock her phone prior to these questions. The agent also conceded that Ms. Popoola was not free to leave at the time of her questioning.

The court also abused its discretion when it allowed admission of other crimes evidence of fraud. The government was permitted to introduce portions of her application for bankruptcy, application for public assistance, IRS filings, and an application for purchase and financing of a time share. The government's justification was that Ms. Popoola was hiding "income" because she did not disclose money in her personal bank account. This was highly prejudicial because of the likelihood that jurors would view that uncharged alleged fraud as evidence

of her propensity to commit the wire fraud in the instant case. The probative value of the other crimes evidence relied on a false premise that Ms. Popoola had a duty to disclose the money her husband gave her to hold temporarily as income to herself as opposed to it being his obligation to disclose as gross receipts for his automobile business.

The court also committed error when it precluded Ms. Popoola from exercising her Sixth Amendment Right to present material exculpatory evidence of her husband's (a co-defendant) custodial statement which asserted that she was not involved in his automobile export business, even though he asked her if he could use her bank account to deposit money for that business after his bank account was closed. This statement was essential to her defense since it indicated that she was acting at his direction and did not have knowledge of the source of the funds going into his automobile business. Pretrial the court directed that the nine defendants be tried in two groups selected by the government. Mr. Ogundele and Ms. Popoola were scheduled for trial in the first group. The court denied her motion for severance so she could be tried in the second group of defendants and call her husband as a witness and he also denied her request to cross examine or call as a witness the FBI agent and elicit the exculpatory statement as a statement against penal interest (FRE 804(b)(3)). In both instances, the court abused its discretion in making its ruling with regard to the trustworthiness of the statement. It gave

27

disproportionate weight to a foreign document suggesting that she might have been partners with her husband in another automobile importing business in Nigeria in 2012. The government was free to present the same evidence to the jury, which it did anyway, and let the jury make factual determination about whether he was being truthful and had been shielding his wife from his activities or not truthful and falsely trying to protect her.

The court committed error when it gave a Willful Blindness/Conscious Avoidance instruction at the government's request absent a factual predicate that Ms. Popoola took deliberate actions to avoid knowing the truth about the source of the money going into her bank account was from the wire fraud romance scam. Ms. Popoola was prejudiced because of the paucity of evidence of Ms. Popoola's knowledge of the alleged wire fraud conspiracy and there was no evidence that Ms. Popoola took deliberate actions to avoid knowing the truth about the source of the money. The instruction undermined the government's burden of proof of actual knowledge and intent to join the conspiracy and likely confused the jury that proof of actual knowledge could be substituted with proof that she took actions that she should have known would assist the conspiracy.

Mojisola Popoola joins and adopts the arguments of Gbenga Ogundele with respect to the district court's error in admitting charts under Rule 1006 in violation of the Rule and appellants' Sixth Amendment rights. She also adopts Mr.

Ogundele's argument that the court erred when it precluded cross-examination

with regard to the exculpatory aspects of Mr. Ogundele's statement by failing to

recognize the still-viable common law on the doctrine of completeness as it relates

to fundamental fairness.

## SUMMARY OF THE ARGUMENT – VICTOR OLOYEDE

Mr. Oloyede was denied a fair trial when the trial court erroneously charged

the jury with a willful blindness/conscious avoidance instruction thereby

permitting the jury to use the incorrect legal theory upon which it could find the

knowledge element required in determining guilt for the offenses charged.

Mr. Oloyede was denied a fair trial when the trial court erroneously

permitted the introduction of summary charts in violation of Rule 1006 and the

Sixth Amendment.

Mr. Oloyede was impermissibly sentenced when the trial court improperly

calculated the loss amount attributable to him and failing to properly consider and

articulate all 18 U.S.C. factors in arriving at the sentence imposed.

## LAW AND ARGUMENT – BABATONDE POPOOLA

**I.   The Evidence was Insufficient to Support Mr. Popoola's Conviction for Aggravated Identity Theft Under 18 U.S.C. § 1028A (Count Six).**

### A.   Standard of Review

An appellate court reviews the sufficiency of the evidence supporting a

conviction de novo. *United States v. Greene*, 681 F. App'x 194, 196 (4th Cir.

29

2017). Appellant asserts that there was insufficient evidence to support his conviction for aggravated identity theft. The Court of Appeals reviews the sufficiency of the evidence supporting a conviction de novo. *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013). "A defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012). In assessing evidentiary sufficiency, we must determine "whether, viewing the evidence in the light most favorable to the government, the jury's verdict is supported by substantial evidence, that is, evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *McLean,* 715 F.3d at 137 (internal quotation marks omitted).

**B.    Argument**

To establish aggravated identity theft, the Government must prove that a defendant (1) knowingly transferred, possessed, or used, (2) without lawful authority, (3) a means of identification of another person, (4) during and in relation to a predicate felony offense. . . . Relevant to the first element, the government must prove that the accused knew that the means of identification belonged to another person. *United States v. Adepoju*, 756 F.3d 250, 256 (4th Cir. 2014)

30

(internal quotation marks omitted). *United States v. Greene*, 681 F. App'x 194, 196-97 (4th Cir. 2017).

Appellant was improperly charged and convicted of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A under Count Six, when Appellant obtained consent from his sister to use the bank account in question to support Appellant's conviction under 18 U.S.C. § 1028A**.** Under Count Six, (Aggravated Identity Theft) The Grand Jury for the District of Maryland charged that on or about October 2, 2012, in the District of Maryland and elsewhere, Appellant and co-defendant Victor Oyewumi Oloyede, during and in relation to a felony violation enumerated in 18 U.S.C. § 28A(c), did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, knowing that the means of identification belonged to another person-to wit. the name and bank account number of Individual Z---during and in relation to conspiracy to commit wire fraud under 18 U.S.C. § 1349. as charged in Count One of this Indictment and incorporated herein. Specifically, the Grand Jury charged that on or about October 2. 2012, Appellant provided to Oloyede the bank account number of Individual Z, into which Oloyede then transferred $10,000 from the BOA x7699 account into which Victim I-had deposited money the same day. J.A. 114.

However, the evidence at trial was uncontroverted that the use of the identifying information and bank account of Individual Z was his sister's Bank of

America account that was used with her consent and authorization. J.A. 3471-3474. The crime of aggravated identity theft is codified at 18 U.S.C. § 1028A by its simple name implies theft of someone's identity or use of someone's identity without consent and/or authorization. Mr. Popoola submits that the consent of his sister to the use of her bank account clearly negates the use of the bank account without lawful authority.

Additionally, Appellant contends that the Government failed to present evidence regarding Appellant's state of mind in regard to the government's claim that Appellant did knowingly use his sisters account "without lawful authority" when Appellant obtained authorization from his sister to use the account. Appellant's sister testified at trial that she authorized Appellant to use her Bank of America account and Appellant's sister was never implicated in any wrongdoing in relation to the allegations involving Appellant.

Clearly congress never intended Aggravated Identity Theft to include consented use of identity, like Mr. Popoola's use of his sister's bank account with her consent. Simply put, there can be no Identity Theft where there is a lawful authority to use someone's identity. In *United States v. Aguilar*, the court considered a statue concerning grand juror intimidation: the residual clause imposed criminal liability for one who "corruptly...endeavors to influence, obstruct, or impede the due administration of justice." 515 U.S. 593, 599-600,

115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995) (interpreting 18 U.S.C § 1503). To curb

the impermissible breadth of the wording, the court (a) implicitly interpreted "the

due administration of justice "to require a court or grand jury proceeding (and thus

excluded "an investigation independent of the court's or grand jury's authority"),

and (b) explicitly required a "nexus" with a grand jury or judicial proceeding to

support criminal liability.

Similar alarm about fair warning and over breadth animates *Arthur*

*Anderson LLP V. United States*, which recognized and generously construed a

knowledge requirement to limit the scope of a statue that criminalized "corruptly

persuading" someone to destroy documents, 544 U.S 696, 125 S. Ct. 2129, 161 L.

Ed. 2d 1008 (2005) (interpreting 18 U.S.C. § 1512). For much the same reason, the

supreme court sharply curtailed so-called honest-services fraud in *Skilling v.*

*United States*, 561 U.S. 358, 130 S. Ct 2896, 177 L. Ed. 2d 619 (2010). Further, in

*Yates v. United States*, the government used a provision of the Sarbane-Oxley Act

criminalizing destruction of evidence to prosecute a poaching fisherman who threw

fish overboard; the plurality invoked the rule of lenity to reverse on the ground

that, under the statute, a fish was not a "tangible object."135 S. Ct. 1074, 1088, 191

L. Ed. 2d 64 (2015) (interpreting 18 U.S.C. § 1519). In *Johnson v. United States*,

the court held that the "residual clause" of the Armed Career Criminal Act was so

vague that it failed to provide the constitutionally required fair notice of what

conduct it actually punished. 135 S. Ct. 5221, 192 L. Ed. 2D 569 (2015) (interpreting 18 U.S.C § 924(e)). Most recently, in *McDonnell v. United States* the court rejected an expansive view of what qualifies as on "official act" in public corruption cases. 136 S. Ct. 2355, 195 L. Ed.2d 639 (2016), se also *Board v. United States*, 134 S. Ct. (2017).

Additionally, at sentencing, the government acknowledged that it was not using the transaction concerning Appellant's sister's account in calculating loss amount attributable to Appellant. J.A. 4549. The government acknowledges that the money transferred to Appellant's sister's account, first went to Oloyede's account, and then he transferred $10,000 to Appellant via Appellant's sister's Bank of America account because Mr. Oloyede specifically requested Bank of America account and Mr. Popoola did not have a Bank of America account. *Id* at 11.

Mr. Popoola operated an automobile sales business and a money transfer business and the government failed to show that Mr. Popoola knew that the money transferred to the account, from Oloyede to Appellant, was the proceeds of illicit activity, notwithstanding that the sister consented to the use of her bank account. *United States v. Greene*, 681 F. App'x 194, 197 (4th Cir. 2017). Clearly the charge of 18 U.S.C. § 1028A is overly broad and inapplicable under the circumstances of Appellant's case. Appellant's conviction is improper because application of the statute overly broad. Although the government may contend that the transaction

itself involved improper actions (i.e. money laundering) on the part of the other

defendants, the allegation of aggravated identity theft has no premise in reality,

where the use of the account was consented to and the circumstances reflect a

transaction known to the account's holder.

As Appellant's sister, authorized use of her account on Appellant's behalf

and was aware of Appellant's use of the account for the transaction in question, the

district court erred in finding Appellant guilty of aggravated identity theft under 18

U.S.C. § 1028A, Count Six of the indictment.

## II.    The Evidence Was Insufficient to Support Mr. Popoola's Conviction for Wire Fraud.

### A.    Standard of Review

"The verdict of a jury must be sustained if there is substantial evidence,

taking the view most favorable to the Government, to support it." *United States v.*

*Steed*, 674 F.2d 284, 286 (4th Cir. 1982); *United States v. Mehta*, 594 F.3d 277,

279 (4th Cir. 2010); *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86

L. Ed. 680 (1942).

### B.    Law and Argument

To obtain the wire fraud convictions, the Government was required to prove:

(1) a scheme to defraud, and (2) use of a wire communication in furtherance of the

scheme. *United States v. Bollin*, 264 F.3d 391, 407 (4th Cir. 2001).

Appellant testified at trial that he was not part of any scheme but was a legitimate businessman that performed a few financial transactions in relation to what he was led to believe was a legitimate business interest. J.A. 3263; J.A. 3449. Based on the evidence presented at trial and corroborated by other evidence, Mr. Popoola, was contacted by his half-brother, Mukhtar D. Haruna, about a business opportunity of currency exchanges between Nigeria and the United States. There was no evidence of an agreement by Mr. Popoola to engage in any fraud with Mr. Haruna or any other person.

There was absence of evidence that Mr. Popoola and the other defendants were involved in any communications with the individuals identified as victims. J.A. 3263; J.A. 3449. Most importantly the evidence failed to support any communication or interaction between Mr. Popoola and the alleged ring leader of the conspiracy, Gbenga Benson Ogundele. Instead, the government alleged that Mr. Popoola and the other defendants used the wire in the alleged fraud or scheme which there was absolutely no evidence tying Mr. Popoola to the scheme to defraud the alleged victims.

The evidence in this case does not support the assertion that Mr. Popoola was involved in a conspiracy to use the wire in the alleged fraud because there was no evidence of Mr. Popoola's involvement in the alleged fraud until the alleged fraud had concluded and funds paid by the victim to the alleged perpetrator.

36

Charging and convicting Mr. Popoola for wire fraud for the specific reason that he conducted currency conversion or purchase of vehicles for Mr. Haruna after the alleged fraud had concluded and without knowledge of the alleged fraud, does not support the wire fraud charge. This is supported by the fact that the Mr. Popoola had no involvement or communication with the alleged perpetrators or victims during the commission of the alleged fraud. The few occasions some funds were transferred to Mr. Popoola was after the fraud against the victim had concluded.

At trial, there was evidence about the monies in Mr. Popoola's bank account and specific transactions were related to automobile sales, some transactions involved wages from his employment, and other transactions involved transfers of U.S. currency to Naira that was ultimately transferred to Mr. Haruna.

Mr. Popoola testified and denied having any knowledge that the source of the money was allegedly based in fraudulent activity. Mr. Popoola maintained that the few financial transactions involving him were done within the framework of legitimate business endeavors– mostly focused on providing a service of money transfer from the United States to Nigeria and buying and selling automobiles. Appellant's personal lifestyle and modest living did not reflect Appellant spending large sums of money or living lavishly.

Moreover, the testimony by Mr. Popoola would have been corroborated by the Government witnesses if the Court had not prohibited cross-examination into

those areas.  Based upon the foregoing, the evidence was insufficient to show that

Mr. Popoola conspired with anyone or possessed knowledge of illicit activity in

relation to the specific financial transactions. Appellant clearly demonstrated that

the transactions were related to his automobile business and from legitimate

sources.

Therefore, Appellant's conviction for conspiracy to commit wire fraud

should be vacated based on insufficient evidence.

## III.   The Evidence Was Insufficient to Support Mr. Popoola's Conviction for Money Laundering.

### A.    Standard of Review

"The verdict of a jury must be sustained if there is substantial evidence,

taking the view most favorable to the Government, to support it." *United States v.*

*Steed*, 674 F.2d 284, 286 (4th Cir. 1982); *United States v. Mehta*, 594 F.3d 277,

279 (4th Cir. 2010); *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86

L. Ed. 680 (1942).

### B.    Law and Argument

To obtain the money laundering convictions, the Government was required

to prove that the defendant knowingly engaged in a monetary transaction in

property of a value of over $10,000 that was derived from specific unlawful

activity. *United States v. Campbell,* 977 F.2d 854, 859 (4th Cir. 1992). A

conspirator may be convicted of an offense committed by his or her coconspirator

if the offense was committed during the course and in furtherance of the

conspiracy. *United States v. Chorman*, 910 F.2d 102, 110-11 (4th Cir. 1990).

*United States v. Smith*, 526 F. App'x 256, 259 (4th Cir. 2013).

As argued in the preceding section Mr. Popoola received funds on the few

specific occasions in his business transaction with Mukky for the purposes of

converting them to Naira or purchasing vehicles for Mukky to be shipped to

Nigeria. At no point during the business transactions was he aware that the funds

originated from an illegal source or the defrauding of alleged victims.

Mr. Popoola challenges the sufficiency of the evidence to support his

convictions for conspiracy to commit money laundering in violation of 18 U.S.C.

§ 1956(h). 18 U.S.C. § 1956(h) makes it a crime to conspire to commit money

laundering in violation of 18 U.S.C. § 1956 or § 1957. Under § 1956(h), "only two

elements of conspiracy need be proven: (1) an agreement between two or more

persons to commit a money-laundering offense; and (2) knowing and voluntary

participation in that agreement by the defendant." *United States v. Broughton,* 689

F.3d 1260, 1280 (11th Cir. 2012).

The usual objects of the money laundering conspiracy charged are: (1) to

conduct financial transactions involving the proceeds of specified unlawful activity

knowing that the transactions were designed to "conceal or disguise" the nature,

location, source, ownership, and control of the proceeds of the specified unlawful

activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("concealment money

laundering"); and (2) to engage in monetary transactions involving "criminally

derived property of a value greater than $10,000," such property having been

derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

Mr. Popoola's conviction cannot be sustained because Mr. Popoola did not

conspire to "conceal" the funds. To convict a person for money laundering under

18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that (1) the defendant

conducted or attempted to conduct a financial transaction; (2) the transaction

involved the proceeds of unlawful activity; (3) the defendant knew that the

proceeds were from unlawful activity; and (4) the defendant knew "that the

transaction [was] designed in whole or in part — (i) to conceal or disguise the

nature, the location, the source, the ownership, or the control of the proceeds of

specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); see also *U.S. v.*

*Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (Defendants conviction for

extensive bank fraud and mortgage fraud schemes upheld but money laundering

convictions based on the transactions of the proceeds into transparent accounts in

their own names were reversed because no reasonable juror could have found

beyond a reasonable doubt that those subsequent transactions were intended to

disguise or conceal the proceeds of the crime). The government clearly failed to

prove the fourth element of the offense, namely that Mr. Popoola attempted to "conceal or disguise" the alleged fraudulently obtained funds.

The Court in *Adefehinti* discussed in detail how the transactions were easily traceable to the defendants and did not serve to conceal the funds even though the financial transaction included fictitious names and companies. Similarly, in this money laundering case, the funds are easily traceable to Mr. Popoola and his business and there were no concealment on his part.

The basis of Mr. Popoola's money laundering conviction were specific deposits into his bank accounts and one deposit to his sister's bank account which did not attempt to conceal or disguise the funds in anyway. *See U.S. v. Olaniyi-Oke*, 199 F.3d 767 (5th Cir. 1999) (money laundering conviction reversed where transaction are engaged in for present personal benefit). None of the financial transactions concealed the identity of Mr. Popoola and/or the purpose of each transaction. As the Court stated in *Adefehinti*

> *"*The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds. "In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business." *United States v. Esterman,* 324 F.3d 565, 570 (7th Cir. 2003). Section 1956, enacted as part of the Money Laundering Control Act of 1986, punishes those who "inject [] illegal proceeds into the stream of commerce while of U.S. citing their source." *United States v. Wynn,* 61 F.3d 921, 926 (D.C. Cir. 1995).

To establish the design element, the government must demonstrate that the charged transactions had the purpose, not merely the effect, of "mak[ing] it more difficult for the government to trace and demonstrate the nature of th[e] funds." *Cuellar v. United States,* 553 U.S. 550, 128 S. Ct. 1994, 170 L. Ed. 2d 942 (2008)). As has been explained by various Circuits: "the acquisition of *any* asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form. But the requirement that the transaction be *designed* to conceal implies that more than this trivial motivation to conceal must be proved." *United States v. Willey,* 57 F.3d 1374, 1384 (5th Cir. 1995) (noting that "a showing of simply spending money in one's own name will generally not support a money laundering conviction"). Here, the government relied on deposits into Mr. Popoola's bank accounts or that of his sister - all done openly, in his name—as proof of concealment money laundering. None of the transactions pointed to by the government show a specific intent to conceal the nature, location, source or ownership of the funds used. Mr. Popoola did not use false names, third parties, or any particularly complicated financial maneuvers, which are usual hallmarks of an intent to conceal. *See United States v. Burns,* 162 F.3d 840, 848–49 (5th Cir. 1998).

The allegations that form the basis of the money laundering transaction does not disguise the source or the recipient and neither was any evidence presented to

suggest that Mr. Popoola intended to conceal or disguise the funds. *See United States v. Thayer*, 204 F.3d 1352, 1354-55 (11th Cir. 2000) (funneling illegal funds through various fictitious business accounts); *United States v. Majors*, 196 F.3d 1206, 1212-13 (11th Cir. 1999) (elaborate shell game involving multiple inter-company transfer with a variety of signatory names); *United States v. Willey*, 57 F.3d 1374, 1387 (5th Cir. 1995) (highly unusual transactions involving cashier's checks, third party deposits, and trust accounts used to disguise source of funds).

As in *Adefehinti* in which D.C. Circuit made clear that "the intent to conceal requires "something more' than the mere transfer of unlawfully obtained funds, … Rather, 'subsequent transactions must be specifically designed to hide the provenance of the funds involved". Id at 323-324. It was relevant in *Adefehinti* that "an observer who reads the endorsement on the initial check and studies the names and numbers on the subsequent deposit slips and checks could easily discern the money trail with ease". Similarly, in this case an observer would easily discern the money trail. *See Id* at 323. The trial record has no suggestion that the prosecutor and law enforcement agents had any difficulty doing so and all the transactions conspicuously lack the convoluted character associated with money laundering. *See Id* at 324.

There is virtually no evidence of a design to conceal, beyond the "trivial motivation" shown by the alleged acquiring of assets with the proceeds of the

alleged criminal activity or disposition of the proceeds of the alleged criminal

activity, which *Adefehinti* instructs is insufficient to establish the necessary intent.

As this Circuit instructed in *Adefehinti*, to have sufficient evidence of concealment,

there should be "the existence of more than one transaction, coupled with either

direct evidence of intent to conceal or sufficiently complex transactions that such

an intent could be inferred." *Id* at 322-323.

Since there is insufficient evidence of conspiracy to commit money

laundering charged, the Court should vacate the jury verdict.

## IV. The District Court Erred in Prohibiting Mr. Popoola from Presenting Evidence and Cross-Examining Government Witnesses on the Facts and Evidence Relating to his Defense theory.

### A.    Standard of Review

The District Court's decision to admit evidence is reviewed on appeal for an

abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S. Ct.

644, 136 L. Ed. 2d 574 (1997); *United States v. Weaver*, 282 F.3d 302, 313 (4th

Cir. 2002).

### B.    Law and Argument

Mr. Popoola was denied of his right to confrontation. The Fifth Amendment

to the United States Constitution prevents the federal government from depriving

an individual of life, liberty or property without due process of law. The Sixth

Amendment provides that a person accused of a crime has the right to confront a

witness against him or her in a criminal action. This includes the right to be present at the trial as well as the right to cross-examine the prosecution's witnesses. A trial judge retains wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross examination based on concerns about, among other things, harassment, prejudice, confusion of issues, witness safety, or interrogation that is repetitive or only marginally relevant. *See; Delaware v. Van Ardsall*, 475 U.S. 673 (1986); *United States v. Lancaster*, 78 F.3d 888 (4th Cir. 1996).

### 1.    Appellant's Statement to the FBI at the Time of Arrest.

The Court, based on a Motion by the Government, prohibited Mr. Popoola's trial counsel from cross-examining F.B.I. Agent Teak H. Wilson (hereinafter, "Agent Wilson") regarding statements made by Mr. Popoola to Government Agents at the time of his arrest. The statements the Appellant made were memorialized in B. Popoola's Exhibit for Identification 7a, handwritten notes of F.B.I. Agents, and B. Popoola's Exhibit for Identification 7b, 302 Report of interview of the Appellant. J.A. 542-547, 556-563, 2712-2714, 2720-2723, 4235-4237, 4267-4277, 4257-4266.

The Court's ruling limiting cross-examination prevented the development of Appellant's defense that the Appellant was selling cars exchanging currency and had no knowledge of any illegal activities including explaining how the Appellant

entered the currency exchange and automobile sale enterprises and other evidence relevant to the Appellant's involvement with "Marcus" and "Mukky". The Court limited cross examination on the basis that the statements were inadmissible hearsay although counsel argued the statements were not being admitted for the truth of the matter but for the fact it was told to the F.B.I. J.A. 479-486, 542-547, 556-563, 2712-2714, 2720-2723, 4257-4266.

If the Court had permitted cross-examination it would have developed Mr. Popoola's defense theory as follows:

(1)    Exactly what questions were being asked by of the Appellant by the F.B.I. at the time of his arrest and what answers the Appellant provided;

(2)    That the Appellant explained how he entered the money exchange and automobile sale business and why the Appellant has no reason to doubt what Mukky told Appellant;

(3)    Appellant's dealings with and relationship to "Neyi Marcus." *See;* Government highlighted areas in B. Popoola's Exhibit for Identification 7c.

Trial counsel also wanted to cross-examine Agent Wilson about the statements memorialized in B. Popoola's Exhibit for Identification 7a, handwritten notes of F.B.I. Agents, and B. Popoola's Exhibit for Identification 7b, 302 Report of interview of the Appellant to show the handwritten notes did not include information included in the 302 Report. J.A. 2712-2714, 2720-2723.4235-4237, 4257-4277.

This line of interrogation would have shown inconsistencies in the Government's investigation and may have given rise to a reasonable doubt. Limiting this line of examination was highly prejudicial to the Appellant.

## 2.    Investigation of Marcus

Also, as part of its case in chief, the Government called case agent in charge, Keith A. Custer (hereinafter, Agent Custer"), as a witness. As part of cross-examination, trial counsel asked Agent Custer about any investigation or knowledge of "Marcus." Agent Custer indicated he did not know "Marcus." In an attempt to explore Agent Custer's knowledge regarding "Marcus", trial counsel attempted to show Agent Custer what was marked for identification as B. Popoola's Exhibit for Identification 8, an email or memorandum (dated September 27, 2016) from Agent Custer to Assistant United States Attorneys Leah Bressack and Thomas Windom (hereinafter, "Document"). J.A. 2685-2688, 4257-4266, 4388-4448, 4463-4465.

Upon objection by the Government, trial counsel was prevented from showing Agent Custer the Document to refresh his recollection or explore the fact the Document identified "Marcus Adeniyi" and "Marcus Mary Ventures" as a car dealer in Nigeria (as well as other information). The balance of the Document was redacted. At a minimum, the Document showed there was some investigation by

the F.B. I. in this case regarding "Marcus" and Agent Custer was aware of it. J.A. 2685-2688, 4257-4266, 4388-4448, 4463-4466, 4541-4548, 4762-4765.

When Agent Custer was recalled as part of Co-Appellant, Victor Oloyede's, defense case. Trial counsel approached the bench and again requested that the Court permit cross-examination of Agent Custer about "Marcus Adeniyi, owner of Marcus Mary Ventures". The Court denied this request. Trial counsel next requested if he could not examine Agent Custer about "Marcus," that a non-redacted version of the Document be submitted under seal and also be reviewed for possible "*Brady*" issues pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The court denied this request.

The information in the Document illustrated the very essence of the Appellant's defense; that there was, in fact, a "Marcus" in the car business. The Government cast doubt about the existence of "Marcus," or alternatively, that any such person and/or business was involved in fraud or part of the conspiracy. Quite simply, trial counsel should have been permitted to use the Document to refresh Agent Custer's memory during cross-examination concerning his knowledge of "Marcus," and impeach Agent Custer if he continued to deny any knowledge of "Marcus." Such inquiry would have permitted the Appellant to test the quality and credibility of the underlying investigation in the instant matter and corroborate essential elements of the Appellant's testimony. J.A. 2685-2688.

The Supreme Court long ago opined that "a State may not knowingly use false evidence, including false testimony to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2D 1217 (1959). "This is true regardless of whether the government solicited testimony to pass uncorrected." *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). A new trial is required when the government's knowing use of false testimony could affect the judgment of the jury. See *Giglio v. United States*, 405 U.S. 150,154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).  Further, "Due process is violated not only where the prosecution uses perjured testimony to support his case, but also where it uses evidence which it knows creates false impression of material fact." *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). Hence, "evidence may be false either because it is perjured though not itself factually inaccurate because it creates a false impression of facts which are known not to be true." *Id*.

Mr. Popoola was extremely prejudiced by the trial court's error in preventing trial counsel from cross-examining about the investigation of "Marcus" and "Marcus Mary Ventures" and to not review the Document for potential *Brady* issues.

Mr. Popoola's defense centered on the fact that in addition to receiving money from "Mukky" in what the Appellant believed were legitimate currency

transactions, the Appellant was also transacting money with "Marcus" in a legal and completely unrelated motor vehicle sales business.

The limitations on the cross-examination of Agent Custer denied the Appellant the ability to develop information to give support and legitimacy to his defense and to put before the jury relevant information about "Marcus." The Appellant was denied the opportunity to establish there was a "Marcus" in the car business and this position was not something made up by the Appellant. J.A. 4257-4266, 2685-2688.

In addition, the restriction on cross-examination into statements made by the Appellant at the time of his arrest about "Marcus" altered the Appellant's defense and ultimately required the Appellant to take the stand; to explain his involvement in selling cars and exchanging money as the reason behind funds being sent to financial accounts associated with the Appellant.

Moreover, if the testimony and the FBI Notes had been allowed into evidence by the Court it would have corroborated Mr. Popoola's defense theory.

### 3.    Other Fraud Investigations Targeting Attorneys

Mr. Popoola's trial counsel was also prevented from cross-examining Agent Custer about F.B.I. investigations into fraud activity targeted at attorneys. The Government introduced the Appellant's college transcript (Government Exhibit Babatunde 2) in order to demonstrate the Appellant received "A" grades in

accounting courses. The obvious reason for the admission of this evidence was to suggest to the jury the Appellant was too smart to be "duped" into unwittingly assisting in any fraud. To counter this suggestion, trial counsel wanted to elicit testimony from Agent Custer, that Agent Custer was aware of F.B.I. investigations into fraud schemes targeted at attorneys. Trial counsel was attempting to show even highly educated individuals practicing law are targeted and victimized by fraud schemes. The Government objected, and the court sustained the objection, improperly limiting this important inquiry before the jury. J.A. 2679-2688, 4257-4266, 4388-4448.

The Trial Court was influenced by Mr. Popoola's grades in college that the trial court used it at sentencing as justification why Mr. Popoola could not have been deceived into the business venture. J.A. 4549**.** Since the trial court was influenced by such evidence, we can only imagine how the evidence prejudiced Mr. Popoola and influenced the jury in their deliberation and Mr. Popoola's conviction.

### 4.    Misleading Evidence by the Government

During its case in chief over objection, the Court allowed the Government introduced Government Exhibit Chart 13 (hereinafter, "Chart 13") which showed Deposits made into Appellant's financial accounts at SunTrust (# 7571) and Wells Fargo (#5127) between 2011 - 2013. J.A. 4212. Counsel for Ogundele objected to

Exhibit 13 but it was overruled. In fact, the SunTrust account had nothing to do with the fraud allegations being tried before the Court and the Government did not link the Chart to any evidence. *See Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). ("evidence may be false either because it is perjured though not itself factually inaccurate because it creates a false impression of facts which are known not to be true."). The Government knew, or should have known that the Suntrust account was not in anyway related to the charged fraud. There was no evidence to show that account was involved in the fraud and conspiracy for which Mr. Popoola was charged and convicted.

Chart 13 as presented and admitted into evidence showed that in 2011 there was a total of $74,527.92 put in the Appellant's account and there was no attempt by the Government to show the types of deposits, i.e. cash, check, etc. The admission of the Chart 13 created the false and erroneous inference that deposits in 2011 were from alleged fraud activity. Chart 13 led to another issue in that the Government submitted the Appellant's 2011 tax return (Government Exhibit I.R.S. 17) to show no taxes were paid on the money listed in Chart 13, moreover Appellant's 2012 and 2013 tax returns were submitted to the jury. This was simply done to inflame the jury against Mr. Popoola by suggesting the Appellant was not paying taxes on taxable income without any evidence the money listed in Chart 13 was related to the conspiracy charged, rather, the implication was that Mr. Popoola

was "bad" because he was committing a separate crime, tax evasion in 2011. J.A. 4549.

It was error for the Court to permit the use and/or the admission of Government Chart 13 knowing it had no evidence that the funds in the bank account for the years were related to the alleged fraud.

Mr. Popoola was prejudiced by the trial court's rulings limiting cross-examination. The cumulative effective of the erroneous rulings limiting cross-examination prevented Mr. Popoola from presenting a defense consistent with his theory of the case that was eloquently set out in opening statement. These erroneous rulings cumulatively warrant vacating Mr. Popoola's conviction and remanding the case for a new trial.

## V.  The District Court Erred in Denying Appellant's Motion to Sever, Resulting in the Denial of Appellant's Fifth Amendment Right to Due Process Under the United States Constitution.

### A.  Standard of Review

The Court of Appeals reviews the denial of a motion for severance under Rule 14 for abuse of discretion. *United States v. Santoni*, 585 F.2d 667, 674 (4th Cir. 1978) (citations omitted). *United States v. LaFrance*, No. 91-5767, No. 91-5768, 1992 U.S. App. LEXIS 13615, at *5 (4th Cir. June 9, 1992).

### B.     Law and Argument

On June 10, 2016, Appellant filed a Motion to Sever his case from that of his codefendants. J.A 184-187; 221-222. In his Motion, Mr. Popoola argued amongst other things that he would be prejudiced by the incriminating statements and/or confessions made by the other Defendants that would not be admissible against the Defendant in a separate trial. That the prejudicial effect against the Defendant outweighs the notions of judicial economy in consideration of the instant Motion.

Appellant's Motion to Sever was denied. J.A. 479-486, 542-547, 556-563. The joinder of defendants at trial is generally preferred for reasons of efficiency; however, Fed. R. Crim. P. 14(a) requires a court to exercise its discretion in favor of severance if joinder "appears to prejudice a defendant...". Fed. R. Crim. P. 14(a).  Joinder of trials is appropriate only if there is no prejudice to the right of a defendant to obtain a fair trial. *Bruton v. U.S.*, 391 U.S. 123, 131 (1968) (violating Due Process and Confrontation Clause rights constitute prejudice to defendant's right to a fair trial) *U.S. v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971) ("The court must weigh, case by case, the advantage and economy of a joint trial to the administration of justice against possible prejudice to a defendant"). Even though the decision to grant or deny a request for severance is left to the sound discretion of trial courts, severance is mandated under Rule 14 when "there is a serious risk that a joint trial would prejudice a specific trial right of one of the defendants, or

prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. U.S.*, 506 U.S. 534, 539 (1993) (antagonistic defenses).

In *Bruton*, the Supreme Court held that where a non-testifying codefendant's statement implicates the defendant, a limiting instruction is inadequate to prevent a violation of the defendant's Confrontation Clause rights. Id. at 135-37; see *United States v. Locklear*, 24 F.3d 641, 645 (4th Cir. 1994). *United States v. Allen*, 491 F.3d 178, 188 (4th Cir. 2007).

The risk of prejudice might be present where evidence admissible against one codefendant, but not the other, is introduced. *Id*. In a complex case like this case, where codefendants have "markedly different degrees of culpability, this risk of prejudice is heightened." Id. Similarly, a defendant may be prejudiced if he could not avail himself of exculpatory evidence in a joint trial that would be available were he tried alone. Id.

Mr. Popoola filed a pretrial motion to sever in recognition of the fact that he could not receive due process and a fair trial while being tried jointly with several other defendants who were apparently deeply involved in the events alleged– while Mr. Popoola's defense was premised upon his actual innocence and the fact that he was unwittingly involved in the actions by co-defendants that appeared innocuous to Appellant but led to the present charges of conviction. The District Court erred in denying Appellant's motion to sever where Appellant's defense was clearly

contradictory to that of the other defendants. Appellant's defense theory surrounded his actual innocence and Appellant argued for severance based on the fact that he would have to incriminate the other defendants and be forced to testify against the other defendants in order to prove his innocence, thus resulting in their conviction. As the record ultimately reflected, Appellant was duped into several small-scale transactions by other individuals involved in a large criminal undertaking.

Also, as reflected by the trial record, the motion to sever should have been granted based on Mr. Popoola's argument that his defense was antagonistic to the defenses of the other defendants and Mr. Popoola's ability to receive due process and a fair jury trial would be denied if tried jointly. Further, Mr. Popoola contends that the trial record reflects the fact that he was unable to receive fair consideration of his defense theory due to his joint trial with several other defendants facing a great deal of evidence entirely unrelated to Mr. Popoola's case.

Ultimately, Mr. Popoola was improperly convicted when the jury was led astray. Appellant was convicted by simply being grouped with individuals who were involved in illicit activity– activity that was completely unrelated to the few transactions Appellant was involved in, and that the Government presented from 2012 and 2014. The grouping of Appellant's business transactions with those illicit transactions of his friends and associates caused the jury to improperly convict

Appellant based on insufficient, flimsy, evidence. Appellant's transactions with

Oloyede do not reflect knowledge and participation in the greater conspiracy.

Rather, Appellant's actions reflect the activities of his small business enterprises.

Based on the foregoing, Mr. Popoola's motion to sever was improperly

denied and in the event that he was afforded a trial as the sole defendant, he would

not have been convicted. Therefore, Mr. Popoola's conviction must be vacated and

his case should be remanded for further proceedings in the interests of justice.

**VI.    The Sentenced Imposed on Mr. Popoola was Based on the Trial Court Incorrect Application of the Sentencing Guideline.**

**Standard of Review**

A Circuit Court of Appeals reviews the district court's imposition of a

sentence under a deferential abuse of discretion standard. *Gall v. United States*,

552 U.S. 38, 50, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007); *United States v.*

*Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009).

**(a)    The District Court Erred in Calculating the Loss Amount Attributable to the Mr. Popoola for Sentencing Purposes.**

The Mr. Popoola objected to the actual loss amount calculation in the

District Court below, and submitted that the actual loss amount for sentencing

purposes should not exceed $119,000. J.A. 4485-4514, 4766-4790, 4791-4796.

The District Court overruled that objection and held Mr. Popoola responsible for

more than $250,000.00 but less than $550,000.00.  This loss amount cannot be

justified or established by a preponderance of the evidence. The loss amount was based solely on Chart 13 showing deposits into Mr. Popoola's account from 2011 through 2015. As previously argued Chart 13 was misleading and there was no evidence presented showing fraud or money laundering at trial or sentencing hearing in 2011 and 2012, yet the trial court relied upon Chart 13 to determine the loss amount. J.A. 4665-4667, 4689-4690**.** Mr. Popoola submits that he should not have been held accountable for a loss exceeding $119,155, and the District Court erred in adopting the loss amount of more than $250,000.00 and less than $550,000.00 proposed by the Government without any evidence to back it up.

In the District Court below, the government did not provide the Court with sufficient information with which it could calculate an accurate loss amount to be attributed to Mr. Popoola for sentencing purposes. Since it was unable to calculate an accurate loss amount for Mr. Popoola, the District Court simply used the total deposits into Mr. Popoola's account between 2011 and 2014 in Chart 13. Based on the evidence at trial and at sentencing, no more than $119,155.00 in "fraud money" should be attributed to Mr. Popoola. Moreover, there was no evidence to support the $546,530.00 the Government alleges is the loss amount. Based on the record and evidence adduced at trial in the case at hand, no quantifiable actual loss more than $119,155.00 could be attributed to Mr. Popoola.

Furthermore, the other defendants were responsible for losses to victims that were not contemplated or foreseeable to Mr. Popoola, because Mr. Popoola was not involved with any conspiracy to defraud victims through love schemes and these defendants and others had their own separate conspiracies involving different people. Mr. Popoola submits that the actual losses did not exceed $119,155.00, and the government failed to prove otherwise in the court below, and that if given the opportunity to do so again they would likewise fail to establish an actual loss amount beyond $119,155.00.

Consequently, the District Court abused its discretion in finding that the actual loss attributable to Mr. Popoola for sentencing purposes exceeded $250,000.00 which resulted in the incarceration for a term of 120 months. In conclusion, the Court should vacate Appellant's sentence and remand his case for re-sentencing based on the loss amount of $119,155.00.

**(b)     District Court Erred in Sentencing Appellant as a Manager or Supervisor Pursuant to U.S.S.G. § 3B1.1(b), as the Appellant did not exercise the necessary control over any other individual involved in the Alleged Conspiracy.**

The district court erred in assessing a three-level upward adjustment in sentencing the Appellant as a leader pursuant to U.S.S.G. § 3B1.1(a), as the Appellant did not exercise the necessary control over any other individual involved in the alleged conspiracy.

When determining the appropriate sentence level, the court, in its discretion, can enhance a defendant's offense level, if the court determines that the defendant played an aggravating role in the offense relative to the other participants.

In this case, the government argued that Mr. Popoola exercised a supervisory or managerial role in the conspiracy alleged, when Appellant informed the Co-defendant, Mr. Awolaja on an alleged technique concerning making deposits in a manner that would avoid detection. J.A. 4574-4575, 4577-4579**.**

At Appellant's sentencing, the court, in finding that the enhancement applied, stated that the "two or three" out of thousands of text messages from Mr. Popoola to Mr. Awolaja. formed the entire basis for allegations that he was a supervisor or manager of the conspiracy, "those two or three out of thousands happen to be the ones where he's directing her how to make deposits in a way that will avoid structuring." J.A. 4579.

The District Court erred in finding that U.S.S.G. § 3B1.1 applied to Appellant based on text messages to Mr. Awolaja. where Mr. Popoola simply explained how to take a certain action involving currency but exercised no control or authority over the actor involved. Appellant contends that providing information on how to take a given action, is not in itself, a proper basis for applying a 3-Level enhancement for a supervisory or managerial role to a defendant.

In *Sayles*, this Court provided insight regarding the type of evidence needed for a district court to assess a § 3B1.1 enhancement. The defendants in that case, Robert Jared Smith and Leonard Sayles, were participants in a drug distribution conspiracy. The Government presented evidence from co-conspirators that both defendants purchased and sold crack to other participants in the conspiracy. Furthermore, one of the co-conspirators testified that Sayles was involved in the conversion of cocaine powder to crack. Based on this evidence, the district court assessed the leadership enhancement to Smith and a lesser two-level enhancement to Sayles. *Id.* at 220-22.

In reversing the district court's application of the § 3B1.1 enhancements, this Court held that "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager, or supervisor' of criminal activity." *Id.* at 225. That is because an adjustment under § 3B1.1 is proper "only . . . if it [was] demonstrated that [the defendant] was an organizer, leader, manager or supervisor of people." Id. at 226. Although the Government contended that it had presented evidence that both defendants had recruited other participants and that *Smith* had retained a larger share of the proceeds from the conspiracy, no such evidence was found in the record. Without evidence of the defendants' aggravating role in the conspiracy beyond the buying and selling of "significant" quantities of

drugs, this Court found that the district court clearly erred in applying the enhancement to the defendants. Id. at 226-27.

Here, at most, Mr. Popoola did not play a role as manager and/or supervisor because the evidence is limited to a handful of text message to a single person on how to deposit funds into an account. Moreover, Mr. Popoola did not exercise control over or supervise the activities of this person or other individuals. Most importantly, the two or three text messages were to Mr. Awolaja. and the advice was not linked to any financial transaction relating to any fraud or money laundering. There was no evidence that Mr. Popoola received a greater portion of proceeds or obtained some greater benefit than the other individuals involved. Mr. Popoola himself only took part in a small number of transactions and at the direction of others who exercised authority. Yet, there was no evidence presented that Mr. Popoola exerted authority over any inferior or co-conspirator within the alleged conspiratorial hierarchy.

Therefore, the district court erred in applying a 3-Level enhancement for Mr. Popoola's role in the conspiracy when there was a lack of a preponderance of evidence that he acted in a manager or supervisor role. Additionally, Appellant's minus role in the acts alleged should result in a reduction of 2-Levels as a minor role was all that Appellant played (if any). J.A. 4472-4484, 4520-4532.

In conclusion, the Court should vacate Appellant's sentence and remand his case for re-sentencing in regard to the improper 3-Level enhancement for alleged role in the offense, under U.S.S.G. § 3B1.1.

    (c)    **The District Court Erred in Enhancing the Appellant's Offense Level at Sentencing for Sophisticated Means**.

The Appellant was assessed a two-level enhancement for sophisticated means. J.A. 4690. The district court clearly erred in applying a two-level enhancement for use of sophisticated means. *U.S. Sentencing Guidelines Manual* § 2B1.1(b)(9)(C) (2010). The district court's determination that the defendant used sophisticated means is reviewed for clear error. *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) (reviewing same issue in tax fraud case).

The Guidelines section 2B1.1(b)(10)) provides for a 2-level enhancement to a defendant's offense level if "the offense . . . involved sophisticated means." The enhancement applies when a defendant employs "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B). There is nothing complex about the alleged scheme or crime in this case otherwise every crimination activity would require a two-level enhancement because each involves some sort of sophistication. However, this provision is reserved for actual sophisticated schemes not the garden variety bank wire fraud and money laundering cases.

63

The district court determined at sentencing that Mr. Popoola's conduct involved sophisticated means based solely on his conclusion:

> THE COURT: Next, under PSR paragraph 27, the sophisticated means enhancement of two points under Section 2S1.1B3 was added. The government agrees, the defense disagrees. The Application Note 5A to 2S1.1B3 says that among the indicia of sophisticated means in a money laundering scheme is the use of fictitious entities, which we have here; shell corporations, which we have here; offshore accounts, which we have here; or two or more levels of fraud. And I adopt the findings in PSR 27 and the -- and ECF 424, page two of three of the government's memoranda. I therefore find that two points apply for sophisticated means as well.

J.A. 4573-4574**.** The enhancement applies if the "defendant's total scheme was undoubtedly sophisticated." *United States v. Edelmann*, 458 F.3d 791, 816 (8th Cir. 2006); see *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) ("The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is especially complex or especially intricate." (internal quotation marks omitted)); *see also United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (no requirement that defendant's individual actions be sophisticated).

Accordingly, the District Court erred in enhancing Mr. Popoola's sentencing guideline range by two levels for sophisticated means and the sentence should be vacated and the case remanded for resentencing.

**VII. The District Court Erred in Denying Appellant's Motion for New Trial Rule 33, When the Evidence Was Insufficient to a Finding of Guilt Beyond A Reasonable Doubt.**

### A.    Standard of Review

This court reviews the denial of a Fed. R. Crim. P. 33 motion for abuse of discretion. *United States v. Moore*, 709 F.3d 287, 292, 2013 WL 765746, at *4 (4th Cir. 2013). *United States v. Makalou*, 517 F. App'x 155, 156 (4th Cir. 2013).

### B.    Law and Argument

A district court may grant a new trial on a defendant's motion "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions are granted "sparingly[] and . . . only when the evidence weighs heavily against the verdict." *United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) (internal quotation marks omitted).

The district court erred when it failed to grant Appellant's motion for acquittal or in the alternative, motion for a new trial under Fed. R. Crim. P. Rule 33, respectively. J.A. 4257-4266. Mr. Popoola has argued in various sections of this brief, the issues raised in Appellant's motion, warranting a judgment of acquittal or a new trial. Appellant incorporates the argument in those section as well as his motion, to avoid repetition.

Based upon the foregoing, the district court erred in denying Appellant's motion for new trial and, therefore, this court should remand Appellant's case for a new trial.

## VIII.  The District Court Erred in Giving the Aiding and Abetting Instruction on the Aggravated Identity Theft Charged in Count 6 of the Indictment.

Mr. Popoola adopts and incorporates the legal arguments made on this issue by other Appellants to the extent applicable to him. J.A. 515-520, 487-491, 503-514.

## IX  The District Court Erred in Giving the Willful Blindness Instruction That Prejudiced Mr. Popoola.

Mr. Popoola adopts and incorporates the legal arguments made on this issue by other Appellants to the extent applicable to him. J.A. 515-520, 487-491, 503-514.

## X.  The District Court Erred When it Prevented Appellants' From Introducing Exculpatory Statement That Were Part of the Inculpatory Statements introduced Into Evidence the Government in violation of the Rule of Completeness.

Mr. Popoola adopts and incorporates the legal arguments made on this issue by other Appellants to the extent applicable to him. J.A. 479-486, 542-547, 556-563.

<div align="center">**ARGUMENT – GBENGA OGUNDELE**</div>

**I.    The District Court Erred in Admitting Charts under Rule 1006 in Violation of the Rule and Appellants' Sixth Amendment Rights.**

**Standard of Review.**

Where evidentiary issues relate to the Sixth Amendment, the appropriate standard of review is de novo. *United States v. Gitarts*, 2009 WL 2705507 (4th Cir. 2009), (unpublished) citing *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004).

**Argument.**

On November 2, 2016, after close of evidence for the day, defense counsel raised objections to entry of certain charts. J.A. 4202-4212. Counsel argued that these charts were inadmissible as substantive evidence under Rule 1006 and introduction of these charts would be a violation of appellants 6th Amendment rights. The government proffered that their witness would not offer expert testimony, that the charts were being offered because the records were voluminous, and that the information in the charts flowed from otherwise admissible evidence. J.A. 1732. Subsequent testimony would prove this proffer inaccurate.

Special Agent Rutledge testified on November 3, 2016. J.A. 1994. He testified that he created the charts on various criteria. He testified that he analyzed bank statements, deposit slips, and emails. J.A. 1998. The agent also testified that he included wire transfers of victims in the case. J.A. 2002. Defense counsel

objected, asked that the statement be struck, and asked that the witness not be able
to refer to victims. The trial court struck the reference to victims. J.A. 2003.
However, the court did allow the agent to say he got the names from a list provided
to him (by case agent Custer presumably). The government did not disclose in
original proffer that the names in the chart were included because they were
suspected victims. *Id.*

Later in the evening of November 3rd counsel for Ogundele, and on behalf
of all co-defendants on trial, filed a Motion to Strike Testimony Regarding Charts
Entered Under Rule 1006 and To Exclude any further Testimony Regarding
Previously Admitted Government Charts. J.A. 2056.

On the morning of November 4, 2017, the court addressed the defense
motion. A lengthy discussion was had, but the gist of counsel's procedural and
constitutional arguments are found in this statement by the court:

> The prejudice issue, I'm going to come back to in just a moment
> because that ties into Mr. Eisele's debate about how these records
> were selected. And then -- so those are the elements that the case law
> says I have to consider.
>
> Now, let's get to the crux of what Mr. Eisele's objection is and his
> objection is shared by all the defendants. And that is, is that this is
> somehow a masquerading opinion. And in that regard, Mr. Eisele has
> said that the items selected on here represent the thought process of
> the case agent as affirmed by the government that the deposits on here
> represent the money produced by victims. And that anybody whose
> money deposited on there is someone who was a victim. And that is

> an opinion and so this summarizes opinion, not underlying writings, recordings or photographs.

J.A. 2078.

The trial court went on:

> It is impossible in a case involving truly voluminous evidence where some of the writings, recordings and photographs are relevant and others are not to identify a subset of the universe of documents which contains relevant and not relevant documents. It is impossible to make the decision either to introduce the hard copy records into evidence one by one or a chart without having asserted some thought process as to what's relevant and not what's not. It would be absolutely impossible.

J.A. 2079.

The trial court acknowledged also that the defense argument was not only based on the rule, but also the Sixth Amendment. J.A. 2079. The trial court denied the motion. J.A. 2084.

The inclusion of a victim list, or any other type of subjective list like this, is not the type of chart summary evidence that is contemplated under Rule 1006. The language of the rule states as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

Chart summaries are meant to save court resources by collating cumbersome reliable written records into a compact format. The rule covers voluminous writings, recordings, and photographs. (not oral testimony) (See *United States v. Johnson*, 54 F.3d 1150 (4th Cir. Va. 1995). To comply with this Rule, therefore, a chart summarizing evidence must be an accurate compilation of the voluminous records sought to be summarized. *United States v. Janati*, 374 F.3d 263, 272 (2004) *citing* Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 8043, at 525 (1st ed. 2000).

This Court has been clear to describe the differences between 1006 and Federal Rule of Evidence 611(a) in that "Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) to facilitate the presentation and comprehension of evidence already in the record." *Id*. *citing* Fed. R. Evid. 611(a) and 4 *Weinstein's Federal Evidence* § 611.02[2][a][vii] (Joseph M. McLaughlin ed., 2d ed. 2003). This has described the purpose of 611(a) charts as follows:

> these 'pedagogical' devices are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted. *See* 6 *Weinstein's Federal Evidence*, *supra*, § 1006.04[2]. Thus, pedagogical charts or summaries may include witnesses' conclusions or opinions, or they may reveal inferences drawn in a way that would assist the jury. 6 Id.§ 1006.04[2], at 1006-10 to 1006-11. But displaying such charts is always under the

supervision of the district court under Rule 611(a), and in the end *they are not admitted as evidence*.

*Janati* at 272. (emphasis added).

Here, the jury had already heard that these charts were no more than a proposed a victim list. Then, after striking that, the trial court allowed the witness to testify why he made the list. This, along with the jury being told that the 1006 charts were offered for the truth of the matter asserted planted a very specific idea: each and everyone one of these amounts are fraud even if the government has not proven it. Evidence, when allowed under Rule 1006, is particularly devastating to a defendant in that it is used by the government to "prove the content." R. 1006. The defendants here were unfairly prejudiced as the government presented editorialized subsection of transactions from an otherwise far more global and admissible set of business records. On top of that, it was not even presented via the person who created the editorial.

Unquestionably, many victims of fraud did testify, but many amounts in these charts were not proven to be amounts related to fraudulent activity. There were over a dozen names on these charts that the jury never heard from. The government burned through the witnesses that they had and then strategically inserted the other persons into their charts, admittedly, to show that they must also be victims. This is improper evidence under 1006 and is unfairly prejudicial. Rule

1006 is used to prevent introduction of voluminous records. It should not have been used as a strategic tool of the government.

Prior to the introduction of the charts, the amount of monetary loss suffered by victims, tied to Ogundele, was a mere fraction of what was included in the summary charts. The charts include somewhere around 2 million dollars. J.A. 4202-4205. Further affecting Ogundele's right to fair trial was the vast amounts of cash that made it into these charts. *Id.* This disparity affected the codefendants similarly as each codefendant had editorialized charts submitted against them.

The cash deposits in these charts were not proven to come from victims. J.A. 2002. The inclusion of the cash in the charts flies in the face of the agent's alleged methodology. For example, the agent testified that he did not include some of the teller transfers because he didn't know the source of the funds. *Id.* He only included ones he verified through emails or bank documents. However, the cash deposits included in the charts were not given the same methodological scrutiny as that of other types of entries such as teller transfers. *Id.* The cash amounts were not tied to emails or verifiable names on cash deposit slips. *Id.* These summaries were clearly not accurate.

An example of properly admitted summaries at trial: the government may have desired to introduce the total amount of monies that were deposited into the Appellants' accounts over a period of years. To comply with the rule, the

government could have provided the bank statements for those years to trial counsel so that they could have verified that these amounts were correct. If they could not find error in the amounts, they would have no reasonable objection under 1006. The agent could testify about the total deposits into the account and the trial court, and jury, would have been saved from reviewed these dozens of bank statements.

This case is different. The agents and the prosecutors decided tactically which transactions that they wanted to highlight and then placed them in the charts. In addition, these tactical decisions were made without any uniform criteria. (other than being alleged victims) This was unfairly prejudicial under Rule 1006 and the Due Process rights of the defendants under the Sixth Amendment.

The seminal case on guaranteeing the right to a fair trial in the face of procedural limitations is *Texas v. Washington*, 388 U.S. 14 (1967). A witness for Jackie Washington, Charles Fuller, would have testified about unquestionably relevant events surrounding the shooting that was the basis for the indictment. *Id*. at 16. However, Texas state statutes barred persons charged or convicted as coparticipants in testifying for one another at trial. *Id.* The state objected, and this objection was sustained on those statutory grounds. The United States Supreme Court held that the right to compel witnesses under the Sixth Amendment was so fundamental that it could be considered incorporated into the due process clause of

the Fourteenth Amendment and that Mr. Washington was denied that right in this

case. *Id.* at 23. The Supreme Court went on:

> The right to offer the testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a
> defense, the right to present the defendant's version of the facts as well
> as the prosecution's to the jury so it may decide where the truth lies.
> Just as an accused has the right to confront the prosecution's witnesses
> for the purpose of challenging their testimony, he has the right to
> present his own witnesses to establish a defense. This right is a
> fundamental element of due process of law.

*Id.* at 19.

The Supreme Court has also held, in reversing a Georgia state murder

conviction, that a single rule of evidence – the hearsay rule – could not be applied

if under the facts and circumstances of the particular case, its application deprived

the accused of a fair trial. *Green v. Georgia*, 442 U.S. 95, 99 (1979).

In this instance, the method and manner these charts were presented,

whereby the government cherry-picked individual records prejudiced the

appellants' right to a fair trial. Appellants do not concede that the evidence was

admissible under Rule 1006. However, if this Court were to find it admissible

under rule 1006, the introduction of the chart evidence in this circumstance

deprived appellants of the right to a fair trial.

Much like in *Washington* and *Green*, a procedural rule was utilized in a way

that violated substantial constitutional rights. These charts were admitted as

substantive evidence. They were created on a methodology that was shaky at best,

or a prejudicial "victim list" at worst. The appellants were denied their fair opportunity to defend themselves against the accusations of the government.

*Inadmissible Expert Opinion.*

Appellants also argued that these charts, admitted through the testimony of Agent Rutledge, were introduced on the basis of an expert opinion. The trial court dismissed that argument. J.A. 2080. The trial court opined that lay opinions are allowed under Rule 701 and that Agent Custer could opine from his experiences as a lay witness. J.A. 2083.

Rule Federal Rule of Evidence 701 allows opinion by a lay witness if it is "rationally based on the witness's perception." Fed R. Evid. 701. The charts were testified to by Agent Rutledge, not Agent Custer. J.A. 2002. Rutledge did not handle the underlying investigation of the claims that were placed on the chart. Presumably it was Agent Custer, the case agent, but he did not testify as to what methodology he used in passing along the information for the chart. The opinions were not "rationally based" on Agent Rutledge's perception. The proper foundation for these charts was not laid under 701 or 702. As a result, the charts should not have been admitted.

The charts at issue here are not accurate summaries used as substitutes for voluminous records evidence. Moreover, the charts were not sufficiently accurate to substitute for the records and testimony. The charts were pedagogical devices

which reflected the government's opinion of the evidence, drawn in a way to

suggest inferences about the evidence. Admission of the evidence was a violation

of the defendants' right to a fair trial, and not properly admitted under Rule 1006.

This Court should reverse and remand for a new trial.

**II.    The District Court Erred When It Instructed the Jury on the Elements of Aggravated Identity Theft and also Erred in Failing to Instruct the Jury that Prior Knowledge of the Use of Actual Person's Identity's was Required for Purposes of Culpability under an Aiding and Abetting Theory as to Aggravated Identity Theft.**

*Standard of Review*

The standard of review for the failure to instruct on an element of the

criminal offense in violation of the United States Constitution is *de novo*, and the

standard of review for improper jury instructions is also *de novo*. *United States v.*

*Pardee*, 368 F.2d 368 (4th Cir.1966).

*Willfull Blindness.*

Prior to trial, Mr. Ogundele, and other defendants, filed certain objections to

the government's proposed jury instruction. One objection was to the conscious

avoidance (willfull blindness) instruction.  J.A. 503. Counsel joins the argument of

Mojisola Popoola with respect to willful blindness.

*The District Court Erred in Instructing the Jury as to the Elements of Aggravated Identity Theft.*

Mr. Ogundele, joined by other defendants facing the same charge, argued that the elements instruction as to Aggravated Identity Theft did not properly instruct the jury on the required mental state. J.A. 512-513. Specifically, the defendants objected to jury instruction as it did not state that each element should include a knowing element. *Id.* Defense counsel submitted a jury instruction that properly set forth the legally required elements. *Id.* at 10. Specifically, appellants submitted the following language as to the element regarding identification used:

> the defendant *knew* that the name, social security number, date of birth, and driver's license of victim that the defendant transferred, possessed, and used belonged to another person.

J.A. 4241.

The court instead used this wording:

> the defendant transferred, possessed, and used the name, social security number, date of birth, and bank account numbers of victim without lawful authority;

J.A. 4244.

The trial court refused the defense submission and its ruling is included within the final set of filed jury instructions. J.A. 4243.

The Supreme Court stated very clearly that, "relevant to the first element, the government must prove that the accused knew that the 'means of identification'

belonged to another person; an accused unaware that the means of identification
refers to a real person cannot be guilty." *Flores-Figueroa v. United States*, 556
U.S. 646, 647, 654-55 (2009). In *Flores-Figueroa*, the court held that "courts
ordinarily read a phrase in a criminal statute that introduces the elements of a crime
with the word 'knowingly' as applying that word to each element." *Id.* at 652. It
concluded "that § 1028A(a)(l) requires the Government to show that the defendant
knew that the means of identification at issue belonged to another person." *Id.* at
657.

The trial court here argued that jury instruction #56, the one individually
dealing with the first element of the crime, covered the issues raised in *Flores-
Figueroa*. This is in error. Even if the specific instruction addresses some of these
concerns, the general elements instruction does indicate the appropriate level of
"knowing" for each element. This conflicting language could easily confuse jury
who had just sat through a three-week trial. If the jury relied on the laxer general
elemental instruction, they very well could have found the appellants guilty under a
lesser mental state.

*The Aiding and Abetting Instruction as Applied to Aggravated Identity Theft Did
Not Sufficiently Inform the Jury of the Required Mental State.*

The government instruction, which the district court adopted on aiding and
abetting for aggravated identity theft, unlawfully lowered the requisite culpability

for the charge. This requisite culpability is comparable to the required knowledge in aiding and abetting for § 924(c) charges. The Supreme Court has ruled that for § 924(c), a simple aiding and abetting instruction was not sufficient. *Rosemond v. United States,* 134 S. Ct. 1240 (2014).

In *Rosemond*, the defendant was charged with using a gun in connection with a drug trafficking crime, in violation of 18 U.S.C.S. § 924(c), or, in the alternative, aiding and abetting that offense under 18 U.S.C.S. § 2, after he participated in an attempted sale of marijuana to two buyers and shots were fired at the buyers after the buyers took the marijuana and ran. *Id.* The district court instructed the jury that they could find defendant guilty of violating § 924(c), as an aider and abettor, if the evidence showed that he knowingly and actively participated in a drug trafficking crime and knew that an accomplice used a firearm in the commission of a drug trafficking crime. *Id*. The jury found defendant guilty of violating § 924(c). *Id.* The Supreme Court held that the district court's instructions were erroneous because they failed to require proof that defendant knew in advance that one of his cohorts would be armed. *Id.* In telling the jury to consider merely whether defendant "knew his cohort used a firearm," the court did not direct the jury to determine when defendant obtained the requisite knowledge, i.e., to decide whether defendant knew about the gun in sufficient time to withdraw from the crime. The Supreme Court describes the aiding and abetting § 924(c)

combo colorfully as a "double-barreled crime." *Id.* at 1245. This analogy is helpful when examining the aiding and abetting / aggravated identity theft combination.

The Supreme Court opinion in *Rosemond* is a self-contained treatise on aiding and abetting jurisprudence. The common law imposed aiding and abetting liability on a person (possessing the requisite intent) who facilitated any part — even though not every part — of a criminal venture. 18 U.S.C. § 2. *Id.* 1246:

> As a leading treatise, published around the time of §2's enactment, put the point: Accomplice liability attached upon proof of "[a]ny participation in a general felonious plan" carried out by confederates.

*Id.* citing 1 F. Wharton, Criminal Law § 251, p. 322 (11th ed. 1912).

Generally, that principle continues to govern aiding and abetting law under § 2: As almost every court of appeals has held, "[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *United States v. Sigalow*, C.B. 995 (1943). As the court points out, the division of labor between two (or more) confederates thus has no significance: A strategy of "you take that element, I'll take this one" would free neither party from liability. *Id.* at 1247.

The Supreme Court has found an intent requirement satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense. *Id.* at 1249. For purposes of aiding abetting law, a

person who actively participates in a criminal scheme knowing its extend and character intends that scheme's commission. *Id.*

Here, the structure of the Aggravated Identity Theft instruction proposed by the government had the same deficiency when used in conjunction with the aiding and abetting instruction. The pertinent parts of the aiding and abetting instruction are as follows regarding Aggravated Identity Theft:

> Accordingly, you may find a defendant guilty of the offense charged, in this case. Aggravated identity theft, if you find beyond a reasonable doubt that the government has proven that another person actually committed aggravated identity theft, and that the defendant aided or abetted that person in the commission of that offense.

> As you can see, the first requirement is that you find that another person has committed aggravated identity theft. Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place. But if you do find that the crime of aggravated identity theft was committed, then you must consider whether the defendant aided or abetted the commission of that crime.

> In order to aid or abet another to commit a crime, it is necessary that a defendant knowingly associate himself in some way with the crime, and that he participate in the crime by doing some act to help make the crime succeed.

> To establish that a defendant knowingly associated himself with the crime, the government must establish that a defendant knowingly participated in the aggravated identity theft crimes charged in Counts Three through Six.

81

> To establish that a defendant participated in the commission of the crime, the government must prove that a defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.

J.A. (Jury Instruction 64).

The instruction is deficient because it does not instruct the jury that the appellants must have had advance notice, not only that a fraud was happening, but that he had advance knowledge of the type of aggravated fraud that must be proven in this case. Ogundele proposed the appropriate elements instruction as to aggravated identity theft in defendant's objections to the government's proposed instructions. J.A. 4247.

The above aiding and abetting instruction, in conjunction with the deficient elemental instruction on aggravated identity theft, could allow the jury to determine that the defendants were guilty of aiding and abetting the crime without prior knowledge of the aggravated nature of the crime.

This court has held in some instances, even when a jury instruction was erroneous, it still may not affect a defendant's substantial rights. *United States v. Young*, 561 F. App'x 85, 92 (2d Cir. 2014) (explaining that "even if there had been error regarding aiding and abetting" in light of *Rosemond*, "it was harmless because ample evidence supported [defendant's] liability under *Pinkerton*").

However, *Young* is inapplicable here as the indictment does not charge conspiracy to commit aggravated identity theft. The indictment, with respect to

Aggravated Identity Theft, only lists 18 U.S.C. § 1028A and 18 U.S.C. § 2. It does not charge them with conspiracy to commit aggravated identity theft.

The jury instructions erroneously lowered the burden of proof as to the elements of aggravated identity theft and failed to properly instruct the jury as to the elements to be proven beyond a reasonable doubt with respect to the aiding and abetting theory. This court should reverse and remand for a new trial with guidance as to the proper jury instructions for Aggravated Identity Theft.

**III.  The District Court Erred in Allowing the Government to Present Gbenga Ogundele's Statement in a Misleading Manner by Allowing the Government to Introduce the Inculpatory Portions While Denying Appellants the Ability to Introduce the Exculpatory Portions Through the Same Agent.**

**Standard of Review**.

A trial judge's evidentiary decisions are reviewed for abuse of discretion. *United States v. Hassan El*, 5 F.3d 726, 731 (4th Cir. 1993), *cert. denied*, 128 L. Ed. 2d 50, 114 S. Ct. 1374 (1994).

**Argument**.

The government filed a motion in limine seeking to prevent appellants from cross-examining the FBI agents regarding certain exculpatory statements made by Gbenga Ogundele. J.A. 465. The government desired to control the presentation and content of Mr. Ogundele's statement to the agents. They wanted to keep the evidenced that helped them in, but keep out what hurt them. The culmination of

their tactics was a presentation of Gbenga's statement that was misleading and fundamentally unfair to all appellants.

Appellants argued several grounds for admission of the exculpatory evidence: § 804(b)(3), the residual hearsay rule, and also authority from the Ninth Circuit. J.A. 551. Adequately described by trial counsel for Ms. Popoola, the current test in the Fourth Circuit leads to a "fundamental unfairness." *Id*. Prior to ruling, the trial court seemed to agree in principal:

> There is an element of unfairness that ultimately, I would have to decide whether it rises to 403 unfairness to where the government gets to put in anything in the statement that they want that harms the defendants, but blocks anything that can be helpful.

J.A. 552.

Ultimately, after analyzing the factors from *United States v. Cole*, the trial court granted the government's motion. 525 F.3d 656 (2008). J.A. 561. The same trial court, in a separate matter, less than a year later, reversed field and applied a different approach by calling upon the "still-viable" common law. *United States v. Bailey*, No. PWG-16-0246, 2017 U.S. Dist. LEXIS 80093, 4 (D. Md. May 24, 2017). Bailey, like Mr. Ogundele, had given a statement to government agents. *Id*. And, like Mr. Ogundele, his statement was a mixed bag. Part of his statement was against his interest while some of it was exculpatory, or at least not against his penal interest. *Id*. at 2. The memorandum opinion in *Bailey* gets to the very heart of the unfairness in admitting the former while not the latter:

84

The back-and-forth presentation of evidence in a criminal case usually works fairly smoothly, but problems arise when one party's artful phrasing of a question calls for a response that is technically accurate, but incomplete, altering the meaning of the original statement.

*Id.* at 6.

The common law, to combat such issues developed the 'completeness doctrine' where "[i]n evidencing the tenor of an utterance material or relevant, made in words, whether written or oral in original or in copy, the whole of the utterance on a single topic or transaction must be taken together." *Id*. (quoting *John Henry Wigmore*, Code of Evidence 371 (3d ed. 1941)).

The common law on the doctrine of completeness was partially codified at Rule 106:

> If a party introduces all or part of a *writing or recorded statement*, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

Fed. R. Evid. 106. (emphasis added)

However, the codified version of the rule of completeness is written more narrowly. The codified rule only includes writings and excludes conversations or other oral statements. *Id.* at 8. As the court in *Bailey* pointed out, the rule does not address whether completing of information is allowed with otherwise inadmissible statements. *Id*. at 9. Further, the rule gives no guidance as to what must be shown

85

to satisfy the fairness requirement that would trigger the introduction of the completing information. *Id.*

Left with little guidance, courts from around the country have come to differing opinions. There is clearly a circuit split. For example, this Court has held that evidence that would be inadmissible if offered independently cannot be used for completeness purposes under Rule 106. *See*, e.g., *United States v. Hassan*, 742 F.3d 104, 134-35 (4th Cir. 2014). *See also United States v. Mitchell*, 502 F.3d 931, 965 n.9 (9th Cir. 2007); *United States v. Guevara*, 277 F.3d 111, 127 (2d Cir. 2001); *United States Football League v. Nat'l Football League*, 842 F.2d 1335, 1375-76 (2d Cir. 1998).

Other circuits have not applied such a hard and fast rule. *United States v. Sutton*, 801 F.2d 1346, 255 U.S. App. D.C. 307 (D.C. Cir. 1986). The D.C. Court of Appeals recognized that there are situations where the introduction of inculpatory parts of a statement, and not the exculpatory parts, may be misleading. As such, a defendant should be able to argue for the admission of otherwise inadmissible hearsay. *Id. See also United States v. Harvey*, 653 F.3d 388, 394-95 (6th Cir. 2011) (affirming decision of district court to admit under the rule of completeness recordings that the court previously had ruled inadmissible on their own); *United States v. Bucci*, 525 F.3d 116, 133 (1st Cir. 2008) ("[O]ur case law

unambiguously establishes that the rule of completeness may be invoked to

facilitate the introduction of otherwise inadmissible evidence.")

Coming back around, the court in *Bailey* recognized that because rule 106 is

only a partially codified version of the rule of completeness, the non-codified (oral

statements) portion of the common law was still valid. The court noted that the

Supreme Court itself recognized that Rule 106 only partially codifies the common

law doctrine of completeness, and for situations beyond the reach of the rule, the

common law still applies. *Id.* at 22 citing *Beech Aircraft Corp. v. Rainey*, 488 U.S.

153, 109 S. Ct. 439 (1988). Following a lengthy analysis, the court in *Bailey* ruled

as follows:

> (1) Rule 106 only covers writings or recordings, but its codification
> does not preempt the application of the common-law rule of
> completeness for oral statements and conversations. If the common-
> law rule is applied to oral statements and conversations, the court
> should consider the factors discussed at § II.A.2 to determine whether
> the completing information is required at the same time that the
> incomplete information is introduced or whether it should be admitted
> at cross examination or later.
>
> (2) As an alternative means of dealing with oral statements or
> conversations, Rule 611(a) allows the trial judge to apply the same
> underlying logic of Rule 106.
>
> (3) Neither Rule 106 nor the common-law rule of completeness is
> triggered unless some clearly identifiably unfairness would exist
> without allowing the party that would be prejudiced the opportunity to
> offer information that would clarify or explain. The trial judge must
> carefully examine both the incomplete and completing information to
> insure that fairness does require the correction, and limit the
> correcting information to that actually needed to eliminate the

unfairness. The factors discussed in § II.A.2 should be used by the judge in conducting this analysis.

(4) When the fairness principles that underlie Rule 106 and the common-law rule of completeness require application of the doctrine, both admissible and inadmissible information should be available to set the record straight. While there is Fourth Circuit authority holding that inadmissible evidence may not be used, *Hassan*, 742 F.3d at 134-35; *Wilkerson*, 84 F.3d at 696, there also is authority holding that it may, *Gravely*, 840 F.2d at 1163, and until this split in authority has been resolved, a court may allow inadmissible evidence under the completeness doctrine, subject to the restrictions mentioned in my third conclusion above.

(5) If the Fourth Circuit should clarify that inadmissible evidence is not available to complete the record under Rule 106, the common law, or Rule 611(a), then the trial court should carefully consider Rule 403, and if the unfairness that would result from the proponent's introduction of the incomplete information cannot adequately be addressed by other means, exclude the misleading information pursuant to Rule 403.

*Id*. at 36-37.

In the trial at hand, the court failed to recognize the still-viable common law on the rule of completeness. Limiting its decisional analysis to the codified rule, the trial court erroneously failed to engage in the meaningful fairness review it now believes (and is) appropriate.

Many of the factors suggested by the court in making a fairness analysis apply in the case at hand. *See* 21A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5077.2 (2d ed. 2005). Does the evidence taken out of context make the evidence misleading?

*Id.* Yes, it did. The government's proffered version of Mr. Ogundele misrepresented his statement as a whole. The curated statement made it appear that Mr. Ogundele went on and on about his guilty conduct and made no explanation for own his activity that could be construed as innocent or mitigating. Further, he made very clear exculpating statements as to his wife and Babatunde that, when removed, distort the true picture of his meeting with the agents.

Does truncation or completion implicate constitutional rights (if the prosecution introduces incomplete portions of a defendant's confession that, if not completed by introducing other parts of the confession, would require the defendant to waive his Fifth Amendment right not to testify)? *Id*. Yes, presenting the statement in this way would force Mr. Ogundele to testify, implicating his Fifth Amendment right, to set the record straight. Further, Ogundele's co-appellants Sixth Amendment rights were implicated in that they were forced to go to trial with Ogundele and as a result could not compel Ogundele's testimony as to the exculpatory statements.

The trial court abused its discretion in failing to recognize the still-viable common law on the doctrine of completeness as it relates to fairness. The case should be reversed and remanded for a proper finding and new trial.

**IV.    The District Court Procedurally Erred in its Calculation of Mr. Ogundele's Sentence by Applying a 16-level Enhancement to Mr. Ogundele's Sentence Based on the Amount of Loss.**

**Standard of Review**

This Court reviews federal sentences for "reasonableness." *United States v. Booker*, 543 U.S. 220, 260–63 (2005). In determining a sentence's reasonableness, this Court "'review[s] the district court's legal conclusions de novo and its factual finding for clear error.'" *United States v. Thornton*, 554 F.3d 443, 445 (4th Cir. 2009) (citation omitted). Clear error exists when "on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010). A sentence may be found procedurally or substantively unreasonable. *United States v. Hargrove*, 625 F.3d 170, 182–93 (4th Cir. 2010).

**Argument**

Ogundele's Presentence Investigation Report calculated that the amount of loss between 9.5 million and 25 million dollars. J.A. 4808. This would have resulted in a 20-level increase. The government had a different argument and calculated the appropriate amount of loss was between 1.5 million and 3.5 million. J.A. 4653. The government based this amount on the charts that they had introduced at trial which showed that approximately 2,195, 103.36 had come through Mr. Ogundele's bank accounts.

90

Mr. Ogundele argued that at trial that not nearly that $2,195, 103.36 was attributed to fraud. And, even though the government could do so, they did not add supplemental proof of loss for purposes of sentencing. J.A. 4647. The court accepted the argument of the government and found the amount of loss to be between 1.5 million and 3 million. This added 16 levels. J.A. 4660.

*Loss Amount*

Section 2B1.1(a) of the Guidelines provides the base offense level for crimes involving fraud or deceit. That section also calls for various increases to a defendant's base offense level depending on the specific loss amount at issue. U.S.S.G. § 2B1.1(b). *United States v. Catone*, 769 F.3d 866 (4th Cir. N.C. 2014). The government must prove the amount of loss by a preponderance of evidence. *Id*. citing *United States v. Pierce*, 409 F.3d 228, 234 (4th Cir. 2005). The district court, though it need not reach a precise figure as to loss, must make a "reasonable estimate" of loss based on the "available information" in the record. *Id*. The loss amounts must be in the record.

Defense counsel questioned the witnesses about the sources of the losses in their accounts. J.A. 1126. Many of the witnesses mentioned giving additional money to persons listed nowhere in the indictment. J.A. 1166. If these loss amounts are not in the indictment, or not proven at trial to be reasonably foreseeable to Mr. Ogundele, the government must prove them at sentencing.

91

However tragic, not every dollar the victims gave out over the internet is attributable to Mr. Ogundele. The trial court abused its discretion in finding that the actual loss attributable to Mr. Ogundele for sentencing purposes was between 1.5-3.5 million dollars which resulted in a sentence of 234 months. The Court should reverse and remand to the district court with instruction to calculate the amount of loss proven at trial or sentencing.

<div align="center">**ARGUMENT – MOJISOLA POPOOLA**</div>

**I.    The District Court Committed Error When It Failed to Suppress Evidence Obtained by the FBI When Mojisola Popoola Was Asked to Enter Her Passcode onto Her iPhone Without Miranda Warnings and In Violation of the Fifth and Sixth Amendment Rights of Mojisola Popoola.**

**Standard of Review.**

Factual findings underlying a motion to suppress are reviewed for clear error and legal determinations are reviewed de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010), *cert. denied,* ⸺ U.S. ⸺, 131 S. Ct. 271, 178 L. Ed. 2d 179 (2010).

**Argument.**

Ms. Popoola filed a Motion to Suppress Statements and Evidence seized from her iPhone, as fruits arising from the statement identifying her iPhone and passcode to unlock the iPhone. The statements and iPhone contents were obtained during the execution of an arrest warrant for her and her husband Gbenga

<div align="center">92</div>

Ogundele and search warrant for their home. (Motion to Suppress, J.A. 174-183).

The FBI entered the house at approximately 6:30 am with approximately 10 agents

with guns drawn. (Motions Hearing, J.A. 253). They located Ms. Popoola in her

paJ.A.mas and informed her she was under arrest and that the FBI had a warrant to

search the house. Ms. Popoola was not free to leave while law enforcement

searched the house. (Motions Hearing, J.A. 263-264). She was not advised of her

Miranda rights at any time during the search of the house. (Motions Hearing, J.A.

259). Agent Winkis testified that she asked Ms. Popoola where her cell phone was

located and Ms. Popoola advised her it was on the night stand in her bedroom.

(Motions Hearing, J.A. 256, 265-266). Ms. Popoola did not volunteer where phone

was, she told her where it was after Agent Winkis asked her where it was without

giving her Miranda warnings. Id. Agent Winkis was unable to find it herself but

another agent found an iPhone in the bedroom and handed it to her. (Motions

Hearing, J.A. 257-258). Agent Winkis noted it was an Apple iPhone and it was

locked and asked Ms. Popoola if she could she please open the phone and she took

the phone and put the numbers (password) in to open it. (Motions Hearing, J.A.

248-249, 259).  Agent Winkis knew at the time Ms. Popoola had the right to refuse

but she did not advise her of her rights. (Motions Hearing, J.A. 260). Ms.

Popoola's actions acknowledged it was her iPhone and put the password in to open

it. Id. Agent Winkis then handed the phone to the forensic person who placed the

phone on airplane mode and would image (search) the phone. (Motions Hearing,

J.A. 250-251). The data seized from the phone was subsequently introduced at trial

in the government's case in chief.

As argued in Ms. Popoola's pretrial Motion to Suppress (Motion to Suppress,

J.A. 174-183), her statement while in police custody was made as a result of a

violation of her Fifth and Sixth Amendment rights. The statements were made

without prior Miranda warnings and they were made involuntarily. The District

Court ruled that the specific statement in question was made voluntarily because

the circumstances were not coercive or threatening, that the request for Ms.

Popoola to unlock the phone was courteous and not commanding.  (Motions

Hearing, J.A. 295).  The District Court also ruled that the act of Ms. Popoola

entering her passcode into the iPhone was neither a testimonial statement nor

communicative conduct for Fifth Amendment purposes and therefore any evidence

derived from it would not be suppressed.  (Motions Hearing, J.A. 294-295).

The District Court erred in finding that her statement was made voluntarily

because she was not advised of her Fifth and Sixth Amendment rights pursuant to.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Any statement made while in

police custody is inadmissible unless the record clearly shows that the warnings

were provided and that a defendant knowingly and intelligently waived those

rights. In *Moran v. Burbine*, 475 U.S. 412, 421 (1986), the Supreme Court

affirmed the high level of proof required to find a waiver of Miranda rights.

> First, the relinquishment of the right must have been voluntary in the
> sense that it was a product of a free and deliberate choice rather than
> intimidation, coercion or deception. Second, the waiver must have
> been made with full awareness, both of the nature of the right to be
> abandoned and consequences of the decision to abandon it.

Clearly the facts indicate Ms. Popoola did not make a deliberate choice to waive

her right to remain silent and reveal the pass code.  In *Rhode Island v. Innis*, 446

U.S. 291 (1980), the Supreme Court defined "interrogation" to mean direct

questioning or its equivalent, instructing:

> [T]he term 'interrogation' under Miranda refers not only to express
> questioning, but also to any words or actions on the part of the… that
> the police should know are reasonably likely to elicit an incriminating
> response from the suspect.

*Id*, at 301 (emphasis added). Asking an individual to provide or enter his or her

passcode to an iPhone constitutes an interrogation and entry of the passcode itself

is a testimonial communication that is protected by Maranda and the defendant's

rights' under the Fifth Amendment. In *United States v. Mitchell*, 76 M.J. 413, 418

(C.A.A.F. 2017) the U.S. Court of Appeals for the Armed Forces found that entry

of an iPhone's password at the request of the investigating officer violated the

accused Fifth Amendment right against self-incrimination:

> asking Appellee to *state* his passcode involves more than a mere
> consent to search; it asks Appellee to provide the Government with
> the passcode itself, which is incriminating information in the Fifth

Amendment sense, and thus privileged. "The privilege ... not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute...." *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *see also United States v. Hubbell*, 530 U.S. 27, 37– 38 (2000). When the agents switched tactics and succeeded in getting Appellee to enter his passcode rather than verbally provide it, that request was part of the same basic effort to convince Appellee to provide the information necessary for the Government to access and search the contents of his phone....

*Id. at* 418. It is clear that Ms. Popoola was in custody at the time in question, that she was not informed of her Miranda Rights prior to being interrogated and therefore could not knowingly and voluntarily waive her rights against self-incrimination.

The District Court made legal determination subject to de novo review when it concluded that the act of entering her password into the iPhone was neither a testimonial statement nor communicative conduct. It reasoned that because Ms. Popoola did not verbally provide the passcode to the FBI agents and they did not see what the passcode was, it was not a statement for Fifth Amendment purposes. (Motions Hearing, J.A. 294-295). It also held that entering the passcode was not a communicative conduct because it was not intended to be an assertion, the same way that entering a combination into a safe is not a testimonial communication. (Motions Hearing, J.A. 283-284). However, the district court's holding is contrary to long established holdings of the Supreme Court. The Fifth Amendment privilege against self-incrimination protects against compelled "testimonial"

96

communications that require a person to use "the contents of his own mind" to communicate some fact. *Curcio v United States*, 354 U.S. 118, 128 (1957).   It is well-established that a communication need not be verbal to be testimonial. *Doe v United States*, ("Doe II"), 487 U.S. 201, 210 n.9 (1988) (noting agreement on this point with Justice Stevens' dissent, id. at 219).  Accordingly, the focus is not on whether the communication is "spoken" but whether it involves, by word or by deed an "expression of an individual's mind". (Stevens J. dissenting) As the Supreme Court noted in *Hubbell*, Supra, while it is well established that "mere physical acts" that do not express the contents of one's mind are not testimonial, compelled entry of the combination of a safe is testimonial because it requires the compelled use of the "contents of [ an individual's] own mind" and is within the Fifth Amendment privilege. 530 U.S. at 43; see also *United States v Kirschner*, 823 F. Supp. 665, 669 (E.D. Mich. 2010) (quashing a subpoena for computer passwords, reasoning that, under *Hubbell* and *Doe*, the subpoena would have required the suspect "to divulge through his mental process his password").

The government in Ms. Popoola's case had a search warrant to obtain all cell phones located within the home she shared with Mr. Ogundele. The warrant did not specify which, if any, phone belonged to Ms. Popoola. Only through her communicative conduct of unlocking the iPhone was the government able to ascertain that it belonged to her.  Without that communicative conduct, the

government would not have been able to access the encrypted iPhone 6 and

determine to whom it belonged and obtain the contents of the device. In U.S. Air

Force Court of Criminal Appeals in *United States v. Blatney*, No. MC 2016-16,

2017 WL 2422807, at 3 (A.F. Ct. Crim. App. May 22, 2017) held:

> the act of unlocking the phone communicated that Appellee knew the
> passcode to his own cell phone, and Appellee further claims that such
> knowledge implicitly suggests that: (1) the iPhone was passcode
> protected, (2) without the passcode the iPhone could not be used, (3)
> Appellee created the passcode, (4) Appellee was the only person who
> could use the phone, and (5) Appellee was the person responsible for
> anything done with the phone.

The government used a significant amount of information gained from Ms.

Popoola's cellphone against her at trial. Notably, the government in its case relied

upon the text messages found on Ms. Popoola's iPhone as evidence in the case.

(Government Exhibits 3e and 3f, J.A. 4221-4234) and highlighted them in its

demonstrative charts. Without Ms. Popoola putting her passcode into the phone,

the government would not have been able to image her cell phone and get past the

iPhone's encryption; they would not have been able to enter these messages

against her. Accordingly, the evidence derived from the iPhone in violation of her

Fifth and Sixth Amendment rights must be suppressed.

II.     **The District Court Erred When it Instructed the Jury That They Could Consider Conscious Avoidance to Determine Mojisola Popoola's Knowledge of the Wire Fraud Conspiracy**

**Standard of Review.**

The district court's decision to offer an instruction and the content of that instruction is reviewed for abuse of discretion. *See United States v. Lighty,* 616 F.3d 321, 366, 377 (4th Cir. 2010).

**Argument.**

At trial, the District Court provided the following modified Jury Instruction No. 44: Conscious Avoidance, Deliberately Closing Eyes:

> In determining whether a defendant acted knowingly, you may consider whether the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. If you find beyond a reasonable doubt that the defendant took deliberate actions to avoid learning that the money in question was the proceeds of fraud or other illegal activity, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken or that the defendant should have known the truth.

> If you find beyond a reasonable doubt that a defendant took deliberate actions to avoid knowing that the money at issue was the proceeds of fraud or other illegal activity and acted with deliberate disregard of the facts, you may find that the defendant acted knowingly. However, if you find that the defendant actually believed that the money at issue was from a legitimate source, he or she may not be convicted. It is entirely up to you whether you find beyond a reasonable doubt that a defendant or defendants deliberately closed their eyes and any inferences to be drawn from the evidence on this issue.

(Final Jury Instructions with Commentary, Exhibit Court-2, SJ.A. 2-6). (Jury

Instruction Transcript, J.A. 3679-3680). Prior to trial, Ms. Popoola, and other

defendants, filed objections to the government's proposed jury instruction on

conscious avoidance, also known as willful blindness. Specifically, Ms. Popoola

objected to the instruction because there was "not an evidentiary basis to establish

that it is appropriate and because the instruction as indicated undermines the

burden of proof of "actual knowledge" "as an element of the offense." (Defendants

Objections to Proposed Jury Instructions Conscious Avoidance-Deliberately

Closing Eyes, J.A. 507-511). If the District Court was nevertheless inclined to

give the instruction in some fashion, then Ms. Popoola provided a proposed

modified version to the government's suggested instruction. The Trial Court

adopted modifications suggested by both the government and defendants which

resulted in the final instructions given to the jury as stated above. In support of the

Trial Court's decision to include the modified instruction, it analyzed that "this

instruction should be given if there is evidence that a defendant deliberately

avoided learning the truth," and that "Courts therefore restrict the use to cases not

only where there is asserted lack of knowledge but also where there is evidence of

deliberate ignorance. *United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir. 1994)

(quoting *United States v. Sanchez-Robles*, 927 F.2d 1070 (9th Cir. 1991)." (SJ.A.

2-6).

While the instruction with modifications is less prejudicial than the government's proposed instruction, it was in error to provide the instruction at all, because there was not sufficient evidence as a threshold matter to support the assertion that Ms. Popoola deliberately avoided learning the truth and because the instruction as indicated undermines the burden of proof of actual knowledge as an element of the offense.

The knowledge element can be proven by direct or circumstantial evidence beyond a reasonable doubt of actual knowledge. *United States v Schnabel*, 939 F.2d 197, 203(4th Cir. 1991) or this Circuit has held that the knowledge element can be proved through an instruction that may "impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *Id*.

The Willful Blindness instruction may only be given where there is an evidentiary basis to support it. *Id*. (citing *United States v Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988). The trial court should only give Willful Blindness instruction where there was either direct evidence of "deliberate avoidance of knowledge" or evidence from which the jury could infer avoidance. *United States v Whittington*, 26 F.3d 456, 463 (4th Cir. 1994).

Courts have noted that there is a risk that the instruction may cause jurors to substitute the element of knowledge for reckless disregard of the facts

indicating actual knowledge or negligent failure to determine the facts

providing element of knowledge. In light of this concern the instruction

should only be given rarely. *United States v Ruhe*, 191 F3d 376, 836 (4th

Cir. 1999). Moreover, "…willful blindness instruction should be handled

with caution.*" United States v Jinwright*, 683 F 3d 471 (4th Cir. 2012)

(citing *United States v Lighty*, 616 F.3d 321, 366,3 77(4th Cir. 2010). In

*United States v Macias*, 786 F3d 1060, 1062 (7th Cir. 2015) the Seventh

Circuit has emphasized the Supreme Court's requirement that there should

be evidence that the defendant took deliberate actions to avoid learning the

truth:

> An ostrich instruction should not be given unless there is evidence
> that the defendant engaged in behavior that could reasonably be
> interpreted as having been intended to shield him from confirmation
> of his suspicion that he was involved in criminal activity. As the
> Supreme Court put it in *Global–Tech Appliances, Inc. v. SEB S.A.,* —
> – U.S. ——, 131 S.Ct. 2060, 2070, 179 L.Ed.2d 1167 (2011), the
> defendant must not only "believe that there is a high probability that a
> fact exists" but also "must take deliberate *actions* to avoid learning of
> that fact" (emphasis added)."

In *United States v Jinwright*, 683 F 3d 471, (4th Cir. 2012) this Circuit

addressed the Willful Blindness instruction acknowledging the appellant's reliance

on *Global-Tech Appliances  Inc. v SEB S.A, Supra.* In upholding the trial court's

instruction, it noted that the trial court admonished the jury that it was not enough

to find the defendants:

were reckless or foolish in failing to recognize what was occurring"
and that a "showing of negligence is not sufficient to support a finding
of willfulness or knowledge." The court cautioned the jury that a
"willful blindness charge does not authorize you to find that the
defendants acted knowingly because they should have known what
was occurring, or that in the exercise of hindsight they should have
known what was occurring, or because they were negligent in failing
to recognize what was occurring.

683 F 3d at 480. Below defendant's asked that the trial court  that if it did give the

Conscious Avoidance Instruction, it should eliminate the "high probability"

language, emphasize the burden of proof beyond a reasonable doubt and include

language that the defendant   "must take deliberate *actions* to avoid learning of that

fact" and include cautionary language  from Jinwright such as: **"willful blindness**

**charge does not authorize you to find that the defendants acted knowingly**

**because they should have known what was occurring, or that in the exercise of**

**hindsight they should have known what was occurring, or because they were**

**negligent in failing to recognize what was occurring."** *United States v Jinwright*,

683 F 3d at 480 (emphasis added). While the trial court did emphasize reasonable

doubt, and eliminate the high probability language, it did not give a clear a

cautionary instruction as the Court in *Jinwright*. Therefore, it is likely the jury

applied the wrong standard and found Ms. Popoola guilty on the "should have

known standard". That combined with the lack of evidence of any deliberate

actions on Ms. Popoola's part to avoid learning the source of the money denied her

a fair trial.

There was no evidence that Ms. Popoola deliberately avoided knowing what the funds in her account were for. Her husband specifically instructed her that he was expecting funds in her account for the auto business because his account had been closed. When she inquired as to why, she was told not to worry about it. (Govt. Exhibit 3e, J.A. 4223). Ms. Popoola had no reason not to trust her husband based on the evidence offered by the government. The government argued that Ms. Popoola was aware that something was amiss plainly by the sheer amount of money coming through her account, of which she would often quickly withdrawal from her account in the form of checks to her husband, and the fact that cash was being deposited from other states. (J.A. 3784-3797; J.A. 3982-3987). As Ms. Popoola's counsel argued in his closing, the evidence did not show Ms. Popoola had knowledge of the fraudulent origin of the funds, she had no reason not to believe her husband, or question that the funds were coming from anywhere else than the legitimate auto business or from those who needed their assistance with Nigerian money exchange. (J.A. 3923-3953). No emails, text messages or oral testimony presented by the government demonstrates that Ms. Popoola acted deliberately to avoid knowledge of the origin of the funds. Thus, the use of this instruction denied Ms. Popoola a fair trial.

III. **Defendant Mojisola Popoola Was Denied Her Sixth Amendment Right to Present Exculpatory Evidence by the Trial Court's Denial of Her Motion to Sever and Alternatively to Cross Examine Agent Custer on Co-Defendant Gbenga Ogundele's Custodial Statement Inculpating Himself and Exculpating Mojisola Popoola.**

**Standard of Review**

A district court's denial of a motion to sever is reviewed for an abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010). The court's decision on the admissibility of an FRE 804(b)(3) Statement Against Interest is also reviewed for abuse of discretion. *See United States v. MacDonald,* 688 F.2d 224, 233 (4th Cir.1982), *cert. denied,* 459 U.S. 1103 (1983) and it's factual finding regarding the reliability of the prior statement or testimony is reviewed for clear error. *United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 309 (4th Cir. 2000).

**Argument.**

The government filed a Motion to Resolve Potential Bruton Issues in which it disclosed a custodial statement made by Ms. Popoola's husband and codefendant Gbenga Ogundele which both implicated and exculpated Mojisola Popoola:

> Mr. Ogundele goes to work in the morning, usually to local car auctions, and his wife, Ms. Popoola is not involved in the business at all. However, back when Mr. Ogundele's Bank of America (BOA) account was shut down, Ms. Popoola accepted deposits into her account at Mr. Ogundele's direction. Ms. Popoola does not know anything about the business and no one calls or contacts Ms. Popoola to deal with the business.

(Govt. Motion, J.A. 144). Ms. Popoola filed a Motion to Sever (J.A. 160-173), addressing the Bruton issue as well as her intention of calling her husband Gbenga Ogundele as a witness with respect to his exculpatory statements which were clearly material to her defense that her husband directed her to accept deposits into her personal BOA account but she did not know that the any of the deposits were proceeds of the wire fraud scheme, since she was not involved in the details of his automobile business. Ms. Popoola sought severance because of prejudice arising from the risk of guilt by association and the spill over impact of the disparity of evidence. The government opposed the Motion to Sever and filed a Motion In Limine (J.A. 465-468) to prohibit Ms. Popoola from eliciting the exculpatory aspects of her husband's statements and Ms. Popoola filed an Opposition (J.A. 487-491) asserting that the statement was admissible under hearsay exceptions FRE 804(b)(3) (Statement against Penal Interest) and FRE 807 (Residual Exception).

At the time of the motions hearing the Court had already decided to split the case into two groups of defendants and the government had elected to try her husband in the first group.  In a subsequent hearing on the Motion in Limine the Court then ruled that Ms. Popoola would be unable to cross examine the FBI agent regarding the exculpatory portion of the statement because it was hearsay that

failed to meet an exception as detailed in Federal Rules of Evidence 804(b)(3)

Statement Against Interest or FRE 807 Residual Exception. (J.A. 556-562).

### A.  The District Court Erred When it Denied Mojisola Popoola's Motion to Sever.

It is well established that "a defendant may be prejudiced"—such that severance

may be warranted "if he could not avail himself of exculpatory evidence in a joint

trial that would be available were he tried alone." *United States v. Allen*, 491 F.3d

178, 189 (4th Cir. 2007); *see also Zafiro v. United States*, 506 U.S. 534, 539

(1993) ("[A] defendant might suffer prejudice if essential exculpatory evidence

that would be available to a defendant tried alone were unavailable in a joint

trial."); *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971) ("a severance

is obligatory where one defendant's case rests heavily on the exculpatory

testimony of his co-defendant, willing to give such testimony but for the fear that

by taking the stand in the joint trial he would jeopardize his own defense.")

In an oral ruling the District Court found the defendant failed to prove two of

the four factors required for severance under *United States v. Parodi,* 703 F.2d

768, 779 (4th Cir. 1983). The District Court found that she did not prove that there

was a likelihood that her husband and co-defendant would testify at a separate trial

and that the government had evidence of impeachment should he choose to take

the stand.  (Motions Hearing, J.A. 386-387). At the hearing, the District Court

inquired as to what evidence Ms. Popoola had that Mr. Ogundele would waive his

rights and "testify unconditionally". (Motions Hearing, J.A. 369). The trial court abused its discretion when it applied this "testify unconditionally" standard. A defendant need not show the likelihood of the co-defendants testimony "unconditionally" or to an "absolute certainty". She need only show it to a reasonable probability. *Parodi*, 703 F.2d at 779. Mr. Ogundele had demonstrated his willingness to exculpate his wife by opening himself up to prosecution through the inculpatory statements made to FBI agents during the search of his home, indicating a reasonable probability that if the trials were severed and he was tried first, he would waive his Fifth Amendment privilege and testify on his wife's behalf.

Once an accused satisfies these threshold requirements, the Court then considers five factors identified in *Parodi* :(1) "the significance of the testimony in relation to the defendant's theory of defense," (2) "the extent of prejudice caused by the absence of the testimony," (3) "judicial administration and economy," (4) "the timeliness of the motion," and (5) "the likelihood that the co-defendant's testimony could be impeached." *Parodi*, 703 F.2d at 779. The first four factors weigh heavily in favor of severance. As to the factor of "the likelihood of impeachment" is only one of five factors to be considered and it alone is not determinative. In addition to applying the wrong standard for the threshold inquiry the court abused its discretion when it unreasonably relied too heavily upon the

government's argument that they would impeach his exculpatory testimony by entering into evidence a document that purported to show Ms. Popoola was a partner in a Nigerian corporation, "Benson Auto Place", whose stated business was the purchase, import and sale of automobiles. (See Govt. Motions Exhibit List, MH-7; J.A. 463, identical to Gov't Trial Exhibit B6, J.A. 4191-4192). (Motions Hearing, J.A. 382). The document in question did not mention who her partner in the corporation allegedly was and Mr. Ogundele's name was not on it, (Motions Hearing, J.A. 383). There was no proffer that she was an active partner, whether the foreign business was active during the alleged conspiracy and there was no proffer that it received money from Mr. Ogundele's American business. All the government could say was that "Benson" is Mr. Ogundele's middle name which he occasionally goes by and that he owns an American business, "G.L. Benson, LLC." (Motions Hearing, J.A. 385). Accordingly, there is very little impeachment value.

The potential for impeachment based on the fact that Mr. Ogundele had a bias in favor of his wife was also minimal under the facts of this case and outweighed by the significance of the theory of the defense. The statement about her minimal involvement in the U. S. automobile business was just as likely to be true because he shielded her from the true source of the funds used to purchase some of the vehicles in order to either protect her or for fear she would not approve of it.

Ms. Popoola was also substantially prejudiced by the disparity of evidence against her and the other co-defendants and the unfair spillover effect on her right to a fair trial. It is extraordinarily difficult for a jury in a conspiracy case to follow admonishing instructions and to keep separate evidence that is relevant only to co-defendants, particularly when the co-defendants are related. See (Motion to Sever, J.A. 166) *Zafiro v. United States*, 113 S. Ct. 933, 938, 941 (1993) Citing: *Krulewitch v. United States*, 336 U.S. 440, 454 (1949). In this case, unlike the evidence against Ms. Popoola, as the government summarized in its closing, there was direct evidence presented by the government against her husband in his statements and emails that he had knowledge of the wire fraud romance scam that was the source of at least some of the money in her account and that he tried to cover it up. (J.A. 3734-3735). However, there was no evidence that he communicated that to her. Given the disparity of the evidence against Ms. Popoola verses her husband, the spillover effect was substantial and the jury could not be reasonably be expected to "compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility." *United States v. Sampol*, 636 F.2d 621, 647 (1980). The court committed errored when it failed to address the prejudice in this case arising from the disparity of evidence against Ms. Popoola and her husband and the risk in this conspiracy case that jury would be

unable to compartmentalize the evidence of his knowledge of the wire fraud from hers.

**B.     The District Court Erred When It Denied Mojisola Popoola the Opportunity to Present Exculpatory Evidence Pursuant to FRE 804(b)(3) and FRE 807**

In violation of Ms. Popoola's Sixth Amendment right to present evidence in her defense, the District Court erred when it granted the government's Motion in Limine and would not admit into evidence the exculpatory statement made by her husband through the cross examination or other testimony of FBI agent Keith Custer. (Gov't Motion in Limine, J.A. 465-468) As Mr. Ogundele was unavailable pursuant to Federal Rules of Evidence 804(a)(1)[2], his statement, which was inculpatory of himself and exculpatory of Ms. Popoola, should have come in through FRE 804(b)(3) because he was unavailable, it was genuinely adverse to his penal interest and corroborating circumstances clearly indicate trustworthiness of the statement. Trustworthiness factors under Rule 804(b)(3) include:

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement, (4) the parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.

---

[2] The court noted that he was unbailable in light the Fifth Amendment privilege. JA 556.

*United States v. Dargan*, 738 F.3d 643, 650 (4th Cir. 2013) (quoting *United State*

*v. Kivanc,* 714 F.3d 782, 792 (4th Cir. 2013). The District Court found that because

of the husband and wife relationship and the nature and strength of the evidence

presented by the government, the statement did not rise to the standards of

trustworthiness as to be admitted under the 804(b)(3) exception to hearsay rule.

(J.A. 561-562) In the same instance, the District Court also ruled that because of

the statements failure to meet the trustworthiness standard under FRE 804(b)(3), it

also failed to meet the standards under FRE 807. (J.A. 562).

Clearly the declarant was still exposed to prosecution at the time of the

statement and the statement was made to law enforcement after waiving his

Maranda rights. While he had a motive to protect his wife, the statement also

implicated himself and his wife.  With regard to "the nature and strength of

independent evidence relevant to the conduct in question", the conduct in question

was whether Ms. Popoola knew that the source of the money being deposited into

her personal bank account was from the particular wire fraud scam alleged. It was

proffered at the hearing and the trial evidence bore out that there was very little, if

any, evidence that Ms. Popoola knew of the source of the wire fraud money.

Despite thousands of emails and text messages offered from search warrants and

seizure of their phones, unlike her husband, there was none in evidence that

showed her knowledge that the source of the money was from wire fraud scam

alleged. The evidence presented by the government as to the untrustworthiness of

the statement was the same circumspect document as mentioned earlier, denoting

Ms. Popoola as a partner in a Nigerian auto business. (Govt. Exhibits MH-7, J.A.

463-464, Trial ExhibitB6, J.A. 4190-4191). This document does not have

significant bearing on the lack of trustworthiness of Mr. Ogundele's statement.

Other evidence as to the untrustworthiness of the statement presented by the

government includes evidence that Ms. Popoola received substantial money from

G.O. Benson and Friendly Auto Sales over the years.  (J.A. 553). This evidence

does not provide proof of Ms. Popoola's knowledge of the origin of the funds

sufficient to deem that the hearsay statement made by Mr. Ogundele is not

trustworthy. In *United States v. Paguio, Jr.,* 114 F3d 928 (9th Cir. 1997), Manuel

Paguio Jr. was charged along with wife and his father with false statements to a

bank to influence action on a loan application. Prior to the first trial his father gave

a statement to his son's lawyer that his son had "nothing to do with it". His father

refused to testify at the first trial asserting his 5th Amendment privilege and at a

second trial following a mistral, the father was unavailable because he was

fugitive. The trial judge admitted only those portions of the father's statements that

were inculpatory and not those that were exculpatory to the son. The 9th Circuit

reversed based on the trial court erroneously parsing the exculpatory statements

from the inculpatory statements but affirmed the trial court's ruling that the third

element of Rule 804(b)(3) "corroboration of trustworthiness" was met under the circumstances. Id. In doing so the 9th Circuit noted "[a] motive of love might, however, induce a reasonable father to make a false self-inculpatory statement in order to save his son" thereby favoring its exclusion. But the 9th Circuit also noted that in light of other evidence corroborating the fact that the father not the son managed the entire operation, the corroboration of trustworthiness requirement was satisfied. And " [w]hile a jury could still conclude that the father was lying to save his son, the corroboration sufficed for admissibility of the evidence." Id. at 933. In so ruling, the 9th Circuit also emphasized that "… it was up to the jury to decide whether the father's statement against penal interest was motivated by truthfulness or a noble motive to lie." Id. While it did not reach the constitutional issues, it noted the Sixth Amendment Rights of the defendant were implicated when an absent declarant's testimony is improperly excluded from evidence. Id. at 934. Citing *United States v Slaughter*, 891 F2d 691, 698 (9th Cir. 1989).

The facts of this case align with *Paguio*; Mr. Ogundele was undisputedly the manager of the operation and directed Ms. Popoola in accepting deposits into her account, that was not disputed. The fact of their relationship also supported an inference of trustworthiness because he was just as likely to protect her by shielding her from the true source of some of the funds for his automobile business as he was to lie about her knowledge when interrogated by the FBI. Those facts

114

along with the general lack of evidence by the government to show the Ms.

Popoola knew that the source funds used to purchase automobiles were from the

wire fraud scam, indicated that there was adequate corroboration to allow the jury

to decide whether the "statement against penal interest was motivated by

truthfulness or a noble motive to lie". Id.

IV.    **The District Court Erred When It Allowed the Government to Present FRE 404(b) Evidence to The Jury, Resulting in Prejudice to Mojisola Popoola.**

**Standard of Review**

A district court's decision to admit evidence of prior bad acts Rule 404(b) is

reviewed for abuse of discretion. *United States v. McBride*, 676 F.3d 385, 395 (4th

Cir. 2012).

**Argument.**

The Government filed a Motion in Limine to alert the trial court of its

intention of presenting FRE 404(b) evidence in the form of a 2013 bankruptcy

filing by Ms. Popoola to show that she knew the money coming through her

account was not legitimate and therefore did not report it as income. (Gov't

Motion, J.A. 475-478).  Ms. Popoola filed her opposition, arguing that the

bankruptcy filing would likely confuse the jury and thereby be a mini trial on

bankruptcy fraud which would be a thinly vailed attack on Ms. Popoola's character

and any legitimate probative value was outweighed by the serious risk of unfair

prejudice. (Memorandum in Opposition, J.A. 492-493).

At the Motions Hearing, the government disclosed that they would be

presenting additional evidence similar to the bankruptcy petition to establish that

Ms. Popoola knew the money coming in to her account was allegedly not

legitimate, including her 2013 Maryland welfare and food stamp application and

her application to purchase a timeshare in 2014 in which the income she reported

was significantly less than the amount of deposits coming into her bank account.

(J.A. 581-585). The Court considered the four factors as laid out in *United States v.*

*Queen,* 132 F.3d 99, 9971 (4th Cir. 1997) in ruling that the evidence was allowed

in under FRE 404(b).  (J.A. 585-589).

In determining whether the prior bad acts evidence was more probative than

prejudicial, the trial judge was required to,

> "balance the relevance of the proposed use of the evidence to the
> case—and the evidence's relevance to that proof—against the high
> risk that the evidence will also tend to establish bad character and
> propensity to commit the charged crime." *United States v. Miller*, 673
> F.3d 688, 697 (7th Cir. 2012).

*United States v. Hall*, 858 F.3d 254, 269 (4th Cir. 2017), *as amended* (June 21,

2017) (reversing the conviction for possession with intent to distribute marijuana

based on the trial court's erroneous admission of a prior conviction for possession

of marijuana)

116

Ms. Popoola's petition for bankruptcy, applications for welfare and food stamps, and application for a timeshare had minimal probative value as weighed against the highly prejudicial assertion that she committed other crimes of fraud. Moreover, the government's theory of admissibility was based on a false premise absent establishing through an expert witness that the money flowing in an out of her account was her income which she had a duty to disclose on these various forms. (J.A. 580, 590-591).

The court instructed the government not to argue she had a legal obligation to report the money in her account as income in the government's opening and not in their examination of witnesses. The government counsel agreed not to include it in its opening. Id. While the government indicated it would not seek to admit Ms. Popoola's conviction for welfare fraud unless she testified in the case (J.A. 584-585), they essentially introduced the same evidence in their case in chief anyway by the introduction of the welfare application and the inference that she lied about her income on the form as consciousness of guilt (state of mind). The Fourth Circuit has noted that less the probative value of the other crimes evidence admitted, the greater the risk that the jury will assume that the defendant has a propensity for committing crimes. See *Hall*, 858 F.3d at 270.

In this case, the government presented virtually no evidence that Ms. Popoola had knowledge of the romance scam that constituted the wire fraud

conspiracy or that she agreed to participate in that particular conspiracy. There was not a single instance where Ms. Popoola communicated with an alleged victim or where she was informed of the origin of the funds by co-conspirators. This lack of evidence enhanced the prejudicial effect of admitting her prior financial filings.

The government was essentially arguing that Ms. Popoola committed tax fraud and from that the jury could infer that she had a "propensity" to committed wire fraud. Indeed, the government hammered home that improper propensity inference in its closing arguments to the jury by repeatedly stating that Ms. Popoola did not report the money coming through her account as income to her because she knew it had fraudulent origins. (J.A. 3742-3754). Then again during rebuttal, the government repeatedly referred to Ms. Popoola as telling "lies" on her bankruptcy and welfare filings. (J.A. 3982-3987). Because the FRE 404(b) evidence was more prejudicial than probative, the trial court abused its discretion and should not have allowed it to come in. The error was aggravated by the government's misconduct in making this improper argument during closing and depriving the defendant of a fair trial.[3]

_____

[3] In this Circuit, "[t]he test for reversible **prosecutorial misconduct** generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Mitchell* 1 F.3d 235, 240 (4th Cir. 1993) (quoting *United States v. Brockingham,* 849 F.2d 872, 875 (4th Cir.1988)).

## ARGUMENT – VICTOR OLOYEDE

**I.    The District Court Erred When It Instructed the Jury That They Could Consider Conscious Avoidance To Determine Mr. Oloyede's Knowledge of the Wire Fraud and Money Laundering Conspiracies**

**Standard of Review**

Appellant Oloyede adopts the Standard of Review advanced by Appellant Mojoisola Popoola in her argument on the same issue.

**Argument**

Appellant Oloyede adopts the Arguments advanced by Appellant Mojisola Popoola in her argument on the same issue and makes further argument below.

It is well settled that the willful blindness instruction should not be given unless the evidence produced at trial demonstrates that the defendant did, in fact, purposefully close his eyes so as to avoid knowing the truth.  Mr. Oloyede did not close his eyes.  The evidence established:

1)  each and every victim did not know they were a victim of a fraud until well after all their money was gone;

2)  Mr. Ololyede inquired of Mr. Ogundele if he had any knowledge of the money's origin and if anything untoward may explain the money;

3)  Mr. Oloyede inquired of the source of much of the money and Mukhtar (Mukhtar Danjuma Haruna) assured him it was all "good money;"

119

4) Although Mr. Oloyede was assured by Ogundele and Mukhtar that there was nothing to worry about, Mr. Oloyede insisted to both of them that the money stop being wired into his bank account;

5) Mr. Oloyede was well acquainted with Mr. Ogundele and knew he and Mukhtar were both lawfully in the car business and the given explanation was reasonable;

6) Mr. Oloyede went to his bank to inquire as to why and how his bank account was closed by the bank.

The government's answer to all this was simply to cross examine Mr. Oloyede as to why he did not go to the FBI or some law enforcement agency and alert them to the problem. Mr. Oloyede explained very reasonably that he did not know for certain whether anything illegal was occurring at all, rather he was simply worried about the possibility. He is faulted by the government in not taking actions members of the law enforcement community would have taken had it occurred to them. The very victims themselves by and large did not alert law enforcement. Law enforcement came to them and advised them of the possibility or probability that they had been fleeced.

The reason the courts require evidence of deliberate avoidance is in doing so jurors are relieved from examining and finding actual knowledge of the existence of fraud with a much less precise finding of "deliberate disregard of the facts"

standard – a standard left primarily to the venue of intentional torts. The instruction given at J.A. 3679-3680.

In this case, the government failed to prove the existence of the first requirement before such an instruction can be given, that is Mr. Oloyede deliberately avoided discovering the source of the funds deposited into his bank account. Although it is unclear whether a subjective or objective standard should be employed in this analysis in either case such a showing could not be found. Secondly, the government must show beyond a reasonable doubt that Mr. Oloyede took *actions* to avoid knowledge. As discussed above, he did exactly the opposite, he reached out to a small universe of individuals who could shed light on the question – Mukhtar, Ogundele, the bank. It should be noted the record is devoid of any evidence of what it was that Mr. Oloyede learned from the bank other than the bank activity in his account caused it to close his account. It is fair to say he was not alerted that a wire fraud was afoot and Mukhtar was at the center of it since another three years passed before anyone was indicted in the case.

Given the circumstantial nature of the evidence against Mr. Oloyede a high probability exists that the jury considered this instruction in convicting Mr. Oloyede of all the offenses. In light of the affirmative steps he took to discover the source of the funds and the lack of evidence to the contrary this instruction should not have been given and in so doing he was denied a fair trial.

**II.      The District Court Erred in Admitting Charts Under Rule 1006 in Violation of the Rule and Appellants' Sixth Amendment Rights.**

Appellant Oloyede joins in this argument with other Appellants without additional facts or further argument.

**III.     The District Court Erred Procedurally and Substantively in its Calculations of the Sentencing Guidelines and in its Sentencing of the Appellant**

**Standard of Review**

This Court reviews sentences for reasonableness, applying an abuse of discretion standard to both the procedural and substantive reasonableness of a sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). For a sentence to be procedurally reasonable, a district court must properly calculate the Guidelines range, consider the statutory sentencing purposes in 18 U.S.C. § 3553(a), analyze the arguments presented by the parties, and sufficiently explain the selected term. *Id.* at 49-50; *see United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010). For a sentence to be substantively unreasonable based on the totality of the circumstances, a court must not "abuse[] its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010).

**Argument**

The district court imposed a procedurally and substantively unreasonable sentence on the Appellant Oloyede.

The sentencing guidelines are merely the starting point and the Court should consider all factors set forth in 18 U.S.C. § 3553(a) in arriving at a reasonable sentence, that being a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing as set forth in that section.

The prosecution has the burden of proving loss amounts by a preponderance of the evidence. See *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011). The Court must determine the scope of the criminal activity that a particular defendant agreed to undertake. See *United States v. Aslan*, 644 F.3d 526, 552 (7th Cir. 2011).

The district court's imposition of a 234 month sentence on Mr. Oloyede was procedurally and substantively unreasonable because the court failed to make an individualized assessment of all factors set forth in 18 U.S.C. § 3553(a) and in so doing imposed a sentence greater than necessary to accomplish the goals of sentencing as more fully set forth below.

The court also failed to address the nature and circumstances of the offense; the history and characteristics of Mr. Oloyede; or the need for the sentence to avoid unwarranted sentencing disparities. Under the circumstances, the 234 month term imposed was far greater than necessary to satisfy the sentencing goals identified in 18 U.S.C. § 3553(a).

**A.    District Courts Must Conduct an Individualized Assessment at Sentencing and Demonstrate On the Record That They Have Considered All Non-Frivolous Arguments in Favor of a Lower Sentence**

A district court commits a significant procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines." *United States v. Heath*, 559 F.3d 263 (4th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38 (2007).

While a court is not required to "robotically tick through § 3553(a)'s every subsection, particularly when imposing a within-Guideline sentence," it must conduct an "individualized assessment justifying the sentence imposed and rejection of arguments for a higher or lower sentence based on § 3553." *United States v. Powell*, 650 F.3d 388, 395 (4th Cir. 2011) (internal quotation marks omitted); *Lynn*, 592 F.3d at 584 (internal quotation marks omitted).

When imposing a sentence, a court must provide a sufficient explanation to "demonstrate that it 'considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decision making authority.'" *Lynn*, 592 F.3d at 576 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)).  Such explanations are

required to "promote the perception of fair sentencing" and to permit "meaningful

appellate review." *Gall*, 552 U.S. at 50.

In numerous cases, this Court has vacated sentences based on a district

court's failure to adequately explain its reasons for selecting a particular term. *See,

e.g., Lynn*, 592 F.3d at 576; *United States v. Gay*, 466 Fed. Appx. 183 (4th Cir.

2012) (unpub.); *United States v. Torres-Aguirre*, 481 Fed. Appx. 803 (4th Cir.

2012) (unpub.); *United States v. Leech*, 409 Fed. Appx. 633 (4th Cir. 2011)

(unpub.); *United States v. Gonzalez-Villatoro*, 417 Fed. Appx. 297 (4th Cir. 2011)

(unpub.); *United States v. Black*, 389 Fed. Appx. 256 (4th Cir. 2010) (unpub.).

For example, in *United States v. Nesbitt*, 464 Fed. Appx. 89 (4th Cir. 2012)

(unpub.), the defendant requested a sentence at the low end of the guideline range

based on his advanced age and declining health. The district court rejected the

request and, instead, imposed a mid-range sentence. To justify its decision, the

court stated only that it had "calculated and considered the advisory Sentencing

Guidelines and the relevant statutory sentencing factors contained in [18 U.S.C.]

§ 3553(a)." *Id.* at 92. Reviewing the district court's decision for reasonableness,

this Court noted that because a within-guideline sentence was imposed, the court

could "provide a less-extensive" explanation for its decision. *Id.* at 91 (citing

*United States v. Johnson*, 587 F.3d 625, 639 (4th Cir. 2009)). However, the Court

continued, the explanation "must be sufficient to allow for 'meaningful appellate

review' such that we need 'not guess at the district court's rationale.'" *Id.* at 91-92 (citing *United States v. Carter*, 564 F.3d 325, 329-30 (4th Cir. 2009)). Ultimately, the Court concluded that the statements were insufficient because they "provided very little indication that [it had] considered the parties' arguments and had a reasoned basis for exercising its legal decision making authority." *Id.*

Similarly, in *United States v. Hardee*, 396 Fed. Appx. 17, 18 (4th Cir. 2010) (unpub.), this Court vacated a sentence as procedurally unreasonable where the district court heard "extensive testimony" from the parties and gave them "multiple opportunities to argue for specific sentences." Despite the district court's apparently passive consideration of the arguments presented, this Court deemed the sentence procedurally unreasonable because the court did not expressly address the arguments, nor did it provide any reason for imposing the selected term. *Id.* (stating that Court could "not conclude that the district court's 'explicit consideration of [the defendant's] arguments would not have affected the sentence imposed.'") (citing *Lynn*, 592 F.3d at 585).

In this regard, as to Mr. Oloyede, the court found that all money that was deposited into his bank accounts was attributable to the fraud scheme totaling $1.6 million dollars. Although victims of the fraud scheme that testified as such only account for $700,000 of that total, the government argued and the court found the remaining $900,000 was also attributable to the fraud scheme. J.A. 4330. This

126

finding is not supported by the evidence nor any lawful inferences that can be

drawn from the evidence.  The court made no attempt to quantify the extent of any

unrelated deposits into Mr. Oloyede's accounts.  Without addressing the issue there

is no way it could have made an appropriate finding of loss to be attributed to Mr.

Oloyede.  Nor did the court consider all § 3553(a) factors as to Mr. Oloyede.

Without addressing the specific reasons posed by Mr. Oloyede's attorney for the

imposition of a 5 year sentence, the court failed to make an individualized

assessment to justify the sentence it did impose.  The court did not explain how or

why it reached its conclusion as to the specific sentence imposed.

Further, the court did not make any findings as to the relative culpability of

all the co-conspirators.  The government argued it would seek a higher sentence for

Mr. Oloyede but the court made no mention of avoiding disparity in its sentence as

to him or anyone else.  Such a finding should have been made in order to

determine whether illegal disparity existed as between the Appellants and other co-

conspirators.

**B.    The District Court Failed to Explain Why a Lower Term
Would Not Satisfy the Sentencing Goals Under 18 U.S.C.
§ 3553(a)**

Throughout the sentencing proceedings, the district court appeared to be less

focused on Mr. Oloyede and his background than on the consequential harm that

fell upon the victims.  The court's attention was directed more at the impact on

victims not on any of the many articulated mitigating factors presented on behalf of

Mr. Oloyede. This is not to say that this attention was totally misdirected.

Obviously, the manner and extent of the victim's losses are relevant § 3553(a)

factors as it relates to the finding of a reasonable sentence. The court however,

neglected to consider the impact of Mr. Oloyede's mitigation in the determination

of a reasonable sentence. In other words, the record demonstrates that the court

considered the victim's situation but failed to consider the mitigating factors

presented by Mr. Oloyede. The court read and considered the victim impact

statements from J.A. 4347-4356.

The court commented several times about the vulnerability of the victims

even though it ultimately found that Mr. Oloyede should not receive a vulnerable

victim enhancement. The court's reasoning for entering a 234 month sentence

seemed tied in great measure to the emotional vulnerability of the victims and to

do so when the court found no evidence that Mr. Oloyede had any knowledge of

who the victims were was clear error. The guideline burden of proof is only a

preponderance and yet the court could not find by that standard that Mr. Oloyede

had any idea who the victims were or how or to what extent they were harmed.

The court's comments lay bare the fact that the court's primary concern was not

with conducting an "individualized assessment" of Mr. Oloyede, but with

addressing the harm that had befallen those whose money had been taken. *See*

*United States v. Powell*, 650 F.3d 388, 395 (4th Cir. 2011). The court's emphasis and focus on the victims should give this Court pause in determining whether and if the 234 month sentence imposed was the minimum sentence the district court could have given in order to satisfy all § 3553(a) factors. Any sentence greater than what is necessary to satisfy those factors is an illegal sentence.

For these reasons, Mr. Oloyede urges this Court to find that the district court committed procedural and substantive error by failing to adequately consider or explaining its reasons for imposing a 234 month sentence and finding that a lesser sentence would not be sufficient to satisfy the § 3553(a) factors.

## CONCLUSION

Each Appellant argues that the errors raised herein individually and in combination deny them a fair trial and they are each seeking a reversal and or a remand for a new trial.

## JOINT ORAL ARGUMENT REQUEST

The parties request oral argument, and in support of their request, the separate defendants each raise novel challenges that are of first impression. Many of these arguments further deserve oral argument as they implicate the right to a fair trial.

Appellant's argument as to the aggravated identity theft instruction raises a first-time application of the United States Supreme Court case *Rosemond v. United*

*States*, 2013 U.S. LEXIS 4108 (U.S. 2013). Further, appellant's claim regarding admission of charts under Rule 1006 raises a unique argument that, a defendant's right to a fair trial supersedes any rule of evidence.

Mojisola Popoola raises the legal determination subject to de novo review not previously addressed in this Circuit about whether the physical entry of a passcode into an iPhone constitutes a statement subject to Fifth and Sixth Amendment protections of *Miranda v Arizona*. She also raises the issue of whether the court abused its discretion when it denied her the ability to present her co-defendant husband's exculpatory statement through severance or alternatively through its admission as a statement against penal interest. Further, all appellants argue that this "splitting" of Ogundele's statement implicates the common-law rule of completeness and the right to a fair trial.

Babatunde Popoola raises various meritorious issues but one that is clearly worthy of oral argument is the issue of whether he was denied a fair trial similarly to Mojisola Popoola in that the trial court violated his right to a fair trial under the Sixth Amendment by denying Mr. Poopoola the right to question the agent about exculpatory statements Mr. Popoola made while also allowing the agent to testify as the inculpatory statements.

Respectfully Submitted,

/s/ Justin Eisele
*Counsel for Appellant*

/s/ John Iweanoge
*Counsel for Appellant*

/s/ Gerald Ruter
*Counsel for Appellant*

/s/ Richard Seligman
Counsel for Appellant

131

# ADDENDUM

# TABLE OF CONTENTS

**Addendum Page**

Amended Memorandum Opinion of
The Honorable Paul W. Grimm
Re: *United States v. Bailey*,
No. PWG-16-0246
     filed November 6, 2017 .........................................................................Add. 1

No *Shepard's* Signal™
As of: December 28, 2017 1:37 PM Z

## *United States v. Bailey*

United States District Court for the District of Maryland, Southern Division

May 24, 2017, Decided; May 25, 2017, Filed

Criminal No.: PWG-16-0246

**Reporter**
2017 U.S. Dist. LEXIS 80093 *; 2017 WL 5126163

UNITED STATES OF AMERICA, v. CALEB ANDREW BAILEY, Defendant.

**Subsequent History:** As Amended November 6, 2017.

# Case Summary

### Overview

HOLDINGS: [1]-The court found that *Fed. R. Evid. 106* only covered writings or recordings, but its codification did not preempt the application of the common-law rule of completeness for oral statements and conversations; if the common-law rule was applied to oral statements and conversations, the court should consider several factors to determine whether the completing information was required at the same time that the incomplete information was introduced or whether it should be admitted at cross examination or later.

### Outcome
The court provided guidance on the motion in limine.

**Counsel:** **[*1]** For Caleb Andrew Bailey, Defendant: Teresa Whalen, LEAD ATTORNEY, Law Office of Teresa Whalen, Silver Spring, MD; William C Brennan, Jr, LEAD ATTORNEY, Brennan McKenna Manzi Shay, Chartered, Greenbelt, MD.

For USA, Plaintiff: Jennifer Sykes, Thomas Patrick Windom, LEAD ATTORNEYS, Kristi Noel O'Malley, Rod J Rosenstein, Office of the United States Attorney, Baltimore, MD.

**Judges:** Paul W. Grimm, United States District Judge.

**Opinion by:** Paul W. Grimm

# Opinion

## AMENDED MEMORANDUM OPINION

Defendant Caleb Andrew Bailey was charged with multiple counts including illegal possession of machine guns, receipt and possession of unregistered short-barrel rifles, receipt and possession of unregistered destructive devices, production and attempted production of child pornography, possession of child pornography, and witness tampering. Revised Second Superseding Indictment, ECF No. 88-2. Prior to trial, the Government filed a motion *in limine*, in which it sought a pretrial ruling precluding Bailey from "eliciting on cross-examination of law enforcement agents certain potentially exculpatory statements Bailey made during his [unrecorded] interviews with law enforcement on May 5, 2016." Gov. Mot. 1, ECF No. 62. In a nutshell, the Government argued **[*2]** that anything Bailey told the agents during his unrecorded interview[1] that it intended to introduce during its case in chief would be admissible non-hearsay (as an admission by a party opponent under *Fed. R. Evid. 801(d)(2)(A)*), but that anything exculpatory that Bailey told them that he intended to elicit under cross examination or otherwise would be inadmissible hearsay, unless he was prepared to testify about it and be subject to cross examination. Gov. Mot. 2. Bailey filed an opposition. Def.'s Opp'n, ECF No. 91.

On May 12, 2017, I held a telephonic hearing with counsel during which I advised that without knowing the specific portions of Bailey's statements that the Government intended to introduce, I was not able to issue a definitive pretrial ruling

---

[1] I previously denied Bailey's Motions to Suppress, ECF No. 52, the two Mirandized statements that he gave to Government agents on May 5, 2015, the day a search and seizure warrant was executed at his residence, which led to the discovery of the evidence that led to the charges pending against him. The guidance in this opinion assumes that the statements given by the Defendant are not inadmissible under the **Fourth** or **Fifth Amendments**. Put differently, the focus of this opinion is the law of evidence, and it takes as given that there are no **Fourth** or **Fifth Amendment** grounds for suppressing the defendant's statement.

2017 U.S. Dist. LEXIS 80093, *2

on the record pursuant to *Fed. R. Evid. 103(b)*, but I nonetheless gave them guidance regarding the approach I would take at trial. I also told them that I planned to issue a written opinion to memorialize my thinking because the issues raised by the Government are recurring in nature, and there is a scarcity of helpful decisional authority in this circuit to guide courts and counsel in resolving the sometimes complicated issues the Government's Motion raises. This Memorandum Opinion **[*3]** provides that guidance.

Whether the defendant in a criminal trial may compel the Government to introduce his exculpatory statements at the same time that it introduces his inculpatory ones implicates a number of evidentiary rules, including *Rules 102* (which instructs judges to interpret the rules of evidence in order to insure fairness, ascertain the truth, and to secure a just determination), *106* (the so-called "rule of completeness"), *401* (relevance), *403* (probative value versus danger of unfair prejudice or confusion); *611(a)* (court control over the examination of witnesses and presentation of evidence); and *802* (the rule against admissibility of hearsay, and its exceptions). But where the inculpatory statements given by the defendant to the government were not written or recorded, common-law principles of evidence also apply. As will be seen, although there is no shortage of case law and treatise analysis on this subject, the law is far from settled, and courts and commentators have reached starkly different results by applying a variety of approaches, resulting in an evidentiary landscape that is unclear.

It is not my aim in this opinion to untangle the many nuances of the Gordian knot raised **[*4]** by the Government's Motion, but rather to identify the key elements that a court should examine to make an appropriate ruling, consistent with the Rules of Evidence and the still-viable common law.[2] The starting place is the common law evidentiary principle known as the "doctrine of completeness" (which is partially codified as *Fed. R. Evid. 106*), and its impact on the adversary system.

---

[2] Following my telephone hearing with counsel but before the entry of this Memorandum Opinion providing the written rationale for my oral ruling, the Defendant entered a guilty plea to certain of the charges. For this reason, there will be no trial. Nonetheless, because I informed counsel that I would memorialize in writing the ruling that I previously made, and because the issues discussed have occurred in past cases where, without the full consideration of the issues that I have given in this case, I reached contrary results, I am filing this Memorandum Opinion. Had the case proceeded to trial, I would have adopted the analysis set out above. It is my hope that the discussion may be helpful to other judges of this court, and counsel, in future cases.

## I. Common-Law Origins of *Rule 106*

The relationship between *Rule 106* and the common-law doctrine of completeness has been explained by one respected evidence treatise this way:

> *Rule 106* arises from the common law completeness doctrine. Both the common law and *Rule 106* presume two tenets of the adversary system. First, under the principle of party presentation of evidence, parties—not the court—bear the responsibility to produce evidence of their respective factual claims. An important corollary of party presentation holds that neither party has any obligation to produce evidence that favors the adversary. Second, a principal of sequential procedure, sometimes called "stage preclusion", provides that the trial of an issue of fact follows a sequence of proof and counterproof whereby at each stage the parties alternate roles in presenting and challenging **[*5]** evidence. . . . The two tenets that give rise to *Rule 106* are also embodied in *Rule 611*.

21A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5072 (2d ed. 2005) (footnotes omitted).

The back-and-forth presentation of evidence in a criminal case usually works fairly smoothly, but problems arise when one party's artful phrasing of a question calls for a response that is technically accurate, but incomplete, altering the meaning of the original statement. A classic example is when the prosecutor elicits from a law-enforcement witness that, when the defendant was interviewed in connection with a homicide investigation, he admitted that he owned the gun used to commit the murder but omits that the defendant also said that he sold the gun three months before the shooting. Quoting the defendant out of context presents a misleading picture for the jury. In such circumstances, if the defendant is required to wait until his case in chief, or even until cross examination, to put his statement to the government witness in its proper context, it might be too late to counteract the impression left with the jury that the defendant, having admitted to owing the murder weapon, was the **[*6]** one who shot the victim.

### A. Common-Law Doctrine

"The common law responded to these abuses of the adversary system by a limited restriction on party control of the cases that . . . [is called] 'the completeness doctrine.'" 21A Wright & Graham, *supra*, § 5072. Wigmore's description of the rule of completeness was that "[i]n evidencing the tenor of an utterance material or relevant, made in words, whether written or oral in original or in copy, the whole of the utterance on a

2017 U.S. Dist. LEXIS 80093, *6

single topic or transaction must be taken together." *Id.* (quoting John Henry Wigmore, *Code of Evidence* 371 (3d ed. 1941)). The influential Field Code codified the common law rule of completeness in this manner:

> When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing, which is necessary to make it understood, may also be given in evidence.

*Id.* (quoting N.Y. Commissioners on Practice and Pleading, *Code of Civil Procedure* § 1687, at 704-05 (1850)).

A careful reader will notice straightaway **[*7]** that in its common-law and early-code-law expression, the doctrine of completeness encompassed conversations and other spoken utterances (as well as acts) that had not been memorialized in writing or recorded. Another important feature of the common-law doctrine of completeness was that it allowed the introduction of otherwise inadmissible evidence to give proper context to the incomplete and misleading evidence offered by the original proponent. *Id.* § 5072 ("Thus, the opponent can introduce what would otherwise be hearsay to complete a truncated statement offered by the proponent." (citing *Crawford v. United States, 212 U.S. 183, 201, 29 S. Ct. 260, 53 L. Ed. 465 (1909))).* Less clear was whether the party seeking to complete the record regarding what was said in a writing or conversation could require the proponent to include the content necessary for completeness at the time the incomplete version was presented to the jury or had to wait until his case in chief or cross examination to do so. Most common-law courts would not allow this "acceleration of completeness," but some courts, including the Supreme Court, did. *Id.* (citing *Crawford, 212 U.S. at 201).*

B. *Rule 106*

The common-law doctrine of completeness has been partially codified by *Fed. R. Evid. 106. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171-72, 109 S. Ct. 439, 102 L. Ed. 2d 445* ("The Federal Rules of Evidence have partially codified the doctrine **[*8]** of completeness in *Rule 106*."); *United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996)* ("The common-law doctrine of completeness has been partially codified in *Rule 106 of the Federal Rules of Evidence*."). *Rule 106* states:

> If a party introduces all or part of a *writing* or *recorded statement*, an adverse party may require the introduction, *at that time*, of any other part—or any other writing or recorded statement—that *in fairness ought to be*

considered at the same time.

*Fed. R. Evid. 106* (emphasis added). The italicized words highlight several important features of *Rule 106*. First, it applies only to writings and recorded statements, not to conversations or other oral statements that have not been memorialized in some written or recorded form (hence, *Rule 106* only *partially* incorporates the common law rule). Second, when the Rule applies, it permits the party against whom the incomplete information has been introduced to require the introduction of completing information at the same time (the so called "acceleration clause"). Third, the rule only requires the introduction of the completing information when fairness requires that it be considered at the same time as the incomplete information.

The Advisory Committee Note to *Rule 106* states:

> The **[*9]** rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial. The rule does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case.
>
> For practical reasons, the rule is limited to writings and recorded statements and does not apply to conversations.

*Fed. R. Evid. 106* advisory committee's note to 1972 proposed rules (citation omitted). Conspicuously absent from the Rule or the Advisory Note is any indication of whether completing information can be admitted under *Rule 106* even if otherwise inadmissible (for example, because it is hearsay).[3] Nor does the Rule or Note give any guidance as to what must be shown to satisfy the "fairness" requirement in order to require the introduction **[*10]** of the completing information at the same time as the incomplete information. And, although the Advisory Note states that the rule only applies to writings and recorded statements (and not to conversations) for "practical reasons," it does not explain what those practical reasons are, or how courts should deal with the problem created when one party introduces a misleadingly incomplete portion of an oral

---

[3] In 2002-03, the Advisory Committee considered whether to amend *Rule 106* to extend its scope to oral statements and acts, and whether to amend the rule to state that evidence that met the fairness requirement of *Rule 106* was admissible even if it would be inadmissible if offered on its own. It ultimately "voted unanimously not to amend *Rule 106* on the ground that the costs exceeded the benefits because 'any problems under the current rule were being well-handled by the courts.'" 21A Wright & Graham, *supra*, § 5071 (quoting Advisory Comm. on Evidence Rules, *Minutes of Meeting of April 25, 2003*, at 9).

statement or conversation.

## II. Application of Rule 106

A. Independent Admissibility

1. *Split of Authority*

In the absence of guidance from the Rule or the Committee, courts and commentators have been left to answer these questions on their own, with conflicting results. For example, some courts have held that evidence that would be inadmissible if offered independently cannot be used for completeness purposes under *Rule 106 See, e.g., United States v. Hassan, 742 F.3d 104, 134-35 (4th Cir. 2014)* (holding that district court did not abuse its discretion by excluding defendant's exculpatory statements under *Rule 106* because they were inadmissible hearsay); *United States v. Mitchell, 502 F.3d 931, 965 n.9 (9th Cir. 2007)* ("*Rule 106* applies only to written and recorded statements, not unrecorded oral confessions, and *Rule 106* does not render admissible otherwise inadmissible hearsay."); *United States v. Guevara, 277 F.3d 111, 127 (2d Cir. 2001)* ("*Rule 106* does not 'render admissible evidence that is otherwise inadmissible.'" (quoting *United States v. Terry, 702 F.2d 299, 315 (2d Cir. 1983))), overruled on other grounds as recognized in United States v. Doe, 297 F.3d 76, 90 n.16 (2d Cir. 2002)*; *United States v. Ortega, 203 F.3d 675, 682-83 (9th Cir. 2000)* (holding that *Rule 106* would not allow defendant's exculpatory statements because they were inadmissible hearsay); *United States Football League v. Nat'l Football League, 842 F.2d 1335, 1375-76 (2d Cir. 1998)* ("The doctrine of completeness does not compel admission of otherwise inadmissible hearsay evidence." (citation omitted)); *United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996)* (holding that the government was entitled to introduce the defendant's inculpatory statements [*11] as admissions under *Rule 801(d)(2)(A)*, but that the defendant could not introduce exculpatory portions under *Rule 106* because they would be inadmissible hearsay).

What is concerning about many of the cases that have restricted *Rule 106* to evidence that is independently admissible is the ease with which they have done so without any real consideration of the common-law history of the doctrine of completeness (which did not limit completing evidence to that which was independently admissible), its purpose to guard against abuses of the adversary system, or the harm that can result from letting one party (for example, the government in a criminal case) have an unfair advantage over another by creating a misleading impression in the minds of the jury that is, as a practical matter, uncorrectable. This hardly lives up to the aspirations of *Rule 102* that the rules of evidence should be construed to the "end of ascertaining the

truth and securing a just determination."

But not all courts have been so quick to restrict *Rule 106* to independently admissible evidence, even at the expense of fairness. In *United States v. Sutton, 801 F.2d 1346, 255 U.S. App. D.C. 307 (D.C. Cir. 1986)*, the court rejected the notion that only admissible evidence could be used to complete the record under *Rule 106*. Its analysis is worth quoting at length: [*12]

*Rule 106* explicitly changes the normal order of proof in requiring that . . . evidence [within the scope of the Rule] must be "considered contemporaneously" with the evidence already admitted. Whether *Rule 106* concerns the substance of evidence, however, is a more difficult matter. The structure of the Federal Rules of Evidence indicates that *Rule 106* is concerned with more than merely the order of proof. *Rule 106* is found not in *Rule 611*, which governs the "Mode and Order of Interrogation and Presentation," but in Article I, which contains rules that generally restrict the manner of applying the exclusionary rules. *See* C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5078, at 376 (1977 & 1986 Supp.). Moreover, every major rule of exclusion in the Federal Rules of Evidence contains the proviso, "except as otherwise provided by these rules," which indicates "that the draftsmen knew of the need to provide for relationships between rules and were familiar with a techniques for doing this." *Id.* There is no such proviso in *Rule 106*, which indicates that *Rule 106* should not be so restrictively construed. *See id.*

*Rule 106* can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court [*13] finds in fairness that the proffered evidence should be considered contemporaneously. A contrary construction raises the specter of distorted and misleading trials, and creates difficulties for both litigants and the trial court.

The most sensible course is to allow the prosecution to introduce the inculpatory statements. The defense can then argue to the court that the statements are misleading because of a lack of context, after which the court can, in its discretion, permit such limited portions to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence. Such a result is more efficient and comprehensible, and is consonant with the requirement that the "rules shall be constructed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of the law of evidence to the end that the truth may be ascertained and

2017 U.S. Dist. LEXIS 80093, *13

proceedings justly determined. *Federal Rule of Evidence 102*.

*Id. at 1368-69* (footnotes omitted); *see also United States v. Harvey, 653 F.3d 388, 394-95 (6th Cir. 2011)* (affirming decision of district court to admit under the rule of completeness recordings that the court previously had ruled inadmissible on their own); *United States v. Bucci, 525 F.3d 116, 133 (1st Cir. 2008)* ("[O]ur case law unambiguously establishes that the rule of completeness **[*14]** may be invoked to facilitate the introduction of otherwise inadmissible evidence."); *United States v. Gravely, 840 F.2d 1156, 1163 (4th Cir. 1988)* ("The cross-designated portions, while perhaps not admissible standing alone, are admissible as a remainder of a recorded statement. *Fed. R. Evid. 106* allows an adverse party to introduce any other part of a writing or recorded statement which ought in fairness be considered contemporaneously. The rule simply speaks the obvious notion that parties should not be able to lift selected portions out of context."); *United States v. LeFevour, 798 F.2d 977, 980-82 (7th Cir. 1986)* ("If otherwise inadmissible evidence is necessary to correct a misleading impression, then either it is admissible for this limited purpose by force of *Rule 106* . . . or, if it is inadmissible . . . the misleading evidence must be excluded too."); *United States v. Green, 694 F. Supp. 107, 110 (E.D. Pa. 1988)* (noting with approval the D.C. Circuit's holding that *Rule 106* permits introduction of evidence that is otherwise inadmissible), *aff'd, 875 F.2d 312 (3d Cir. 1989)*.

## 2. Concerns Animating Split of Authority Are Mitigated by Proper Application of *Rule 106*'s "Fairness" Clause

Perhaps courts' willingness to restrict the use of *Rule 106* to admissible evidence reflects the same concern expressed by the Department of Justice when it objected to the revision of the rule in 2002 to permit the use of inadmissible evidence. DOJ "prosecutors **[*15]** argued that amending the Rule would allow defense counsel to make bogus claims that the evidence was taken out of context so that they could get inadmissible evidence before the jury." 21A Wright & Graham, *supra*, § 5071. Fair enough. But it is just as much of an abuse of the adversary system for the prosecution to paint a misleading picture to the jury by introducing out-of-context inculpatory statements by the defendant as it is for a defense attorney to assert "bogus" claims that prosecution evidence was taken out of context as a pretext to "correct" the record by introducing otherwise inadmissible evidence. And it does not answer to prevent the later abuse but permit the former. Moreover, proper application of the "fairness" requirement of *Rule 106* should prevent the abuses that the Department of Justice feared because judges should restrict application of *Rule 106* to those situations where misleading information

actually was introduced by the prosecution and allow only such correcting evidence as is necessary to counteract it. In this regard, courts and commentators have identified various factors that go a long way towards preventing any abuse of *Rule 106* that might occur if inadmissible evidence is allowed to complete the record. **[*16]**

To begin with, *Rule 106* should never come into play unless misleading evidence has been introduced that requires clarification or explanation—otherwise there is no unfairness that needs correction. *Wilkerson, 84 F.3d at 696* ("Thus, the rule of completeness . . . would not appl[y] . . . where there was no partially introduced conversation that needed clarification or explanation."). And, judges need not take at face value exaggerated claims that a partially introduced statement requires completion unless it can be shown with some precision just how the incomplete evidence is taken out of context. The Seventh Circuit has identified a four-part test to determine when this has happened:

> Our case law interpreting *Rule 106* requires that the evidence the proponent seeks to admit must be relevant to the issues in the case. Even then, a trial judge need admit only that evidence which qualifies or explains the evidence offered by the opponent. The test is conjunctive. Once relevance has been established, the trial court then must address the second half of the test, and should do so by asking (1) does it explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, **[*17]** and (4) will admitting it insure a fair and impartial understanding of all the evidence.

*United States v. Velasco, 953 F.2d 1467, 1474-75 (7th Cir. 1992)* (citations omitted).

A respected evidence treatise also has identified a series of factors that help courts identify when the fairness requirement of *Rule 106* has been met. They include: (1) Is the proffered evidence taken out of context (does what is missing change the meaning of what was introduced)? (2) Does the lack of context make the evidence misleading (does the admitted evidence "invite" or "permit" a false premise)? (3) Can the misleading impression be dispelled by other means (for example, by instructing the jury not to draw the misleading inference, or by permitting introduction of completing evidence at a later time, such as during cross examination or the defense case, so as not to interrupt the presentation of the prosecution's case)? (4) How much evidence is needed to dispel misleading effects (lawyers should be precise in identifying the information actually needed to correct the misleading impression created by the incomplete evidence,

Add. 5

2017 U.S. Dist. LEXIS 80093, *17

and judges should be skeptical about allowing expansive introduction of lengthy excerpts from writings or recordings under the guise of "correcting" a misimpression)? [*18] (5) How strong is the evidence admitted and omitted (how does the strength of the admitted evidence compare to the strength of the omitted evidence—a minor discrepancy does not require "correction" with a massive introduction of information of little probative value)? (6) How long will repair be delayed if not accelerated (if the completing information is not introduced during the prosecution's case, can the defendant effectively dispel any misleading impression during cross examination or during his case in chief, or will the damage, once done, be irremediable if not immediately addresses)? (7) What is the consequential fact to be proved (if the misimpression goes to an essential element of the prosecution's case—such as the defendant's motive or intent—then there is a more exigent need to insure immediate correction than exists if the incomplete information is primarily relevant to a less critical issue, such as an assessment of a witness's credibility)? (8) How much will completion disrupt or prejudice the proponent (the more disruptive the immediate completion will be of the proponent's case, the more cautious the court should be before allowing it at that time)? And (9) does truncation [*19] or completion implicate constitutional rights (if the prosecution introduces incomplete portions of a defendant's confession that, if not completed by introducing other parts of the confession, would require the defendant to waive his *Fifth Amendment* right not to testify)? 21A Wright & Graham, *supra*, § 5077.2.

Consideration of these factors should be sufficient for any careful judge to determine whether (and if so, how much) completeness is required by *Rule 106*, and eliminate much of the concern expressed by those who resist the idea of permitting inadmissible evidence to complete the record when fairness legitimately requires it. Unfortunately, to date few cases (especially those that hold that inadmissible information may not be used for completion purposes) have taken the opportunity to do so.

B. Oral Statements

A final vexing issue raised (but not answered) by *Rule 106* and the enigmatic language of the Advisory Committee Note is what courts should do with regard to oral statements or conversations that have not been memorialized by a writing or recording—particularly when the unwritten or unrecorded statement is the defendant's confession to a law-enforcement officer. On its face, *Rule 106* is limited to "writings" and "recorded statements," and the [*20] Advisory Committee Note states that for (unnamed) "practical reasons" the rule does not apply to conversations. *Fed. R. Evid. 106* & advisory

committee's note to 1972 proposed rules. Many courts have taken this to mean that in a criminal case, the prosecution may elicit a law-enforcement officer's testimony about inculpatory statements made by the defendant because they are admissible under *Rule 801(d)(2)(A)* as admissions. But they have also held that, during cross examination of the officer, the defendant may not elicit non-inculpatory statements the defendant made during the same interview because (a) *Rule 106* does not apply to oral statements and (b) even if it did, the defendant's exculpatory statements (even if necessary to dispel the misleading, out-of-context impression left by the officer's direct examination) are inadmissible hearsay. *See, e.g., Ortega, 203 F.3d at 682-83* ("Even if the rule of completeness did apply, exclusion of Ortega's exculpatory statements was proper because these statements would still have constituted inadmissible hearsay."); *Wilkerson, 84 F.3d at 696* (holding that *Rule 106* did not apply to unrecorded conversation between defendant and FBI agent, and defendant's exculpatory statements to the agents were not admissible under the hearsay rules).

While [*21] the "practical reasons" why oral conversations are excluded from *Rule 106* undoubtedly include the need to avoid "he said, she said" disputes about the content of an unrecorded or unwritten statement, those concerns do not justify creating an environment in which the prosecution may be able to introduce the defendant's out-of-context inculpatory oral statements, but where the defendant is powerless to do anything at that time because *Rule 106* does not reach oral statements. And if there is legitimate concern about the difficulty in establishing what was said in oral conversations, the factors described above provide a judge with the analytical tools to determine whether to allow the evidence during the proponent's case or thereafter during cross examination or during the adversary's case in chief on a case by case basis. A blanket rule of prohibition is unwarranted, and invites abuse. Moreover, if the content of some oral statements are disputed and difficult to prove, others are not—because they have been summarized (for example, in a FBI agent's form 302 summary of the defendant's confession), or because they were witnessed by enough people to assure that what was actually said can be established [*22] with sufficient certainty.

1. *Residual Common-Law Completeness Doctrine*

But there is an even more fundamental reason why court decisions that hold that *Rule 106* does not apply to oral statements or conversations should not prevent a party from completing the record (at the time the misleading evidence is introduced or thereafter during cross examination or the opposing party's own case) to prevent abuse of the adversary system when a proponent introduces a misleadingly

Add. 6

2017 U.S. Dist. LEXIS 80093, *22

incomplete part of a conversation or oral confession. The reason is that, as the Supreme Court itself appears to have recognized, *Rule 106* only *partially* codifies the common law doctrine of completeness, and for situations beyond the reach of *Rule 106*, the common law still applies.[4] *Beech Aircraft, 488 U.S. at 170-72*; 1 Kenneth S. Broun, *McCormick on Evidence* § 56, at 392 n.5 (7th ed. 2013) ("*In Beech Aircraft Corp. v. Rainey*, the Court indicated that *Rule 106* 'partially codified' the completeness doctrine. The implication is that the uncodified aspect of the doctrine is still in effect in federal court."); 21A Wright & Graham, *supra*, § 5072.1 (stating that *Beech Aircraft* "impliedly held that *Rule 106* does not repeal the common law completeness doctrine").

Further, to the extent that the common-law doctrine of completeness (which **[*23]** allowed even inadmissible evidence to be introduced to dispel misleading evidence of written, recorded and oral statements) applies to oral statements or conversations, commentators have recognized that, when necessary to avoid the prejudice created by introduction of misleading characterization of oral statements, inadmissible evidence should be permitted for completion purposes. One has observed:

> With respect to other parts of writings and recorded statements or related writings and recorded statements, counsel may eschew *Rule 106* and develop the matter on cross-examination or as part of his own case. Similarly, the remainder of oral statements and related oral statements may be introduced by an opposing party on his next examination of the same witness, whether cross or redirect. Of course, as with written or recorded statements, it is sometimes stated that the additional oral statements may be admitted only if otherwise admissible. Clearly, the principle of completeness does not give an adverse party an unqualified right to introduce an omitted part of a conversation or related conversation otherwise inadmissible merely on the ground that the opponent has "opened the door." To the extent **[*24]**

---

[4] The Court resorted to the common-law rule of completeness to reverse the trial court's exclusion of evidence necessary to dispel a "distorted and prejudicial impression" of a witness's letter brought about by a law-enforcement officer's testimony. *Beech Aircraft, 488 U.S. at 170*. The Court noted that *Rule 106* only "partially codified" the doctrine of completeness and brushed away arguments that completion was not required because *Rule 106* did not apply: "While much of the controversy in this suit has centered on whether *Rule 106* applies, we find it unnecessary to address that issue. Clearly the concerns underlying *Rule 106* are relevant here, but, as the general rules of relevancy permit a ready resolution to this litigation, we need go no further in exploring the scope and meaning of *Rule 106*." *Id. at 172*.

however that such evidence, otherwise inadmissible, tends to deny, explain, modify, qualify, counteract, repel, disprove or shed light on the evidence offered by the opponent, the evidence may be admitted provided its explanatory value is not substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or waste of time, *Rule 403*.

2 Michael H. Graham, *Handbook of Federal Evidence* § 106:2 (7th ed. 2012) (footnotes omitted); *see also* Broun, *supra*, § 56 ("It is sometimes stated that the additional material may be introduced only if it is otherwise admissible. However, as a categorical rule, that statement is unsound. In particular, the statement is sometimes inaccurate as applied to hearsay law. At least when the other passage of the writing or *statement* is so closely connected to the part the proponent contemplates introducing that it furnishes essential context for that party, the passage becomes admissible on a nonhearsay theory." (emphasis added) (footnotes omitted)); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 1:43 (4th ed. 2013) ("*Rule 106* does not say whether additional statements (or parts) may be admitted when necessary to provide context if they would **[*25]** otherwise be excludable under other rules, such as the hearsay doctrine. . . . It seems that hearsay objections should not block use of a related statement . . . when it is needed to provide context for statements already admitted. Thus a statement should be admissible if it is needed to provide context under *Rule 106* and to prevent misleading use of related statements even if the statement would otherwise be excludable hearsay . . . ."); 1 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* §106.02[3] (11th ed. 2015) ("[*Rule 106*] does not on its face state that hearsay is admissible. This has led some courts to hold that *Rule 106* operates solely as a timing device, affecting the order of proof—it does not make admissible what would otherwise be excluded. We believe these rulings are misguided and contrary to the completeness principle embodied in *Rule 106*. A party should not be able to admit an incomplete statement that gives an unfair impression, and then object on hearsay grounds to completing statements that would rectify the unfairness.").

### 2. *Rule 611's Connection to Rule 106*

Courts, too, have found the means to rectify abuses of the adversary system caused by incomplete or misleading renditions of oral statements by resorting **[*26]** to *Fed. R. Evid. 611(a)*, which provides, in relevant part:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth.

In *United States v. Pacquette, 557 F. App'x 933 (11th Cir. 2015)*, the court held "*Rule 106* does not apply to oral statements. However, we have extended the fairness standard in *Rule 106* to oral statements 'in light of *Rule 611(a)*'s requirements that the district court exercise reasonable control over witness interrogation and the presentation of evidence to make them effective vehicles for the ascertainment of truth.'" *Id. at 936* (internal quotation marks and citation omitted) (quoting *United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005)); see also United States v. Verdugo, 617 F.3d 565, 579 (1st Cir. 2010)* (noting that the district court "retained substantial discretion under *Fed. R. Evid. 611(a)* to apply the rule of completeness to oral statements"); *United States v. Collicott, 92 F.3d 973, 983 n.12 (9th Cir. 1996)* (noting, without disagreement, that other circuits have held that *Rule 611(a)* gives district courts the same authority regarding oral statements that *Rule 106* gives regarding to recorded statements); *United States v. Branch, 91 F.3d 699, 727-28 (5th Cir. 1996)* (noting, without disagreement, that "[o]ther circuits have held that *Rule 611(a)* imposes an obligation for conversations similar to what *rule 106* does for writings"); *United States v. Li, 55 F.3d 325, 329 (7th Cir. 1995)* (holding that *Rule 106* does not apply to oral statements, but observing "we . . . have held that *Fed. R. Evid. 611(a)* grants district courts the **[*27]** same authority regarding oral statements which *Fed. R. Evid. 106* grants regarding written and recorded statements"); *United States v. Haddad, 10 F.3d 1252, 1258 (7th Cir. 1993)* ("[*Rule 106*] refers to written or recorded statements. However, *Rule 611(a)* gives the district courts the same authority with respect to oral statements and testimonial proof."); *Alvarado, 882 F.2d at 650 n.5* (holding that *Rule 106* applies to writings, but *Rule 611(a)* "renders it substantially applicable to oral testimony as well").

The evidence commentators agree. 1 Broun, *supra*, § 56, at 394 n.7 (observing that while *Rule 106* only applies to writings and recordings, "[n]evertheless, the trial judge appears to have the same power to require the introduction of [the] remainder of oral conversations under Federal and Revised Uniform Rule of Evidence (1974) *611(a)*"); 2 Graham, *supra*, § 106:2 ("Under unusual circumstances, the court may require the proponent to introduce contemporaneously other parts of oral conversation pursuant to the general authority of the court to control the mode and order of interrogating witnesses and presentation of evidence [*Rule 611(a)*]."); 1 Mueller & Kirkpatrick, *supra*, § 1:43 ("It seems that basic notions of relevancy embodied in *Rule 401*, coupled with the principle in *Rule 403* that evidence can be excluded if it is misleading or overly prejudicial, both complemented by the power of trial judges acknowledged in *Rule 611* to exercise reasonable control' **[*28]** of the presentation of evidence in order to aid in 'determining the truth,' provide ample basis to apply the completeness principle

more broadly. Hence courts can indeed apply essentially the same principle to proof of oral statements, even if they were not recorded or written down, and in cases where they are recorded or written down but the proponent has chosen to prove them by other means, such as testimonial accounts."); Saltzburg et al., *supra*, § 106.02[2] ("While *Rule 106* by its terms applies only to writings and recordings, the principle of completeness embodied in the rule has been applied to testimony about oral statements as well (such as a police officer's selective rendition of a defendant's oral statement). Whether this is mandated by *Rule 106* or by *Rule 611* is unimportant. The important point is that where a party introduces a portion of an oral statement, the adversary is entitled to have omitted portions introduced at the same time, insofar as that is necessary to correct any misimpression that the initially preferred portion would create." (footnote omitted); 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 106.02[3]* (Joseph M. McLaughlin, ed., 2d ed. 2015) ("[T]he trial court does have an essentially equivalent control [as in *Rule 106*] over testimonial **[*29]** proof, as part of a judge's general power to control the mode and order of interrogating witnesses and presenting evidence [referencing *Rule 611(a)*]."); 21A Wright & Graham, *supra*, § 5072.2 ("*Rule 611* is another rule that must be considered along with *Rule 106*. Indeed, it is frequently said that *Rule 106* is a 'specialized application' of *Rule 611*. . . . Perhaps the most expansive use of *Rule 611* to supplement *Rule 106* is the courts who used *Rule 611* to justify continuation of the common law completeness doctrine." (footnotes omitted)).

### 3. *Rule 403*

Finally, *Fed. R. Evid. 403* should not be overlooked when considering the implications of the rule of completeness as it relates to writings, recordings, and oral statements. *Rule 403* states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusion the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Even in circuits (such as the Fourth Circuit) that seem to limit *Rule 106* to written or recorded statements and that do not appear to allow the introduction of evidence under the rule of completeness to rectify the unfairness caused by the introduction of a misleadingly incomplete description of the content of a writing, recording, **[*30]** or oral statement unless it is independently admissible, *Hassan, 742 F.3d at 134-35*; *Wilkerson, 84 F.3d at 696*, a trial court is not powerless to address an abuse of the adversary system. If allowing a government witness to testify only to a defendant's

Add. 8

2017 U.S. Dist. LEXIS 80093, *30

inculpatory statements, without being subject to cross examination about the exculpatory portions of the same statement (because they are not independently admissible) would leave the jury with a misleading understanding of the defendant's statement to the extent that it would cause unfair prejudice, the court may give the government a choice: either allow cross examination to provide a complete picture of what the defendant said; or exclude the testimony of the incomplete portion of the statement.

*Rule 403* should not be used in this manner, however, unless the testimony regarding the defendant's statement is unfairly incomplete, when measured by the factors discussed above. And, if a defendant seeks to introduce excluded portions of his statement (either during cross examination or in his own case) in order to complete the record, the same factors should be used by the court to ensure that only what is actually necessary to dispel the misleading impression is permitted.

## **Conclusion**

So, what lessons **[\*31]** may be drawn from this discussion? First, the rule of completeness, like its common-law predecessor, is more than just an obscure procedural rule governing the timing of the introduction of writings and recordings. It is tied to the very purpose of the adversary system, which allows the parties to strike blows that are hard but not unfair. The adversary system finds its most important application in the trial of a criminal case. The government has nearly unlimited resources to investigate and bring charges. With that power comes the obligation to prove the charges beyond a reasonable doubt. We take pains to instruct criminal juries that the government bears the entire burden of proof. The defendant is presumed to be innocent, and is not required to prove anything, or even testify. We admonish juries to draw no adverse inference when a defendant elects not to testify in his case. We also esteem the defendant's right not to be compelled to incriminate himself and take precautions to avoid the chilling effect that comes with any comment in front of the jury that suggests that they should take note of the fact that he chose not to testify.

If a prosecutor introduces an incomplete version **[\*32]** of the defendant's written or oral statement to the investigating officers by eliciting only the inculpatory portions, while leaving out exculpatory ones that, in fairness, would paint a more complete picture and dispel a misleading impression that the jury may have reached having heard only the incomplete portions, then the defendant is at a serious disadvantage. If he is unable to introduce the parts of his statement that the government omitted at the same time that the incomplete version is presented to the jury (or instead very

shortly thereafter on cross examination, or even later during his own case) because the court rules that the omitted parts are inadmissible hearsay or (if the statement was an oral one) that *Rule 106* is inapplicable to oral statements, then he has only two remaining options: (1) allow the misleading version to stand unchallenged; or (2) waive his rights against self-incrimination and testify—but only after the government has completed its case. This is a high price to pay to correct misleading information. If one accepts, as the language of the Rule requires, that *Rule 106* may only be invoked in the first place to correct an unfair presentation of incomplete information, **[\*33]** then construing *Rule 106* the way that many courts have done countenances an abuse of the adversary system that the common-law rule of completeness was designed to prevent. That is why the better-reasoned cases have held that, where necessary to redress an unfairly incomplete rendition of a written, recorded or oral statement, evidence that would otherwise be inadmissible may be introduced.

Second, the goal of *Rule 106* and the common-law rule of completeness is to level the playing field, not tilt it in favor of the defendant. For that reason, it should only come into play when it is clear that the incomplete version of a written, recorded or oral statement is unfairly misleading. And only information that is essential to dispel the misleading impression should be admitted. This is especially true if, as the better-reasoned cases have concluded, inadmissible evidence may be used for this purpose. For this reason, judges have an obligation to carefully examine both the assertedly misleading information and the proffered completing information to insure that the evidence that was introduced requires clarification or explanation, and the proffered evidence is essential to clarify or explain. Careful consideration **[\*34]** of the factors that courts and commentators have developed will allow a judge to strike the right balance, and offset any concern about the use of inadmissible evidence where necessary to correct unfairly incomplete evidence. *See supra*, § II.A.2.

Third, there is little persuasive justification for not applying the same principles to oral statements that *Rule 106* applies to written or recorded ones. A misleading oral statement is no less unfair that a written one. And the cases that have allowed the use of *Rule 611(a)* to achieve this result seem better reasoned than the ones that have not. *See supra*, § II.B.2. Similarly, it seems ill-advised to conclude, as some courts have done, that only admissible evidence may be used under *Rule 106* or the common law rule of completeness without first considering the underlying purpose of the rule, which is to prevent an abuse of the adversary system. *See supra*, § II.A.1. One can hardly claim the moral high ground through a willingness to accept an unfair result in the name of

2017 U.S. Dist. LEXIS 80093, *34

evidentiary purity. As the D.C. Circuit noted in *Sutton*, "*Rule 106* can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness **[*35]** that the offered evidence should be considered contemporaneously. A contrary construction raises the specter of distorted and misleading trials, and creates difficulties for both litigants and the trial court." *801 F.2d at 1368-69*.

Finally, if a trial court is compelled by reason of the governing circuit authority to restrict *Rule 106* to writings and recorded statements (and precluded from using *Rule 611(a)* to adopt the protections of *Rule 106* for oral statements), or is prevented from admitting inadmissible evidence when necessary to dispel an unfairly misleading version of a written or oral statement introduced by the prosecutor, the court should carefully consider *Rule 403*. *See supra*, § II.B.3. If the incomplete version offered by the government would cause unfair prejudice to the defendant, or tend to mislead the jury, then the court—unable because of restrictions imposed by circuit authority to redress the prejudice—should prevent the government from introducing the unfairly misleading evidence to the jury.

The ultimate conclusions that I reach in light of the foregoing discussion are:

(1) *Rule 106* only covers writings or recordings, but its codification does not preempt the application of the common-law rule of completeness for oral statements **[*36]** and conversations. If the common-law rule is applied to oral statements and conversations, the court should consider the factors discussed at § II.A.2 to determine whether the completing information is required at the same time that the incomplete information is introduced or whether it should be admitted at cross examination or later.

(2) As an alternative means of dealing with oral statements or conversations, *Rule 611(a)* allows the trial judge to apply the same underlying logic of *Rule 106*.

(3) Neither *Rule 106* nor the common-law rule of completeness is triggered unless some clearly identifiably unfairness would exist without allowing the party that would be prejudiced the opportunity to offer information that would clarify or explain. The trial judge must carefully examine both the incomplete and completing information to insure that fairness does require the correction, and limit the correcting information to that actually needed to eliminate the unfairness. The factors discussed in § II.A.2 should be used by the judge in conducting this analysis.

(4) When the fairness principles that underlie *Rule 106* and the common-law rule of completeness require application of the doctrine, both admissible and inadmissible information **[*37]** should be available to set the record straight. While there is Fourth Circuit authority holding that inadmissible evidence may not be used, *Hassan, 742 F.3d at 134-35*; *Wilkerson, 84 F.3d at 696*, there also is authority holding that it may, *Gravely, 840 F.2d at 1163*, and until this split in authority has been resolved, a court may allow inadmissible evidence under the completeness doctrine, subject to the restrictions mentioned in my third conclusion above.

(5) If the Fourth Circuit should clarify that inadmissible evidence is not available to complete the record under *Rule 106*, the common law, or *Rule 611(a)*, then the trial court should carefully consider *Rule 403*, and if the unfairness that would result from the proponent's introduction of the incomplete information cannot adequately be addressed by other means, exclude the misleading information pursuant to *Rule 403*.

Date: November 6, 2017

/s/ Paul W. Grimm

United States District Judge

**End of Document**

**Add. 10**

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*30,982*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 8, 2018            /s/ Justin Eisele
                                  *Counsel for Appellant*

                                  /s/ John Iweanoge
                                  *Counsel for Appellant*

                                  /s/ Gerald Ruter
                                  *Counsel for Appellant*

                                  /s/ Richard Seligman
                                  Counsel for Appellant

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 8th day of January, 2018, I caused this Brief of

Appellants and Joint Appendix, and Supplemental Joint Appendix to be filed

electronically with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

> Jennifer R. Sykes
> Thomas P. Windom
> OFFICE OF THE U.S. ATTORNEY
> 6406 Ivy Lane
> Greenbelt, Maryland 20770
> (301) 344-0112
>
> *Counsel for Appellee*

I further certify that on this 9th day of January, 2018, I caused the required

copies of the Brief of Appellants and Joint Appendix, and Supplemental Joint

Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed

Volumes of the Joint Appendix to be served, via UPS Ground Transportation, upon

counsel for the Appellee, at the above address.

/s/ Justin Eisele
*Counsel for Appellant*

/s/ John Iweanoge
*Counsel for Appellant*

/s/ Gerald Ruter
*Counsel for Appellant*

/s/ Richard Seligman
Counsel for Appellant